SEYFARTH SHAW LLP
Robert W. Tollen (SBN 038875) rtollen@seyfarth.com
Janine S. Simerly (SBN 102361) jsimerly@seyfarth.com
Cassandra H. Carroll (SBN 209123) ccarroll@seyfath.com
560 Mission Street, Suite 3100
San Francisco, California 94105
Telephone: (415) 397-2823
Facsimile: (415) 397-8549

Attorneys for Defendant
SAFETY-KLEEN SYSTEMS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN WAMBOLDT, on behalf of himself, those similarly situated and on behalf of the general public,<br><br>Plaintiff,<br><br>v.<br><br>SAFETY-KLEEN SYSTEMS, INC., a Wisconsin corporation, and DOES 1 through 100, inclusive,<br><br>Defendant. | Case No. CV 07 00884 PJH<br><br>**SAFETY-KLEEN'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Date: August 8, 2007<br>Time: 9:00 A.M. |

1

2

**TABLE OF CONTENTS**

3    I.     STATEMENT OF ISSUES ................................................................................1

4    II.    MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S
       OVERTIME CLAIM ...................................................................................3

5

6          A.     FACTS ...................................................................................................3

7          B.     LAW ......................................................................................................8

8                 1.     Overtime Regulation ................................................................8

9                 2.     Motor Carrier Safety Exception ..............................................9

10                3.     California Motor Carrier Safety Regulation ...........................9

11                4.     The Amount Of Driving Time or Mileage Is Not Relevant
                        Unless it is *De Minimis* .......................................................11

12                5.     Conclusion .............................................................................15

13   III.   MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S
       COMMISSION CLAIM ............................................................................15

14

15         A.     FACTS .................................................................................................15

16         B.     LAW ....................................................................................................18

17

18

19

20

21

22

23

24

25

26

27

28

i

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

*Kerr v. Jeans,*
     193 F.2d 572 (5th Cir. 1952) ................................................................14

*Levinson v. Spector Motors,*
     330 U.S. 649 (1947)..............................................................12, 13, 14

*Morris v. McComb,*
     332 U.S. 422 (1947)....................................................................13, 14

*Phillips, Inc., v. Walling,*
     324 U.S. 490 (1945)...............................................................................12

**STATE CASES**

*Alcala v. Western Ag Enterprises,*
     182 Cal. App. 3d 546 (1986) ...............................................................12

*Bell v. Farmers Insurance Exchange,*
     87 Cal. App. 4th 805 (2001) ...............................................................12

*Building Material & Construction Teamsters Union v. Farrell,*
     41 Cal. 3d 651 (1986) ..........................................................................11

*Collins v. Overnight Transportation,*
     105 Cal. App. 4th 171 (2003) ..............................................8, 9, 12, 15

*Cortez v. Purolator Air Filtration Products Co.,*
     32 Cal. 4th 163 (2000) .........................................................................2

*Egan v. Egan,*
     251 Cal. App. 2d 577 (1967) ................................................................9

*Hernandez v. Mendoza,*
     199 Cal. App. 3d 721 (1988) ..............................................................12

*Hudgins v. Nieman Marcus Group, Inc.,*
     34 Cal. App. 4th 1109 (1995) ..............................................................21

*Kerr's Catering Service v. Dept. of Industrial Relations,*
     57 Cal. 2d 319 (1962) ..........................................................................21

*Nordquist v. McGraw-Hill Broadcasting Co. (1995) 32 Cal. App. 4th 555 (1995)....................11

*Quillian v. Lion Oil Company,*
     96 Cal. App. 3d 156 (1979) ................................................................21

*Ralphs Grocery Company v. Superior Court,*
     112 Cal. App. 4th 1090 (2003) .............................................19, 20, 21

*Ramirez v. Yosemite Bottling Company,*
     20 Cal. 4th 785 (1999) ...................................................................11, 12

ii

1

## OTHER AUTHORITIES

2

3    29 C.F.R. §§ 541.100(a)(2) ...................................................................................11

4    29 C.F.R. § 782.2(b)(3) .......................................................................................14

5    29 C.F.R. § 782.3(a) ...........................................................................................14

6    49 C.F.R. § 172.101 ...............................................................................5, 6, 7, 10

7    49 C.F.R. §§ 395.1 – 395.13 .............................................................................9, 11

8    29 U.S.C. §§ 201 *et seq* ......................................................................................11

9    FLSA § 7(a), 29 U.S.C. § 207(a) ..........................................................................12

10   FLSA § 13(b)(1), 29 U.S.C. § 213(b)(1) .....................................................11, 12, 13

11   8 CCR § 11070 ...................................................................................................19

12   8 CCR § 11010 ...................................................................................................19

13   13 CCR § 1160.3(d) ............................................................................................10

14   13 CCR §§ 1200 *et seq* .................................................................3, 9, 10, 11, 12, 15

15   California Labor Code

16        § 202.........................................................................................................2
          § 290.........................................................................................................9

          § 410.........................................................................................................9

17        § 510(a)..........................................................................................1, 2, 8, 9, 11
          § 515......................................................................................................8, 9

18        § 517.........................................................................................................8

          § 1171.......................................................................................................8

19        § 1173.......................................................................................................8
          § 1178.......................................................................................................8

20        § 1182.......................................................................................................8

          §§ 2698 *et seq* .........................................................................................2, 8

21        § 2699(a)...................................................................................................2

22   California Bus. & Prof. Code §§ 17200 et seq ...........................................................2

23   California Vehicle Code

24        § 353.......................................................................................................10
          § 2402.7...................................................................................................10

          § 34500.................................................................................................9, 10

25

26   Eight-Hour-Day Restoration and Workplace Flexibility Act of 1999 .............................8

27

28

1    **PLEASE TAKE NOTICE** that, on August 8, 2007, 2007, at 9:00 a.m., or as soon

2    thereafter as the matter may be heard, defendant Safety-Kleen will move for summary judgment

3    or, in the alternative, partial summary judgment against plaintiff Steven Wamboldt.  This motion

4    is brought in accordance with the Court's Minute Order, filed April 5, 2007, and the Court's

5    Stipulated Order, filed April 17, 2007.

6    **I.    STATEMENT OF ISSUES**

7            Defendant Safety-Kleen moves for summary judgment or, in the alternative, partial

8    summary judgment against plaintiff Steven Wamboldt.  Wamboldt was employed by Safety-

9    Kleen as a Customer Service Representative ("CSR").[1]  Wamboldt's First Amended Complaint

10   includes two independent claims:

11   •        That Safety-Kleen unlawfully failed to pay him premium pay for overtime work as

12            required by California Labor Code § 510.[2]  FAC ¶¶ 10, 27-28.

13   •        That Safety-Kleen unlawfully reduced his sales commissions by the overall

14            "profitability" of the branch in which he worked, FAC ¶ 10, or for failure of the branch to

15            meet branch "revenue goals."  FAC ¶ 12.  *See also* ¶ 27.

16   The complaint also includes three dependent or derivative claims, meaning they depend on

17   Wamboldt successfully establishing one or the other of his first two claims.  Wamboldt claims

18   that, by failing to pay him all wages due, i.e., overtime and commissions, Safety-Kleen also

19   violated –

20

21   _____

22   [1] The title has been changed to Sales and Service Representative ("SSR") without a change in
     duties.  The terms may be used interchangeably.

23   [2] Labor Code § 510(a):

24       "Eight hours of labor constitutes a day's work.  Any work in excess of eight hours in one
         workday and any work in excess of 40 hours in any one workweek and the first eight

25       hours worked on the seventh day of work in any one workweek shall be compensated at
         the rate of no less than one and one-half times the regular rate of pay for an employee.

26       Any work in excess of 12 hours in one day shall be compensated at the rate of no less
         than twice the regular rate of pay for an employee.  In addition, any work in excess of

27       eight hours on any seventh day of a workweek shall be compensated at the rate of no less
         than twice the regular rate of pay of an employee."

28

1

1   •      California Labor Code § 202,[3] which requires an employer to pay all wages due within 72

2          hours of an employee's quitting.  Complaint ¶¶ 13, 26.

3   •      The Unfair Competition Law ("UCL"), California Bus. & Prof. Code §§ 17200 et seq.,

4          FAC ¶¶'s 33-41, which provides for relief in the form of restitution from a person who

5          has engaged in an unlawful business practice.  Unlawfully withholding wages is an

6          unlawful business practice.  An order for payment of such wages is a restitutionary

7          remedy under the UCL.  *Cortez v. Purolator Air Filtration Products Co.*, 32 Cal.4[th] 163

8          (2000).

9   •      The California Labor Code Private Attorneys General Act of 2004 ("PAGA"), Labor

10          Code §§ 2698 *et seq.,*  FAC ¶¶ 7, 30,  which provides for judicial enforcement by an

11          aggrieved employee of civil penalties that could otherwise only be assessed and collected

12          by the California Labor and Workforce Development Agency.  Labor Code § 2699(a).

13          PAGA also authorizes civil penalties for violation of provisions of the Labor Code that

14          otherwise lack civil penalties, section 2699(f), and for judicial enforcement by an

15          aggrieved employee of those new civil penalties, section 2699(g).  The FAC fails to

16          identify a provision of the Labor Code that fits within either of PAGA's two branches.

17          At a minimum, there must be a violation of some provision of the Labor Code.  Plaintiff

18          has alleged only one: a violation of the Labor Code's overtime provisions.  Plaintiff's

19          commission claim is based on an alleged violation of a provision of an Industrial Welfare

20          Commission Order, which is not a part of the Labor Code.

21          Safety-Kleen moves for summary judgment against Wamboldt.  Safety-Kleen contends

22 that California's overtime requirements are "not applicable" to Safety-Kleen's CSR's, including

23 Wamboldt, pursuant to section 3(K)(2) of California Industrial Welfare Commission Order No.

24

25 [3] Labor Code § 202:

26     "If an employee not having a written contract for a definite period quits his or her employment, his or her wages shall become due and payable not later than 72 hours

27     thereafter, unless the employee has given 72 hours previous notice of his or her intention to quit, in which case the employee is entitled to his or her wages at the time of quitting."

28

1    7-2001.[4]  Within the meaning of section 3(K)(2), Safety-Kleen's CSR's are drivers whose hours

2    of service are regulated by Title 13 of the California Code of Regulations ("CCR") §§ 1200 *et*

3    *seq*.  Safety-Kleen also contends that it used branch revenue, not profitability, in calculating CSR

4    commission compensation and that nothing under California law prohibits that practice.   Once

5    Wamboldt's overtime and commission claims fail, then so too his waiting-time, Unfair

6    Competition Law, and Labor Code Private Attorneys General claims, because they depend on

7    the court's concluding that one or both of his first two claims was valid.

8    **II.     MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S
          OVERTIME CLAIM**

9

10        **A.     FACTS[5]**

11            Safety-Kleen is a provider of parts washers, environmental services, and industrial waste

     management.  Parts washers are machines used to remove dirt, grime, oil and other waste from
12
     various parts and equipment, such as, for example, gears, nuts and bolts, tools, wheel bearings
13
     and engine components.  The dirt and grease are removed by washing the part in a cleaning
14
     solvent in the parts washer.  A typical use would be in an automotive repair shop, where a
15
     mechanic removes a part from a vehicle and washes it in the parts washer to remove the oil and
16
     dirt, before inspecting it and determining whether to repair or replace it.  There are a multitude of
17
     items that can be cleaned in parts washer and a multitude of reasons for doing so.  Safety-Kleen
18
     sells or leases parts washers to customers and contracts with the customer to service them.
19
     Safety-Kleen also services parts washers owned by its customers or leased by them from other
20
     sources.
21

22

23   [4] IWC Order No. 7-2001, § 3(K):  "The provisions of this section [overtime] are not applicable to
     employees whose hours of service are regulated by:
24
     (1) The United States Department of Transportation Code of Federal Regulations, Title 49,
25           Sections 395.1 to 395.13, Hours of Service of Drivers; or

26   (2) Title 13 of the California Code of Regulations, subchapter 6.5, Section 1200 and the
             following sections, regulating hours of drivers."
27
     [5] This recitation of facts is supported by the Declaration of Billy R. Ross in Support of Motion
28   for Summary Judgment/Partial Summary Judgment, filed herewith, except where otherwise
     specifically indicated.

                                        3

1    Parts washers must be periodically serviced by removing used cleaning solvent and

2    replacing it with fresh.  That is done by Safety-Kleen's CSR's.  CSR's are also responsible for

3    maintaining and increasing Safety-Kleen's customer base by placing additional parts washers

4    and selling additional service contracts and other Safety-Kleen products and services.

5    CSR's drive trucks, like those pictured in the following three exterior and one interior

6    photographs.[6]

7

8

9        

10

11

12

13

14

15

16        

17

18

19

20

21

22

23    Each CSR has a territory.  A CSR starts the day at the CSR's branch.  There are thirteen

24    branches in California.  Wamboldt worked at the El Monte branch in the Los Angeles area.

25    After doing their paperwork, CSR's drive their trucks, loaded with 5, 16 and 30-gallon drums of

26    fresh cleaning solvent, additional parts washers and other Safety-Kleen products, to their

27    customers.  CSR's visit a range of from three to fifteen customers per day.  At the customer's,

28    [6] Pictures are in color if viewed on screen or if a color printer is used.

they remove the used cleaning solvent from the customer's parts washers and replace it with fresh solvent.  This is accomplished by switching out the drum of used solvent with a drum of fresh solvent on the "sink-on-a-drum" parts washer or by pumping out the used solvent into an empty waste drum on a tank or vat type parts washers and then pumping fresh solvent into the parts washer.

 

**Sink-on-a-Drum parts washer**        **Tank or vat type parts washer** [7]

The CSR then loads the drums of used solvent onto the truck.  At the end of the day, they return to their branches with the drums of used cleaning solvent collected throughout the day.

Mr. Wamboldt testified at his deposition that he drove approximately 40 miles each day and that, with traffic in the El Monte (Los Angeles) area, that amounted to about "two and a half hours" each workday "behind the wheel."  Wamboldt Deposition, tr. 230:13 – 231:9-20.[8]

CSR's transport hazardous materials.  In California, Safety-Kleen uses several parts washer cleaning solvents that are not classified as hazardous, but there are important exceptions. Two exceptions are AquaWorks® MM-SPRAY HD Concentrate "CORROSIVE LIQUID, BASIC, INORGANIC, N.O.S. (Contains Potassium Hydroxide), 8, UN 3266, III," and AquaWorks® MM-DIP Concentrate "CORROSIVE LIQUID, BASIC, INORGANIC, N.O.S. (Contains Potassium Hydroxide), 8, UN3266, III."  They are both listed on the Department of

---

[7] These are just two examples of parts washers.  There are many different kinds.

[8] Attached as Exhibit B to Declaration of attorney Robert W. Tollen, filed herewith.

1  Transportation's Table of Hazardous Materials, 49 CFR § 172.101,[9] p. 177, as "Corrosive liquid,

2  basic, inorganic, N.O.S., 8, UN 3266, III."  Attached as Exhibits A and B to the Ross Declaration

3  are the manufacturer's Material Safety Data Sheet (or "MSDS") for each of those two materials.

4  The MSDSs are required by the Occupational Safety and Health (OSHA) and are in a format

5  prescribed by that agency.  Section 14 shows the information conforming to the Department of

6  Transportation's Hazardous Materials Table.  As described in Section 3, those two materials can

7  be harmful to the respiratory track (sore throat, coughing, shortness of breath and/or mucous

8  membrane burns), eyes (irritation, redness, pain, blurred vision, burns and/or damage), skin

9  (irritation, redness, pain, blistering, and/or burns), and ingestion (painful swallowing, nausea,

10  vomiting, stomach pains, mouth-throat-gastrointestinal burns, lung injury and/or death).

11  Although many parts washers in California use non-hazardous cleaning solvents, some use these

12  two hazardous cleaning solvents.  Regardless of the needs of a CSR's daily scheduled customers,

13  every CSR in California normally carries at least one extra 30-gallon drum of MM-SPRAY and

14  one or more two-gallon jugs of MM-DIP in order to be ready to satisfy unscheduled needs of

15  existing or potential new customers.[10]  Mr. Wamboldt also normally carried other hazardous

16  materials on his route from branch to customers, including hazardous Parts Washer 105 Solvent

17  and hazardous paint thinner.[11]  Mr. Wamboldt acknowledged at his deposition that Department

18  of Transportation regulations "include, as hazardous material, the very solvents that [he] handled

19  on a daily basis driving [his] truck for Safety-Kleen."[12]

20       Safety-Kleen also provides industrial waste management services.  This industrial waste

21  includes DOT regulated corrosive, toxic, and flammable materials such as dry cleaning solvent

22  (perchloroethylene), chrome plating waste, brake cleaning solution (corrosive liquids), paint

23  thinners (methyl ethyl ketone and toluene), and petroleum distillates.  The industrial waste is

---

[9] Appendix A, filed herewith.

[10] In addition to the Declaration of Billy R. Ross, *see also* the Declaration of Johnny Jimenez and the Declaration Kevin Preson, submitted herewith.

[11] Declaration of Johnny Jimenez and the Declaration Kevin Preson, submitted herewith.

[12] Wamboldt Deposition, p. 168:15-25, Exhibit B to the Declaration of attorney Robert W. Tollen, filed herewith.

6

Safety-Kleen's Notice and Motion for Summary Judgment / Partial Summary Judgment
Case No. CV 07 00884 PJH

1    placed by the customer into DOT approved shipping containers such as 55-gallon steel drums

2    and 5-gallon plastic containers.  This industrial waste is transported by the CSR from the

3    customer's place of business back to the branch.  Much of this industrial waste is recognized as a

4    hazardous material by DOT and by the U.S. Environmental Protection Agency.  This hazardous

5    material must be shipped on a uniform hazardous waste manifest and the proper DOT shipping

6    name must be used to describe the hazardous material.  The DOT shipping name for a hazardous

7    material is determined by using the information contained in 49 CFR § 172.101, the Hazardous

8    Materials Table.

9         Safety-Kleen does not maintain readily retrievable data on materials transported from the

10   branch to the customers, but it does maintain such data on materials transported from customers

11   to the branch.  The system can retrieve every single shipment of material that each CSR

12   transported from a customer to the branch each day and can identify whether each such material

13   is classified as hazardous by the U.S. Department of Transportation.

14        Mr. Wamboldt was employed by Safety-Kleen from February 25, 2002, through May 25,

15   2002.  He filed his complaint on November 17, 2006.  Therefore, the maximum reach of his

16   claim, under a four-year statute of limitations, would be to November 17, 2002.

17        During the period from November 2002 through May 2005, on 85.7% of his actual

18   working days, Mr. Wamboldt transported hazardous waste from customers back to his branch.

19   See Exhibit C to the Ross Declaration (summary of the number and percentage of Wamboldt's

20   working days when he transported hazardous waste from customers to the branch).  See also,

21   Exhibit D to the Ross Declaration (list by date of each shipment of hazardous waste).  On Ross

22   Exhibit D, the hazardous material designations of each shipment are shown in columns G, H and

23   I.  They correspond to columns 2 through 6 on the Department of Transportation's Table of

24   Hazardous Materials (206 pages).[13]  The Ross declaration also attaches, as Exhibit E, four

25

26

27

28   _____
     [13] 49 CFR § 172.101, a copy is filed herewith as Appendix A for the court's convenience.

Safety-Kleen's Notice and Motion for Summary Judgment / Partial Summary Judgment
Case No. CV 07 00884 PJH

1   representative manifests signed by Mr. Wamboldt.  They are offered as illustrations of the source

2   of the data recorded on Exhibit D.[14]

3   **B.     LAW**

4   **1.     Overtime Regulation**

5          Prior to January 1, 2000, overtime under California law was regulated exclusively

6   by the Industrial Welfare Commission (hereafter "IWC"), a semi-legislative body authorized by

7   statute to issue regulations or orders governing wages, hours and working conditions.  Labor

8   Code §§ 1171, 1173, 1178, 1178.5, 1182.  Pursuant to that authority, the IWC had, for a number

9   of years, promulgated orders requiring premium pay for daily (over 8 hours) and weekly (over 40

10  hours) overtime.  *See generally, Collins v. Overnight Transportation,* 105 Cal.App.4th 171

11  (2003).

12         In 1997, the IWC repealed its daily overtime requirements.  In response, the Legislature

13  entered the field for the first time by enacting the Eight-Hour-Day Restoration and Workplace

14  Flexibility Act of 1999, Stats 1999 ch. 134 (AB 60), effective January 1, 2000 (referred to herein

15  as "AB 60").  A copy of AB 60 is filed herewith as Appendix B.  As a result of AB 60, certain

16  employment standards were fixed by statute, and the balance, as before, remained subject to

17  regulation by the IWC.

18         AB 60 created current Labor Code § 510.  It requires daily and weekly overtime.[15]  Under

19  AB 60, the IWC was directed to continue to issue regulations or orders, as it had before

20  enactment of AB 60, except that its actions were subject to the new statutory provisions.[16]  The

21  IWC has continued to do so, and its orders incorporate the statutory requirements of section 510

22  and other mandatory statutory provisions.

23

24  [14] We have redacted the names of the customers and their addresses for purposes of trade secret
    confidentiality.  Non-redacted copies can be presented *in camera* if the Court so wishes.

25  [15] The primary, but not exclusive, purpose of AB 60 was to restore *daily* overtime.  From the
    effective date of the IWC's 1997 action to the effective date of AB 60, i.e., the calendar years
26  1998 and 1999, California had no daily overtime requirement.

27  [16] During the first six months of 2000, the IWC was directed and authorized to issue orders
    without first convening wage boards, as otherwise required by Labor Code § 1178.  *See* Labor
28  Code §§ 515(a), 517(a).

Safety-Kleen's Notice and Motion for Summary Judgment / Partial Summary Judgment
Case No. CV 07 00884 PJH

1

2.      **Motor Carrier Safety Exception**

2          AB 60 also authorized the IWC to retain any exemption contained in its wage orders in

3    effect in 1997.  Labor Code § 515(b)(2).  One of those exceptions or exemptions (here invoked

4    by Safety-Kleen) presently appears as section 3(K) of Industrial Welfare Commission Order No.

5    7-2001 (Mercantile Industry).  *See* full text set forth in footnote 4, *supra*.[17]  California's overtime

6    requirements are not applicable to employees whose hours of service are regulated by either of

7    the two referenced sets of motor carrier safety regulations, i.e., 49 U.S.C. §§ 395.1 to 395.13 *or*

8    13 CCR §§ 1200 *et seq.  See also, Collins, supra.*

9

3.      **California Motor Carrier Safety Regulation**

10         The hours of service of Safety-Kleen's CSR's are regulated by 13 California Code of

11   Regulations ("CCR") §§ 1200 et seq, because all CSR's, specifically including plaintiff

12   Wamboldt, drive vehicles that transport hazardous materials.

13   •      Section 1200 is the first section of chapter 6.5 (Motor Carrier Safety) of CCR Title 13.

14          The chapter includes sections 1200 through 1293.  Section 1200 provides that the motor

15          carrier safety provisions of chapter 6.5 apply to all vehicles listed in Vehicle Code

16          § 34500.

17   •      Vehicle Code § 34500 provides that the department (of the California Highway Patrol[18])

18          "shall regulate the safe operations of" various vehicles including "(g) any truck[19]

19          transporting hazardous materials."

20

21   [17] The IWC issues its Orders on broad industry-wide bases, e.g.,  manufacturing, agriculture,
     transportation, mercantile, etcetera, and for certain occupations not covered by any industry
22   order.  Counsel for Safety-Kleen believes IWC Order No. 7-2001 is the correct Order applicable
     to Safety-Kleen.  It does not matter, for purposes of this motion, because the Orders all contain
23   the same exclusion from overtime.  "An identical exemption is contained in 11 other wage orders
     covering industries that may involve use of motor carriers."  *Collins v. Overnite Transportation,*
24   105 Cal.App.4[th] 171, 175 (2003).  All of the Orders are listed at http://www.dir.ca.gov/
     iwc/wageorderindustriesprior.htm.

25   [18] Vehicle Code § 290.

26   [19] Neither the Vehicle Code nor the regulations defines a "truck," but Vehicle Code § 410
     defines a "motortruck" as a "motor vehicle designed, used or maintained primarily for the
27   transportation of property."  The vehicles driven by Safety-Kleen CSR's are "motortrucks."  If
     they are "motortrucks," they are also "trucks," since "the general includes the specific."  *Egan v.*
28   *Egan,* 251 Cal.App. 2d 577, 582 (1967).

9

1    •     Vehicle Code § 353 defines "hazardous material" as "any ... material ... posing an

2    unreasonable risk to health, safety or property during transportation, as defined by

3    regulations adopted pursuant to [Vehicle Code] Section 2402.7."

4    •     Vehicle Code § 2402.7 authorizes the Commissioner of the California Highway Patrol to

5    adopt the definitions designated by the U.S. Department of Transportation relating to

6    hazardous materials, and the Commissioner has done so. *See* 13 CCR § 1160.3(d),

7    defining "hazardous material" as including materials designated as hazardous under 49

8    CFR § 172.101.

9    •     Section 172.101 of 49 CFR includes the Hazardous Materials Table (pp. 131 – 337),

10    listing materials designated by the U.S. Department of Transportation as hazardous.[20]

11    •     As noted, Wamboldt transported hazardous materials from his branch to his customers

12    each and every working day, and he transported hazardous waste from his customers to

13    his branch on 85.7% of his actual working days.

14    Because Wamboldt drove a vehicle covered by 13 CCR ch. 6.5, §§ 1200 *et seq.* (Motor

15    Carrier Safety), he was subject to safety regulations under 13 CCR § 1212.5 (Maximum Driving

16    and On-Duty Time), specifically including subsection (a)(2)(A) (prohibiting a motor carrier[21]

17    from permitting or requiring any driver[22] used by it to drive more than 12 hours following 8

18    consecutive hours off duty) and subsection (a)(2)(B) (prohibiting a motor carrier from permitting

19    or requiring any driver used by it to drive after having been on duty 15 hours following 8

20    consecutive hours off duty), and under sections 1212(b)(1) and (2) (adverse and emergency

21    conditions), 1213.1 (placing drivers out-of-service), 1213.2 (automatic on-board recording

22

---

23    [20] Appendix A, filed herewith.

24    [21] Defined as "The registered owner, lessee, licensee, ... or bailee of any vehicle who operates or directs the operations of any such vehicle on a for-hire or not-for-hire basis." 13 CCR § 1201

25    (g). Safety-Kleen owned or leased all vehicles driven by its CSR's. Declaration of Johnny Jimenez and the Declaration Kevin Preson, submitted herewith.

26    [22] Defined as "Any person ... who drives any motor vehicle subject to this chapter. 13 CCR §

27    1201(h). A "motor vehicle" is any "vehicle that is self-propelled." Vehicle Code § 415(a). Safety-Kleen CSR's drive self-propelled vehicles subject to chapter 6.5. Declaration of Johnny

28    Jimenez and the Declaration Kevin Preson, submitted herewith.

1    devices capable of recording and displaying hours of service, subsecs. (c) and (i)), and 1214

2    (driving while fatigued, ill, or other).[23]

3        In sum, Wamboldt's hours of service were regulated by 13 CCR ch. 6.5, §§ 1200 *et seq.*

4    On that basis, he was exempt from California overtime requirements.

5        **4.    The Amount Of Driving Time or Mileage Is Not**
        **Relevant Unless it is *De Minimis***
6

7        Under the exemptions for executive, administrative, and professional exemptions, an

8    employee must be engaged more than half the employee's time in exempt duties to qualify.

9    Labor Code § 515(a), (e); IWC Order No. 7-2001, §§ 1(A)(1)(e), 1(A)(2)(f), 1(A)(3)(b), and

10   2(N). The Fair Labor Standards Act has a similar (not identical) test for the its executive,

11   administrative and professional exemptions. *See* 29 CFR §§ 541.100(a)(2), 541.200(a)(3),

12   541.300(a)(2), 541.700 (employee's "primary duty" must be performance of exempt work).

13   There are no similar words or concepts in the IWC's exemption for employees whose hours of

14   service are regulated under either the U.S. Department of Transportation's regulations, 49 CFR

15   §§ 395.1 to 395.13, or under California's Motor Carrier Safety Regulations, 13 CCR §§ 1200 *et*

16   *seq.*

17       California's exemption was modeled after the similar motor carrier exemption of the Fair

18   Labor Standards Act (hereafter "FLSA"), 29 U.S.C. §§ 201 *et seq.  See* FLSA § 13(b)(1), 29

19   U.S.C. § 213(b)(1).  Because California wage laws are patterned on federal statutes, unless "the

20   language or intent of state and federal labor laws substantially differ," *Ramirez v. Yosemite*

21   *Bottling Company,* 20 Cal.4[th] 785, 798 (1999), federal cases interpreting the federal statutes may

22   serve as persuasive guidance for interpreting California law.  *Building Material & Construction*

23   *Teamsters Union v. Farrell,* 41 Cal.3d 651, 658 (1986); *Nordquist v. McGraw-Hill Broadcasting*

24   ───────────────
     [23] Appendix C, filed herewith.  Counsel for plaintiff cited those same regulations, specifically 13
25   CCR §1200(s), in their May 9, 2007, Opposition to Safety-Kleen's motion for summary
     judgment in the related *Perez* case, no. C 05-5338 PJH.  *See* pp. 9-10.  Counsel argued
26   inconsistently there that their clients were not subject to the Motor Carrier Safety Regulations,
     but that the section of those regulations that defined "on-duty time," section 1200(s), *was*
27   applicable to them.  The reason that counsel's clients were subject to section 1200(s) is that they
     were subject to the Motor Safety Carrier Regulations, 13 CCR §§ 1200 *et seq.*  On that basis,
28   they are exempted from the IWC's overtime regulations.

                                            11
     ───────────────────────────────────────────────
     Safety-Kleen's Notice and Motion for Summary Judgment / Partial Summary Judgment
     Case No. CV 07 00884 PJH

1    *Co.* (1995) 32 Cal.App.4th 555, 562 (1995); *Hernandez v. Mendoza,* 199 Cal.App.3d 721, 726,

2    fn. 1 (1988); *Alcala v. Western Ag Enterprises,* 182 Cal.App.3d 546, 550 (1986); *Bell v. Farmers*

3    *Insurance Exchange,* 87 Cal.App.4th 805, 817 (2001).  That approach is particularly appropriate

4    under the California Motor Carrier Safety Regulations, 13 CCR §§ 1200 *et seq.,* because they are

5    "a parallel set" of regulations to the federal motor carrier regulations.  *Collins v. Overnite*

6    *Transportation,* 105 Cal.App.4th 171, 175 (2003).

7           The FLSA requires time-and-a-half for time worked in excess of 40 hours per week.

8    FLSA § 7(a), 29 USC § 207(a).  FLSA section 13(b)(1), 29 USC § 213(b)(1), exempts "any

9    employee with respect to whom the Secretary of Transportation has power to establish

10   qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title

11   49."[24]

12          Like the safety program authorized by the California Legislature and developed by the

13   Department of the California Highway Patrol, "Congress, as a primary consideration, has

14   preserved intact the safety program which it and the Interstate Commerce Commission[25] have

15   been developing for  motor carriers." *Levinson v. Spector Motor Service,* 330 U.S. 649, 661

16   (1947).  "To do this, Congress has prohibited the overlapping of the jurisdiction of the … Wage

17   and Hour Division, United States Department of Labor, with that of the Interstate Commerce

18   Commission as to maximum hours of service." *Ibid.* "Such overlapping … has not been

19   authorized by Congress and it remains for [the courts] to give full effect to the safety program to

20   which Congress has attached primary importance, even to the corresponding exclusion by

21   Congress of certain employees from the overtime pay provisions of the [FLSA]." *Ibid.,* at 661-

22   662.

23          Like exemptions under California law, *Ramirez v. Yosemite Bottling Company, supra,* 20

24   Cal.4th at 794, exemptions under the FLSA are to be narrowly construed.  *Phillips, Inc.,* v.

25   [24] The FLSA merely requires that the Secretary of Transportation have "power" to regulate; the
     Secretary's actual exercise of the power is not required.  Under the IWC's exemption, the
26   employee must actually *be* regulated.  That difference is not relevant here, because Safety-
     Kleen's California CSR's, including Wamboldt, are actually regulated under the applicable
27   regulations.

28   [25] Predecessor to the Secretary of Transportation.

                                                    12

*Walling*, <u>324 U.S. 490</u>, <u>493</u> (1945).  That principle does *not* apply when narrowly construing the

exemption would also narrowly construe the jurisdiction of the agencies administering the motor

carrier safety programs:

> … [B]y virtue of the unique provisions of § 13(b)(1) of the [FLSA], we are *not* dealing with an exception to that Act which is to be measured by regulations which Congress has authorized to be made by the Administrator of the Wage and Hour Division, United States Department of Labor.  Instead, we are dealing here with the interpretation of the scope of the safety program of the Interstate Commerce Commission….  Congress, in the [FLSA], does not attempt to impinge upon the scope of the [ICC] safety program. It accepts that program as expressive of a … congressionally approved project. Section 13(b)(1) … thus requires that we interpret the scope of § 204 of the Motor Carrier Act in accordance with the purposes of the Motor Carrier Act and the regulations issued pursuant to it.  *It is only to the extent that the [ICC] does not have power to establish qualifications and maximum hours of service pursuant to said § 204, that the … [FLSA] has been made applicable* or its Administrator has been given congressional authority to act. *This interpretation puts safety first*, as did Congress. It limits the Administrator's authority to those employees of motor carriers whose activities do not affect the safety of operation…. *[W]e should approach the issue … squarely from the point of view of the safety program … apart from the [FLSA].*

*Levinson v. Spector Motors*, 330 U.S. 649, 676-677 (1947) (emphasis added).

> *It is the character of the activities rather than the proportion of* either *the employee's time* or of his activities that determines the actual need for the Commission's power to establish reasonable requirements with respect to qualifications, maximum hours of service, safety of operation and equipment.

*Ibid.,* at 674-675 (emphasis added); *Morris v. McComb,* 332 U.S. 422, 431-432 (1947).

> This line of reasoning … keeps within the jurisdiction of the Commission's safety program [classes of employees and work], provided only that the class or work … affects safety of operation, *regardless of whether or not in any particular week they have devoted more hours and days to activities not affecting safety of operation* than they may have devoted to those affecting such safety of operation.

*Levinson, supra,* at 675 (emphasis added).

> [A]n employee who is engaged in a class of work that affects safety of operation is *not necessarily engaged during every hour or every day* in activities that directly affect safety of operation. While the work of a full-duty driver may affect safety of operations during only that part of the time while he is driving, yet,

13

1
2
3
4

> as a practical matter, it is essential to establish reasonable
> requirements with respect to his qualifications and activities at all
> times in order that the safety of operation of his truck may be
> protected during those particular hours or days when, in the course
> of his duties as its driver, he does the particular acts that directly
> affect the safety of operations."

5 *Ibid.* at 675-676 (emphasis added).

6
7
8
9
10

> [If the employee is] called upon in the ordinary course of his work
> to perform, either regularly or from time to time, safety-affecting
> activities …, he comes within the exemption *in all workweeks*
> *when he is employed at such job*…. *[T]he rule applies regardless*
> *of the proportion of the employee's time or his activities which is*
> *actually devoted to such safety-affecting work* in the particular
> workweek, and the exemption will be applicable in a workweek
> when the employee happens to perform no work directly affecting
> safety of operation.

11
12 29 CFR § 782.2(b)(3) (emphasis added); *Kerr v. Jeans,* 193 F.2d 572, 573 (5th Cir. 1952).  The

exemption is inapplicable only where "such safety-affecting activities are so trivial, casual, and
13
insignificant as to be de minimis."  29 CFR § 782.2(b)(3).
14

15
16
17

> A "driver" … is an individual who drives a motor vehicle in
> transportation…. This definition does not require that the
> individual be engaged in such work at all times…. *Drivers …*
> *include … such partial duty drivers as … "driver-salesmen" who*
> *devote much of their time to selling goods rather than to activities*
> *affecting such safety of operation.*

18 29 CFR § 782.3(a) (emphasis added).

19         In *Kerr v. Jeans,* cited above, the plaintiff argued that, if the employer's contention were

20 true, "any employer who wished to defeat the purpose of the [FLSA] need only send a truck with

21 his employees to work in some type of safety of operations a few times each year … and thus

22 defeat the purpose of [the FLSA]."  193 F.2d at 574.  "That same argument [however] was

23 unsuccessfully employed in *Morris v. McComb,* [332 U.S. 422 (1947)]."  *Id.  Morris v. McComb*

24 held that the motor carrier exemption applied to drivers with respect to whom "only about 4% of

25 their time and effort [was] devoted to services in interstate commerce."  332 U.S. at 431.

26 Moreover, the exemption applied to the entire pool of 37 to 43 such drivers, notwithstanding that

27 the "interstate commerce trips were distributed generally throughout the year and their

28

14

1   performance was shared indiscriminately by the drivers and was mingled with the performance

2   of other … services rendered by them [not] in interstate commerce," so that only 9 out of 37

3   drivers made one or more such trips each week, most drivers made one such trip "*throughout the*

4   *year,*" and two never made such trips. *Ibid.,* at 433-434.

5          The federal regulations "establish a unique regulatory scheme regulating the driving

6   hours of truck drivers, which is designed to balance safety considerations against the demands of

7   the trucking industry." *Collins v. Overnight Transportation, supra,* 105 Cal.App.4[th] at 175.

8   "They exist under statutory authority for the regulation of motor vehicle safety." *Id.* "Those

9   motor carrier employees, whose hours of service are regulated by this set of safety standards,

10  have always been exempted from the coverage of the federal [FLSA]." *Id.* California's Motor

11  Carrier Safety Regulations at 13 CCR §§ 1200 *et seq.,* are "a parallel set of California

12  regulations." *Id.*

                              **5.    Conclusion**

14         Within the realm of *intrastate* commerce, the Department of the California Highway

15  Patrol regulates the hours of service of drivers in the same manner as the U.S. Secretary of

16  Transportation regulates the hours of service of drivers in *interstate* commerce. Just as Congress

17  provided for the FLSA to give way to the jurisdiction of the ICC (now Transportation

18  Department) under the Motor Carrier Act, the California IWC provided for California's overtime

19  regulations to give way to the safety jurisdiction of both the U.S. Department of Transportation

20  and the Department of the California Highway Patrol. Mr. Wamboldt's two and a half hours of

21  driving each day were not *de minimis.* He was subject to the jurisdiction of the Department of

22  the California Highway Patrol. California's overtime requirements were inapplicable to him.

23  **III.   MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S
         COMMISSION CLAIM**

24

25       **A.    FACTS**

26         Plaintiff Wamboldt challenges Safety-Kleen's 2004 Customer Service Representative

    Compensation Plan. Counsel for Wamboldt identified the specific plan in a letter dated

27  December 20, 2006, addressed to counsel for Safety-Kleen. The letter attached a copy of the

28

                                        15

1   plan. A copy of the letter and the plan are attached as Exhibit A to the Declaration of Attorney

2   Robert W. Tollen, filed herewith. The plan sets forth 9 steps. Counsel for Wamboldt flagged the

3   supposedly unlawful steps, numbers 3 and 4 on page 2. Further discussion herein regarding the

4   content of the plan are based on the Declaration of David Eckelbarger In Support of Motion for

5   Summary Judgment/Partial Summary Judgment, filed herewith.

6       The plan described four separate methods by which CSR's earned additional

7   compensation – or "variable payout" – beyond their salaries in 2004.  The first variable payout,

8   described in the first four steps, is the only one that is at issue. Steps 5, 6 and 7 described three

9   separate variable payouts, none of which is at issue. Step 8 totaled the four variable payouts.

10  Step 9 totaled the salary plus the total variable payout. All variable payouts were based on stand-

11  alone, non-cumulative four-week periods. Most Safety-Kleen financial administration is based

12  on such four-week periods.

13      Measuring a CSR's contribution to revenue is an inexact science. One problem is that

14  most of the sales a CSR brings into the company in one four-week period represent selling

15  efforts that took place before that four-week period, possibly long before. It can also often

16  represent selling efforts of the current CSR's predecessors. In addition to CSRs, Safety-Kleen

17  employs Sales Associates, who bear a greater responsibility than CSR's for selling services and

18  products. For all of these reasons, Safety-Kleen has frequently changed its variable

19  compensation formula, always trying to find the best way to relate variable compensation to a

20  CSR's contribution. The company did the same for its Sales Associates.

21      Under the 2004 plan, the first variable payout was determined pursuant to the first four

22  steps, each designed to affect a behavior:

23      First, CSR's earned "hurdle points." Hurdle points were based on a CSR's sales revenue

24  in a four-week period. Sales revenue consisted of (1) revenue received in that period for

25  servicing (cleaning, refreshing and replenishing) parts washers, (2) revenue received for

26  containerizing and removing waste, and (3) revenue received for product sales. It takes less

27  effort to sell services and products to industrial users than to commercial users, because more

28  sales can be made at one industrial location than at one commercial location. For that reason,

16

1   seven-tenths (.7) of a hurdle point was credited for each dollar of industrial sales, and a full

2   hurdle point was credited for each dollar of commercial sales.  A full hurdle point was credited

3   for each dollar of product sales.

4            Second, hurdle points were multiplied by a factor that increased as sales revenue

5   increased.  Like the allocation of hurdle points, this factor was designed to encourage CSR's to

6   do what they could to maintain or increase sales revenue.

7            Third, aside from sales revenue, Safety-Kleen wanted to encourage placements.  A

8   "placement" was physically placing a piece of equipment, like a parts washer, with a customer.

9   Parts washers normally remain Safety-Kleen property, but the customer signs a service contract.

10  Safety-Kleen's revenue comes from the customer's periodic payments under the service contract.

11  In addition to compensating CSR's for that revenue down the road, Safety-Kleen wanted to

12  provide immediate variable compensation for placements.  Therefore, hurdle points were

13  multiplied by a factor that increased as the number of placements increased.

14           The multipliers for volume of sales and for placements were accomplished in one step.

15  See the chart under Step 1.  For example, assume a CSR had been assigned 52,500 hurdle points

16  and had eight placements.  The 52,500 hurdle points would place the CSR in the row for 51,251

17  to 55,00 hurdle points, and the 8 placements would place the CSR in the column for 7+

18  placements.  The figure at that intersection is 5.50%.  It meant that the CSR's hurdle points

19  would be multiplied by .055 (52,500 x .055 = 2887.5).

20           Fourth, Safety-Kleen wanted to encourage cooperation among CSRs and between CSRs

21  and sales associates at a branch.  Each of them contributed to the branch's overall revenue.

22  Safety-Kleen wanted a way to recognize their collective contributions.  Each branch was

23  assigned a four-week revenue budget or goal.  The number resulting from step 2 was multiplied

24  by a factor that varied in accordance with the extent to which the branch met its goal.  That

25  calculation is set forth in the table opposite Steps 3 and 4 on page 2.  It produces the amount of

26  the first variable payout.  Sales Associates' variable compensation in that year had a similar

27  component.

28

17

1    The revenue referred to in steps 3 and 4 of the plan consisted of Safety-Kleen's fees or

2  charges billed to customers during the four-week period.  Safety-Kleen charged customers with

3  payment of money in return for parts cleaner services, vacuum services, containerized waste

4  management services, dry cleaning services, equipment sales, allied product sales, project

5  management fees, etcetera.  The company submitted bills to its customers for the payment of

6  those charges.  Instead of referring to "revenue" in steps 3 and 4 of the 2004 compensation plan,

7  it might have been more accurate to have referred to "billed" or "anticipated revenue," because it

8  was based on billings.  For CSR compensation under the 2004 plan, budgeted billings were

9  compared to actual billings.  That comparison was performed before any adjustment to billings

10  was made to account for bad debt, returns, customer complaints, or anything else.  Thus, those

11  adjustments did not enter into the calculation for CSR compensation.  As well, no expense of any

12  kind was taken into account.  Profitability, being a product of revenue and expenses, was also not

13  taken into account.  Steps 3 and 4 of the plan were based strictly on a comparison of actual

14  billings to customers to budgeted billings to customers.

15    The year 2004 was the only year Safety-Kleen used a factor of branch revenue

16  performance compared to branch revenue budget as a factor in setting CSR commissions.

17  **B.    LAW**

18    The First Amended Complaint alleges that plaintiffs' commissions were reduced by the

19  "profitability of the branch."  ¶¶ 10, 16, 17, 22(e), and 37.  Paragraph 12 alleges that commission

20  were reduced "to meet certain revenue goals."  Plaintiff's Notice of Motion to Amend

21  Complaint; Points and Authorities,[26] p. 4:24, recites that "Safety-Kleen failed to pay ... the full

22  amount of commissions due by reducing commissions earned and payable ... so as to

23  compensate Safety-Kleen for failure of the branch to meet certain revenue goals."  It further

24  recites, p. 5:1-6, that "[t]he California Labor Code also does not permit employees to take

25  deductions from employees for cash shortages experienced by the employer," citing "8 Cal.C.

26

27

28

[26] Filed herein on March 13, 2007.

18

1   Regs. § 11010 et seq. ¶ 8."[27]   The citation is not to the Labor Code.   It is to the Orders of the

2   IWC, which are published in the California Code of Regulations.   Section 8 of the IWC's Orders

3   reads in full:

4      Cash Shortage and Breakage

5      No employer shall make any deduction from the wage or require

6      any reimbursement from an employee for any cash shortage,
   breakage, or loss of equipment, unless it can be shown that the
   shortage, breakage, or loss is caused by a dishonest or willful act,

7      or by the gross negligence of the employee.

8   The IWC's Statements As To The Basis discuss the reasons for its Orders.   The Statement As To

9   The Basis for Order No. 7-80 (Revised) recites with regard to section 8 (as do all the statements

10   as to basis):[28]

11      Some prohibition against deductions from pay for shortage or

12      breakage has existed in IWC Orders since 1920.   It is apparent that
   the employee's welfare financially would be involved and his or

13      her employment possibly would be at stake if the employee could
   be charged for shortages without the protection of this section.

14      It is the IWC's intent that the employer can only deduct for cash

15      shortages or breakages if they are caused by the dishonest or
   willful act or gross negligence of the employee.

16      Safety-Kleen's commission compensation plan took branch revenue into account.   The

17   IWC's wage orders do not prohibit taking revenue into account.   They prohibit "use of certain

18   *expenses* in determining wages due an employee."   *Ralphs Grocery Company v. Superior Court,*

19   112 Cal.App.4th 1090, 1101 (2003) (emphasis added).   Since "profitability" is based on "not

20   only revenue but also … expenses," id., the use of profitability is also prohibited, if the expenses

21   that go into it are among the expenses that may not be taken into account.

22      The complaint in *Ralphs Grocery* was that the company was "basing its incentive

23   compensation, or bonus, on the *net* earnings of a store."   112 Cal.App.4th at 1094 (emphasis on

24   _____

25   [27] The IWC's Orders are published in the California Code of Regulations beginning at 8 CCR
§§ 11010 et seq.   They may more easily be accessed at the IWC's web site: http://www.dir.ca.
gov/IWC/iwc.html.   Counsel for Safety-Kleen believe the correct Order is No. 7-2001,  8 CCR §

26   11070, but it makes no difference which Order is applicable, because they all contain the same
language.

27   [28] Previously submitted as Appendix 22 to Opposition to Motion to Amend, filed April 10, 2007.

28   A copy is submitted herewith as Appendix D.

Safety-Kleen's Notice and Motion for Summary Judgment / Partial Summary Judgment
Case No. CV 07 00884 PJH

1   net in the original).  Net earnings are calculated by subtracting expenses.  Safety-Kleen's plan

2   does not take account of expenses, profitability, or net earnings.  It is based solely on revenue.

3   No statute, IWC regulation, or reported court case has ever prohibited an employer from taking

4   revenue into account in designing a commission or incentive plan.

5        In *Ralphs Grocery, supra,* the court noted that there are "persuasive arguments, supported

6   by substantial academic literature, that profit-based compensation plans benefit both employers

7   and employees" and that, "as a matter of economics, calculation of an incentive bonus based on

8   profitability … differs markedly from reducing … wages through prohibited deductions."

9   Nevertheless, the court held, "to the extent [the Legislature or the IWC] has prohibited the use of

10  certain *expenses* in determining wages …, economic reality must yield to regulatory imperative."

11  Id. (emphasis added).  Safety-Kleen's commission plan uses no expenses.  There is no regulatory

12  imperative to which its economic reality must yield.

13       The claim in *Ralphs Grocery* was valid because it alleged that Ralphs Grocery's plan was

14  based on profitability, which, in turn, was based on prohibited expenses.  "To the extent the

15  bonus calculation includes *expense* items the Legislature or the [IWC] has declared may not be

16  charged to an employee …, such a bonus plan is unlawful."  112 Cal.App.4th at 1094 (emphasis

17  added).

18       However, other expense items, *even those beyond the individual*
         *manager's direct control,* may lawfully be considered in profit-
19       based bonus programs, which can serve as an effective economic
         incentive … to maximize company profit by increasing revenue
20       and minimizing expenses.  *Because the complaint in this case*
         *alleges the bonus plan … includes deductions for expenses within*
21       *the first prohibited category,* it states causes of action for unlawful
         deductions from wages and unlawful business practices.
22
    *Id.* (emphasis added).  The Safety-Kleen plan made no deduction for expenses, neither prohibited
23
    expenses nor allowed expenses.  Safety-Kleen's management believed in 2004 that basing a
24
    CSR's compensation in part on the degree to which his or her branch met its revenue goals
25
    would "serve as an effective economic incentive [to the CSR] to maximize company profit by
26
    increasing revenue," *id.*, but no part of that incentive was based on expenses that California
27
    prohibited an employer from taking into account – or on any expense.
28

Safety-Kleen's Notice and Motion for Summary Judgment / Partial Summary Judgment
Case No. CV 07 00884 PJH

1       All of the other case law is examined in *Ralphs Grocery*: *Kerr's Catering Service v.*

2   *Dept. of Industrial Relations,* 57 Cal.2d 319 (1962); *Quillian v. Lion Oil Company*, 96

3   Cal.App.3d 156 (1979); and *Hudgins v. Nieman Marcus Group, Inc.,* 34 Cal.App.4th 1109

4   (1995). The sales commission in *Kerr's Catering* was "subject to reduction for any cash and

5   inventory shortages." 112 Cal.App.4th at 1098. The bonus in *Quillian* was based on

6   "merchandise or cash shortages." 112 Cal.App.4th at 1099-1100. Sales associates' commissions

7   in *Hudgins* were subject to reduction for commissions previously paid for unidentified returns in

8   violation of California's prohibition on "deductions from an employee's wages for cash

9   shortages, breakage, loss of equipment, and other business losses that result from the employee's

10  simple negligence." 112 Cal.App.4th at 1100-1101; *Hudgins*, 34 Cal.App.4th at 1118.

11      The above opinions criticize the practice of making deductions for losses "beyond the

12  employees' control," so as to make employees "insurers of the employer's merchandise," *Kerr's*

13  *Catering*, 57 Cal.2d at 327; *Hudgins*, 34 Cal.App.4th at 1124. Those pronouncements are made

14  in the context of an employer that makes deductions from employee compensation to make up

15  for expenses of the business. The *Ralphs Grocery* court held non-prohibited expenses, "even

16  those beyond the individual manager's control, may lawfully be considered." 112 Cal.App.4th at

17  1094. The above opinions do not declare it unlawful to base commission or incentive pay on the

18  combined efforts of two or more employees.

19      Based on its review of the case law, the *Ralphs Grocery* court concluded that, to the

20  extent the bonus calculation in that case included "*expense* items the Legislature or the [IWC]

21  has declared may not be charged to an employee …, such a bonus plan is unlawful." 112

22  Cal.App.4th at 1094 (emphasis added). Safety-Kleen's commission compensation plan includes

23  no expense item. It is lawful.

24  DATED: May 30, 2007

        SEYFARTH SHAW LLP
25          Robert W. Tollen
        Janine S. Simerly

26

27          By Robert W. Tollen
        Attorneys for Defendant
28          SAFETY-KLEEN CORP.

Safety-Kleen's Notice and Motion for Summary Judgment / Partial Summary Judgment
Case No. CV 07 00884 PJH