SEYFARTH SHAW LLP
Robert W. Tollen (SBN 038875) rtollen@seyfarth.com
Janine S. Simerly (SBN 102361) jsimerly@seyfarth.com
Cassandra H. Carroll (SBN 209123) ccarroll@seyfarth.com
560 Mission Street, Suite 3100
San Francisco, California 94105
Telephone: (415) 397-2823
Facsimile: (415) 397-8549

Attorneys for Defendant
SAFETY-KLEEN SYSTEMS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN WAMBOLDT, on behalf of himself, those similarly situated and on behalf of the general public, <br><br> Plaintiff, <br><br> v. <br><br> SAFETY-KLEEN SYSTEMS, INC., a Wisconsin corporation, and DOES 1 through 100, inclusive. <br><br> Defendant. | Case No. CV 07 00884 PJH <br><br> **SAFETY-KLEEN'S REPLY MEMO IN SUPPORT OF SUMMARY JUDGMENT/PARTIAL SUMMARY JUDGMENT** <br><br> Date: August 8, 2007 <br> Time: 9:00 A.M. |

# TABLE OF CONTENTS

Page

I.     MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S OVERTIME
       CLAIM..................................................................................................................1

       A.    THE EXEMPTION TURNS ON ACTUAL DUTIES AND ACTIVITIES;
             METHODS OF COMPENSATION ARE IRRELEVANT.....................................1

       B.    THE MOTOR CARRIER SAFETY EXEMPTION IS NOT TO BE
             NARROWLY CONSTRUED. ...............................................................................1

       C.    PLAINTIFF IS SUBJECT TO IWC ORDER NO. 4 OR 7; IT IS NOT
             NECESSARY TO RESOLVE WHICH. .................................................................2

       D.    WAMBOLDT IS A DRIVER SUBJECT TO THE MOTOR CARRIER
             SAFETY REGULATIONS. ..................................................................................6

       E.    WAMBOLDT TRANSPORTED HAZARDOUS MATERIALS.........................11

       F.    CLASS CERTIFICATION...................................................................................13

II.    MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S COMMISSION
       CLAIM................................................................................................................13

Safety-Kleen's Reply Memo In Support Of Summary Judgment/Partial Summary Judgment,
Case No. CV 07 00884 PJH

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Cleveland v. Policy Management Systems Corp.*,
    526 U.S. 795 (1999)..............................................................................11

*Crooker v. Sexton Motors, Inc.*,
    469 F.2d 206 (1st Cir. 1972)....................................................................8

*Friedrich v. U.S. Computer Services*,
    974 F.2d 409 (3rd Cir.1992) ....................................................................2

*Gerard v. Northern Transportation*,
    146 F. Supp. 2d 63 (D. Me. 2001) ...........................................................9

*Levinson v. Spector Motor Service*,
    330 U.S. 649, 67 S. Ct. 931, 91 L. Ed. 1158 (1947)...........................2, 7

*Morris v. McComb*
    332 U.S. 422, 434, n.13 (1947) ................................................................9

*Porter v. Poindexter*,
    158 F.2d 759 (10th Cir. 1947) ..................................................................1

## STATE CASES

*California School of Culinary Arts v. Lujan*,
    112 Cal. App. 4th 16 (2003) ...................................................................10

*Collins v. Overnight Transportation*,
    105 Cal. App. 4th 171 (2003) ...................................................................2

*Conley v. Pacific Gas & Elec.*,
    131 Cal. App. 4th 260 (2005) .................................................................10

*Harrington v. Despatch Industries*,
    2005 WL. 1527630 (D. Mass. 2005) .....................................................2, 9

*Murphy v. Kenneth Cole*,
    40 Cal. 4th 1094 (2007) .........................................................................11

*Ralphs Grocery v. Superior Court*,
    112 Cal. App. 4th 1090 (2003) ...............................................................13

*Tidewater Marine Western, Inc., v. Bradshaw*,
    14 Cal. 4th 557 (1996) ...........................................................................10

## FEDERAL STATUTES

29 C.F.R. § 782.2(b)(3).................................................................................8

29 U.S.C. § 213(b)(1) ...................................................................................2

ii

1

**MISCELLANEOUS**

2  IWC Orders, §§ 1(A)(1)(3), (2)(f), (3)(b) *and* 2(N) ......................................................7

3  8 CCR § 1212 ...................................................................................................6

4  8 Cal.C.Regs. § 11010 *et seq* .........................................................................5

5  13 CCR §1201(h).............................................................................................7

6  Labor Code § 515(a) ..........................................................................1, 7, 13

7  Vehicle Code § 34500.........................................................................12

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Safety-Kleen's Reply Memo In Support OF Summary Judgment/Partial Summary Judgment,
Case No. CV 07 00884 PJH

I.     **MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S OVERTIME CLAIM**

A.     **THE EXEMPTION TURNS ON ACTUAL DUTIES AND ACTIVITIES; METHODS OF COMPENSATION ARE IRRELEVANT.**

Plaintiff's Opposition argues that Wamboldt could not be exempt because Safety-Kleen treated him as non-exempt. An employee's actual activities or duties determine whether the employee is exempt, not how the employer classifies or treats the employee. *Porter v. Poindexter*, 158 F.2d 759, 761 (10th Cir. 1947). Plaintiff thinks Safety-Kleen treated Wamboldt as non-exempt because he was hourly-paid. Safety-Kleen's CSR's were paid a guaranteed base salary of $ 32,000 per annum plus commissions,[1] but the method of payment is irrelevant. The motor carrier safety exemption does not require that qualifying employees must be salaried. It does not require any particular method of compensation. Plaintiff confuses the executive, administrative and professional exemptions with the motor carrier safety exemption. The latter three exemptions require that a qualifying employee must be salaried. Labor Code § 515(a). They are irrelevant to the motor carrier safety exemption.

B.     **THE MOTOR CARRIER SAFETY EXEMPTION IS NOT TO BE NARROWLY CONSTRUED.**

Contrary to plaintiff's argument, the motor carrier safety exemption is not to be narrowly construed, and its application is not limited to employees "plainly and unmistakably" within its terms. None of the cases cited by plaintiff involves the motor carrier safety exemption or its federal parallel. While Safety-Kleen does not dispute that it bears the burden of proof in an overtime case, the burden is the same as the burden in any other case: predominance of the evidence. The reason is that (a) the motor carrier safety exemption and (b) coverage under the Department of the California Highway Patrol's Motor Carrier Safety regulations are mirror images one of the other. To the extent that the exemption is denied, the jurisdiction of the Department is denied. To the extent that the jurisdiction of the Department is acknowledged, the

---

[1]  Wamboldt deposition, pp. 42:7-9, 44:11-13, 134:10-11; Second Declaration of Robert W. Tollen, filed herewith. *See also,* Declaration of Wamboldt in Support of Motion for Class Certification, May 18, 2007, p. 2:24 ("I was paid a salary of $ 32,000 per year.").

1

1   exemption is acknowledged.  An employee may not be subject to the Department's Motor

2   Carrier Safety regulations and not exempt or vice versa.  Imposing a "plain and unmistakable"

3   standard on the jurisdiction of the Department of the California Highway Patrol is not

4   permissible.  Therefore, it may not, and cannot, be imposed on the exemption.

> The MCA [Motor Carrier Act] was enacted in 1935 "to promote efficiency, economy, and safety in the rapidly burgeoning motor transportation industry." *Friedrich v. U.S. Computer Services*, 974 F.2d 409, 412 (3rd Cir.1992). The MCA "vested in the Interstate Commerce Commission power to establish reasonable requirements with respect to qualifications and maximum hours of service of employees and safety of operation and equipment of common and contract carriers by motor vehicle." *Levinson v. Spector Motor Service*, 330 U.S. 649, 658, 67 S.Ct. 931, 91 L.Ed. 1158 (1947). The FLSA wage and hour standards were enacted three years after the MCA with an exception for employees over "whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of [the MCA]." 29 U.S.C. § 213(b)(1).
>
> In making an exception, Congress's purpose was to avoid a jurisdictional conflict between the Secretary of Labor and the Secretary of Transportation by giving precedence to the MCA as a public safety statute. *See Levinson*, 330 U.S. at 662 ("It remains for us to give full effect to the [MCA's] safety program to which Congress has attached primary importance, even to the corresponding exclusion by Congress of certain employees from the benefits of the compulsory overtime pay provisions of the Fair Labor Standards Act.").

16  *Harrington v. Despatch Industries*, 2005 WL 1527630, *3-4 (D. Mass. 2005) (copy attached).

17  California's Motor Carrier Safety regulations are "a parallel set of California regulations" to the

18  federal motor carrier regulations.  *Collins v. Overnight Transportation*, 105 Cal.App.4th 171,

19  175 (2003).  The exemption requires that full effect be given to the California Highway Patrol's

20  safety program, even to the corresponding exclusion of certain employees from the benefits of

21  California's overtime provisions.

## C.   PLAINTIFF IS SUBJECT TO IWC ORDER NO. 4 OR 7; IT IS NOT NECESSARY TO RESOLVE WHICH.

The Industrial Welfare Commission (IWC) is a quasi-legislative body.  The Division of

Labor Standards Enforcement (DLSE) is not; it is an enforcement agency.  The IWC has issued

17 wage orders with no explanation of their interrelationships.  Some of them cover very broad

categories, the manufacturing industry, for instance.  Others cover relatively narrow categories,

industries preparing agricultural products for market, on the farm, for example.  Many businesses

2

operate in more than one industry.  DLSE fills the void with its pamphlet, *Which IWC Order?*

*Classifications* (January 2003) (referred to herein as "Pamphlet").[2] While DLSE makes no

stronger claim for the pamphlet than calling it a "guide," *see* the pamphlet's front page, it is all

we have.  The pamphlet provides the following explanation at page 2:

> In order to determine which [IWC] Order applies to an employee or a
> business, it is first necessary to determine if a business is covered by an
> industry order.  An industry order (IWC Orders 1, 2, 3, 5, 6, 7, 8, 9, 10, 11,
> 12 and 13) regulates wages, hours and working conditions in specific
> industries.  An order is an industry order if the title of the order contains
> the word "industry."  Otherwise, the order is an occupational order (IWC
> Orders 4, 14, 15, 16 and 17).  Wage, hour and working condition
> regulations contained in an occupational order only apply when a business
> is not covered by an industry order…
>
> A business is classified according to the main purpose of the business
> except in the case of IWC Order No. 5… Large businesses may conduct a
> variety of operations and it may appear initially that different industry
> orders could apply.  However, when those operations are part of the main
> business, only one order will apply.

The industry order most likely to cover Safety-Kleen's business is Order No. 7.  In the

related case of *Perez v. Safety-Kleen*, where plaintiffs are represented by the same counsel as

here, plaintiffs explicitly alleged that they were subject to Wage Order No. 7.  Complaint, ¶¶ 1,

22, 38(b)(ix), and 41.  Wage Order No. 7 covers "any industry, business, or establishment

operated for the purpose of … selling, or distributing goods or commodities at wholesale or

retail; or for the purpose of renting goods or commodities."  Order No. 7, § 2(H).  As

Wamboldt's First Amended Complaint recites, ¶ 8, Wamboldt's duties included "(i) sales to

potential and existing customers" and activities in support of sales.  As Wamboldt notes in his

declaration, ¶ 5, he "was paid commissions based on my sales and service revenue."

Commissions are a common form of payment to employees who are responsible for sales.

During an earlier period of employment for Safety-Kleen, Wamboldt was paid "commission

only."  Wamboldt Declaration, ¶ 7.  According to plaintiff, the "primary job duties" of a CSR

were "to service Safety-Kleen's customers, including selling, collections, and servicing

equipment."  Wamboldt Motion for Class Certification, p. 1:9-10.

---

[2]  Exhibit C to the Ramos Declaration in Opposition to Motion for Summary Judgment.

1    If Order No. 7 were not applicable, then Safety-Kleen's CSR's would be covered by

2    IWC's Order No. 4 (Professional, Technical, Clerical, Mechanical and Similar Occupations).

3    Section 2(O) of that Order includes a long, list of disparate covered occupations, among them

4    installers, machine operators, mechanics, vehicle operators, and "kindred occupations."   DLSE's

5    pamphlet, pp. 13-17, also lists vehicle drivers, hazardous materials cleanup and handling when a

6    contractor's license is not required, and truck drivers.

7    Plaintiff suggests that Order No. 16 applies, because it is one of five of 17 orders that

8    lack a motor carrier safety exemption.[3]  Plaintiff argues for Order No. 16, because the pamphlet

9    "specifically identifies the occupation of hazardous materials handler" as falling under that

10   Order.  Opposition, p. 6:19; Pamphlet, p. 29.  However, Wage Order No. 16 does not apply

11   because it is applicable solely to certain on-site occupations in the construction, drilling, logging

12   and mining industries.  Each of those industries is defined in section 2 of the Order.  Safety-

13   Kleen and its CSR's are not in the construction, drilling, logging or mining industry.

14   Plaintiff's acknowledgement that Mr. Wamboldt is a "hazardous material handler,"

15   Opposition, p. 6:19-20, places him squarely under Wage Order No. 4.  The occupation of

16   hazardous material cleanup and handling can fall under Wage Order No. 16 only when a

17   contractor's license is required.  Pamphlet, p. 29.  Safety-Kleen's CSR's must have vehicle

18   licenses with hazmat endorsements,[4] but not contractor's licenses.  When a contractor's license is

19   not required, then that same occupation falls under Wage Order No. 4.  Pamphlet, p. 15.

20   Whether characterized as vehicle driver, hazardous materials cleanup and handler, mechanic,

21   truck driver or vehicle operator, Safety-Kleen's CSR's fall under Order No. 4, if they do not fall

22   under Order No. 7.

23   Plaintiff also suggests CSR's might fall under Wage Order No. 17 (Miscellaneous

24   Employees).  Opposition, p. 7:1-2.  DLSE's pamphlet recites that no occupations have been

25   identified as meeting the definition of "miscellaneous employees."  Pamphlet, p. 32.

26
27   [3]  The other four are No. 11 (Broadcasting Industry); No. 12 (Motion Picture Industry); No. 15
     (Household Occupations); and No. 17 (Miscellaneous Employees).
     [4]  Steve Hawkins Deposition, pp. 46-48; Second Declaration of Robert W. Tollen, submitted
28   herewith.

4

1        In moving to amend his complaint to add his commission compensation claim, plaintiff

2    Wamboldt represented to the Court that "the California Labor Code does not permit deductions

3    from employees for cash shortfalls experienced by the employer." Notice of Motion to Amend

4    Complaint, p. 5:1-2. *See also*, Wamboldt's Reply Memorandum, 5:9-11. There is nothing in the

5    Labor Code that says anything about cash shortages, but Wamboldt correctly cites "8 Cal.C.Regs

6    § 110010 *et seq.* ¶ 8." Notice of Motion, p. 5:2; Reply, p. 5:11.[5] *See also*, Opposition, p. 23:5.

7    The citation is to the IWC's wage orders. All 17 are listed in 8 CCR beginning at section 11010.

8    They are also listed on the IWC's web page: http://www.dir.ca.gov/iwc/

9    wageorderindustries.htm. Section 11010 of the regulations is Order No. 1 (Manufacturing

10   Industry). The last three digits "010" correspond to "1" in the Orders listed on the IWC's web

11   site. Section 11020 is Order No. 2 (Personal Services Industry), and all the way through to

12   section 11090, which is Order No. 9 (Transportation Industry). Then, the section numbers of the

13   regulations start over again with section 11110, which is Order No. 10 (Amusement and

14   Recreation Industry), through section 11117, which is Order No. 17 (Miscellaneous

15   Occupations).

16       Paragraph 8 in Wamboldt's citation (8 Cal.C.Regs. § 11010 *et seq.* ¶ 8) is the section of

17   the orders that prohibits an employer making deductions from wages for cash shortages,

18   breakage or loss of equipment. There is an identical prohibition, always paragraph 8, in each of

19   the wage orders from 1 through 15. There is no such language in Orders 16 or 17. Thus, by

20   alleging that Safety-Kleen violated 8 Cal.C.Regs. § 11010 *et seq.* ¶ 8, prohibiting deductions for

21   cash shortfalls, Wamboldt alleged that he is subject to one of the Orders from 1 through 15 and

22   not to Orders 16 or 17. If Wamboldt were subject to either Order 16 or Order 17, he would not

23   be subject to a prohibition on deducting for cash shortages, as there is no such prohibition in

24   those Orders. As stated, the two of the Orders most applicable are 4 and 7. No other Order can

25   apply. As between those two orders, it does not matter which is correct, because each contains

26   the motor carrier safety exemption.

27   [5] The California Code of Regulations may be found on-line at http://www.oal.ca.gov. Go to
Title 8 (Industrial Relations), Division. 1 (Department of Industrial Relations), Ch. 5 (Industrial

28   Welfare Commission).

1
2

**D.    WAMBOLDT IS A DRIVER SUBJECT TO THE MOTOR CARRIER SAFETY REGULATIONS.**

3

Contrary to plaintiff's reading of the Motor Carrier Safety regulations, Opposition, p.

4

7:14-15, "drivers" and "driver-salespersons" are not two different categories.  A "driver-

5

salesperson" is a subcategory of a "driver."  All driver-salespersons are drivers, but not all

6

drivers are driver-salespersons.  The reason is that driver-salespersons may be excluded from

7

some (but not all) of the Motor Carrier Safety regulations otherwise applicable to drivers.  *See* 8

8

CCR § 1212 (Drivers' Hours of Service) (emphasis added):

9

> (a) General.  The rules in this section and Sections 1212.5 and 1213 apply
> to all motor carriers and *drivers*, except as provided in paragraphs (b)
> through (i) of this section.  …

10
11

> (c) Driver-salesperson.  The provisions of Section 1212.5(b) shall not
> apply to any driver-salesperson whose total driving time does not exceed
> 40 hours in any period of seven consecutive days.

12

The motor carrier safety rules in sections 1212, 1212.5, and 1213 apply to all "drivers," except as

13

specifically excepted.  Driver-salespersons are excepted from the rules in section 1212.5(b).  If

14

"driver-salespersons" were not "drivers," there would be no need to except them from rules

15

otherwise applicable to all "drivers."

16

A "driver" is defined as "Any person, including the owner-driver, who drives any motor

17

vehicle subject to this chapter, and any person, whether driving for compensation or not, who is

18

under the direct control of and drives for a motor carrier."  8 CCR § 1201(h).  The definition

19

places no minimum or threshold on the amount of driving required and no limit on the amount of

20

other work allowed.  If a person drives, that person is a "driver," and the Motor Carrier Safety

21

regulations of sections 1212, 1212.5, and 1213 "apply to all … drivers."  8 CCR § 1212(a).

22

Under the definition of "driver-salesperson," section 1201(i), that person must not devote

23

more than 50% of all hours to driving.  Plaintiff turns that definition on its head by arguing that,

24

if a driver-salesperson may not devote more than 50% of his or her time to driving, then a

25

"driver" must.  Opposition, pp. 8:8-18.  As stated, "drivers" and "driver-salesperson" are not

26

mutually exclusive categories.  "Driver-salespersons" are a subset of "drivers."  There is no

27

requirement quantifying the amount of time a "driver" must drive.  There is only a limitation on

28

6

1    the time a "driver-salesperson" may drive to qualify for relief from some of the motor carrier

2    safety rules otherwise applicable to all "drivers."

3         Plaintiff writes that, "Consistent with 13 CCR 1201's definitions," DLSE has specifically

4    stated in its Interpretative Manual that to be exempt ..., a 'driver' must 'drive' more than 50

5    percent of the workday." Opposition, p. 9:2-5. In fact, the materials cited show that DLSE

6    "*Deleted* language re must regularly be engaged (50% of time) in driving; substituted entitled to

7    overtime pursuant to *Crooker v. Sexton Motors, Inc.*"[6] The reason is that the earlier language, on

8    which plaintiff still relies, was wrong.

9         In order to qualify for the executive, administrative or professional exemptions, an

10   employee must be engaged in exempt duties more than half the employee's time. Labor Code

11   § 515(a) and (e); IWC Orders, §§ 1(A)(1)(3), (2)(f), (3)(b) *and* 2(N) (definition of "primarily").

12   In order to qualify for the outside salesperson exemption, IWC Orders § 1(C), an employee must

13   work more than half the time away from the employer's premises. Section 2(M).[7] The motor

14   carrier safety exemption contains no such language or limitation. Neither do the regulations that

15   it incorporates. The exemption is absolute. The overtime provisions "are not applicable to

16   employees whose hours of service are regulated by [13 CCR §§ 1200 *et seq.*]." The regulations

17   apply to the hours of service of "any person ... who drives any motor vehicle." 13 CCR

18   §1201(h). Motor Carrier Safety regulation is not limited to the days a driver drives. For

19   example, section 1212.5(b)(2) prohibits an intrastate driver from driving if the driver has been

20   "on duty" for 80 hours in any consecutive eight days, regardless of the amount of time driving.

21   *See* section 1201(s), defining "on duty" time. Section 1213(c)(4), (g)(11) requires that "on duty

22   not driving" time be recorded. For purposes of motor carrier safety, "it is essential to establish

23   reasonable requirements with respect to [a driver's] ... activities at all times in order that safety

24   of operations ... may be protected during those particular hours or days when ... he does

25   [drive]." *Levinson v. Spector Motors,* 330 U.S. 649, 675-676 (1947). The language DLSE

---

26   [6] *See* DLSE Enforcement Policies and Interpretations Manual (Revised) (March, 2006), Exhibit
     D to Ramos Declaration in Opposition to Motion for Summary Judgment; 4th page of
27   "Enforcement Manual Revisions" at the front of the Manual, revision to section 50.9.2.1
     (emphasis added).
28   [7] Citations are to Order No. 4. Lettering may vary in other Orders, but not the language.

7

1    deleted was definitely not "consistent" with the Motor Carrier Safety regulations.  It had no

2    basis.  DLSE was correct to delete it.

3           The new language recites that a driver "who does not drive or operate a truck for any

4    period of time during an entire workday is entitled to overtime premium compensation for all

5    overtime hours worked performing duties other than driving during that day."  Wamboldt does

6    not contend that there are days when he did not drive at all (and worked overtime).  Further, the

7    new language is wrong.  DLSE does not purport to base it on California authority.  DLSE cites

8    *Crooker v. Sexton Motors, Inc.*, 469 F.2d 206 (1st Cir. 1972), a federal case (1st Circuit)

9    interpreting the Fair Labor Standards Act.  This court is fully capable of determining whether

10   *Crooker* supports DLSE's statement.

11          Crocker was employed by an auto dealership in New Hampshire.  His primary duty was

12   to clean and polish cars.  On occasion, he went to Massachusetts to take delivery of cars or parts

13   for transportation back to New Hampshire.  469 F.2d at 208.  The court of appeals held he was

14   subject to the ICC's jurisdiction and was, therefore, exempt from overtime under the FLSA.  The

15   court noted that it was "the character of the activities rather than the proportion of either the

16   employee's time or his activities that determines the actual need for the Commission's power."

17   469 F.2d at 209.  It also noted that the factual question is "not whether a substantial part of [the

18   employee's] duties affected the safety of operations but, rather, whether any of [the employee's]

19   duties had a *substantial effect* on motor vehicle safety."  *Id.* (emphasis in original).

20          The court of appeals, nevertheless, remanded to the district court to determine whether

21   there were workweeks when Crooker performed no interstate driving at all.  It did so based on

22   language it quoted from the Department of Labor's regulations at 29 CFR § 782.2(b)(3), but it

23   did not quote enough of the language, and it was (understandably) confused by the too-limited

24   portion it quoted.  We provide a fuller quotation, with italics added and the words quoted by the

25   court of appeal underlined:

26           (3) As a general rule, if the bona fide duties of the job performed by the
             employee are in fact such that he is ... called upon in the ordinary course
27           of his work to perform, either regularly or from time to time, safety-
             affecting activities of the character described in paragraph (b)(2) of this

28

                                              8

section,[8] *he comes within the exemption in all workweeks when he is employed at such job.* This general rule assumes that the activities involved in the continuing duties of the job in all such workweeks will include activities which have been determined to affect directly the safety of operation of motor vehicles on the public highways in transportation in interstate commerce. Where this is the case, the rule applies regardless of the proportion of the employee's time or of his activities which is actually devoted to such safety-affecting work in the particular workweek, and *the exemption will be applicable even in a workweek when the employee happens to perform no work directly affecting ``safety of operation.''* On the other hand, where the continuing duties of the employee's job have no substantial direct effect on such safety of operation or where such safety-affecting activities are so trivial, casual, and insignificant as to be de minimis, the exemption will not apply to him in any workweek so long as there is no change in his duties. [Citations omitted.] <u>If in particular workweeks other duties are assigned to him which result, in those workweeks, in his performance of activities directly affecting the safety of operation of motor vehicles in interstate commerce on the public highways, the exemption will be applicable to him those workweeks, but not in the workweeks when he continues to perform the duties of the non-safety-affecting job.</u>

The distinction is between a job involving safety-affecting activities, i.e., driving, in the ordinary course of the job and a job that does not involve safety-affecting activities in the ordinary course of the job.  In the former case, an employee is subject to the exemption in every workweek the employee performs that job, including workweeks when the employee performs no safety-affecting duties, i.e., driving.  In the latter case, the employee is subject to the exemption only in specific weeks when the employee performs safety-affecting duties.  Mr. Wamboldt's job involved driving in the ordinary course of the job.  He was exempt everyday and every workweek, regardless of whether he drove or not on any particular day or week.  *Accord: Gerard v. Northern Transportation*, 146 F.Supp.2d 63, 67 (D. Me. 2001); *Harrington v. Despatch Industries*, 2005 WL 1527630, *6 (D. Mass. 2005) (copy attached).

Plaintiff recites that "Crooker's week to week analysis was taken directly from *Morris v. McComb*, 332 U.S. 422, 434, n.13 (1947), which concluded," according to plaintiff, that –

If such a driver does not drive or operate a truck in the transportation of property in interstate or foreign commerce for an entire week, he is not subject to the regulations (exemption) herein prescribed during that week.

---

[8]  Employees "whose work involves engagement in activities consisting wholly or in part of … that of a driver…"

9

1    Opposition, p. 13:18-21. Plaintiff is wrong. The quoted language is neither the Supreme Court's

2    language, nor its conclusion. It is from the ICC's opinion in *Ex Parte No. MC-3*, 23 M.C.C. 1,

3    39. It continues: "*We express no opinion as to whether or not during that week the driver is*

4    *subject to the provisions of section 7 [overtime] of the [FLSA].*" In footnote 13, the latter

5    sentence is italicized by the Supreme Court. The Supreme Court explains in the next paragraph

6    that the "above statement demonstrates the Commission's opinion as to its power to establish

7    qualification and maximum hours of service." The Supreme Court also explains why the

8    Commission might have reached such a narrow and probably incorrect opinion. Far from

9    holding that a driver is not subject to the exemption when the driver fails to drive in interstate

10    commerce for a whole week, *Morris v. McComb* held that the exemption was applicable to an

11    entire pool of 37 drivers, notwithstanding that the average number making one or more such trips

12    each week was only 24%, 332 U.S. at 433, meaning that 76% of the drivers made fewer than one

13    such trip each week.

14        Contrary to the Opposition, p. 15:3, DLSE's manual is not entitled to deference. The

15    Opposition is correct that DLSE is authorized to promulgate regulations, p. 15:15-16, but the

16    opinions expressed in the manual have not been submitted to that process under the California

17    Administrative Procedure Act, Gov't Code §§ 11340 *et seq*. For that reason, they are "void."

18    *Tidewater Marine Western, Inc., v. Bradshaw*, 14 Cal. 4th 557, 561, 568, 572, 576, 577 (1996);

19    *California School of Culinary Arts v. Lujan*, 112 Cal. App. 4th 16 (2003); *Conley v. Pacific Gas*

20    *& Elec.*, 131 Cal. App. 4th 260, 270-71 (2005). In accordance with *Tidewater Marine*,

21    California's Governor issued Executive Order No. S-2-03.[9] It declares that any agency utilizing

22    any guideline, manual, or standard of general application not adopted as a regulation in

23    accordance with the Administrative Procedure Act, must do so "on an opinion-only basis which

24    will not carry the force of law." Executive Order S-2-03, §§ 2, 3. DLSE states on its website

25    that its opinion letters and manual are "advice in specific cases only."[10] The approach

26

27

28

---

[9] Found at http://gov.ca.gov/index.php?/site/forward-executive-orders/.
[10] See http://www.dir.ca.gov/dlse/Manual-Instructions.htm.

1    recognized in *Murphy v. Kenneth Cole*, 40 Cal.4th 1094, 1106 (2007) (consideration and respect,

2    but not binding and ultimately for the judiciary to decide) is not "deference."

3    ### E.    **WAMBOLDT TRANSPORTED HAZARDOUS MATERIALS.**

4        Mr. Wamboldt was asked at his deposition:[11] *"Do you have any reason to disagree with*

5    *my statement to you that the DOT regs include, as a hazardous material, the very solvents that*

6    *you handled on a daily basis driving your truck for Safety-Kleen? Do you have any reason to*

7    *dispute that?"* Obviously, if Mr. Wamboldt had disagreed with or disputed the statement,

8    Safety-Kleen's counsel would have interrogated him on his reasons, but Mr. Wamboldt did not

9    disagree:[12] *"I have not read every line of the DOT regulations, so I don't know if it specifically*

10   *says that. But I could assume that."* According to plaintiff, "Mr. Wamboldt … is licensed and

11   trained in carrying hazardous materials and has a hazmat endorsement on his commercial

12   license." Opposition, p. 12:4-5. *See also*, Declaration of Steven Wamboldt in Opposition to

13   Summary Judgment, p. 2:20-21 ("I have a 'hazmat' endorsement on my license and, as such, am

14   required to be familiar with the rules and regulations pertaining to the transport of such

15   materials"). As a person admittedly "familiar with the rules and regulations pertaining to the

16   transport of such [hazardous] materials," *ibid*, Mr. Wamboldt is bound by his admission that he

17   handled hazardous materials on a daily basis. "[A] party cannot create a genuine issue of fact

18   sufficient to survive summary judgment simply by contradicting his or her own previous sworn

19   statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn

20   deposition)…." *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 806 (1999).

21       Further, plaintiff purports to create an issue of fact solely over his transporting hazardous

22   material from branch to customer. He offers no evidence to dispute Safety-Kleen's evidence that

23   he transported hazardous material from customer to branch. Safety-Kleen's business includes

24   parts washer services, environmental services, and industrial waste management. Opening

25   Motion, p. 3:10-11, and Ross Declaration, 2. They are separate services. (*See* Safety-Kleen's

26   web site, http://www.safety-kleen.com, under Environmental Services/Industrial Hazardous

27   ---
[11] Wamboldt Deposition, p. 168:15-19, Exh. B to Tollen Declaration, submitted with the moving papers in Support of Safety-Kleen's Motion for Summary Judgment.

28   [12] Wamboldt Deposition, p. 168:23-25.

1   Waste Management.)  Industrial waste management involves removing corrosive, toxic and

2   flammable materials from customer premises and transporting them to the branch for ultimate

3   shipment to disposal sites.  Motion, p. 6:20 – 7:8; Ross Declaration, ¶ 6.  The Opposition states,

4   p. 12:2-3, that the "'waste' Mr. Wamboldt … typically removed was used, aqueous (non-

5   hazardous) parts washer solution."  That carefully crafted sentence does not dispute that he also

6   removed other hazardous wastes, unrelated to parts washers.  Further, that sentence is *not*

7   *supported* by the cited paragraph of the Wamboldt declaration, nor by anything else in the

8   Wamboldt declaration.  Paragraph 12 of the declaration recites that non-hazardous "dirt, oil and

9   grease" are "removed by Safety-Kleen's parts washing solution."  It says nothing about the

10   removal of customer-generated hazardous wastes as part of Safety-Kleen's industrial waste

11   management services.  The diluted, non-hazardous DIP that Mr. Wamboldt recites he

12   transported, Wamboldt Declaration in Opposition to Summary Judgment, p. 4:7-8; Opposition,

13   pp. 11:4-5, 12:2-3, is *not* one of the substances listed on Exhibit D to the Ross Declaration.  As

14   the Opposition notes, p. 11:6-9, it does not have a DOT hazmat designation.  *See* section 14 of its

15   MSDS, Exhibit F to the Ramos Declaration.  All of the materials listed in the Ross Declaration,

16   Exhibit D, have DOT hazmat designations listed in columns G and H of Exhibit D.  For example,

17   the first two materials listed on Exhibit D are both "Hazardous Waste, Liquid, N.O.S.; 9NA3082

18   PG III."  They are located on page 207 of the Table of Hazardous Materials; Appendix A to the

19   Motion.  Each item on Exhibit D can be located on the Table of Hazardous Materials.  The

20   Department of the California Highway Patrol is authorized to regulate the safe operations of

21   vehicles transporting hazardous materials. Vehicle Code § 34500.  "Hazardous materials"

22   include materials listed on the U.S. Department of  Transportation's Table of Hazardous

23   Materials.  13 CCR § 1160.3(d) and 49 CFR § 172.101.

24         Rather than dispute Safety-Kleen's showing, plaintiff attacks it in his separately-filed

25   Objections to Evidence.  Assuming the Court accepts that argument beyond page limitations,

26   Safety-Kleen will respond in its separately-filed Response to Objections.

27

28

Safety-Kleen's Reply Memo In Support Of Summary Judgment/Partial Summary Judgment,
Case No. CV 07 00884 PJH

F.   **CLASS CERTIFICATION**

On a simultaneous schedule with Safety-Kleen's motion for summary judgment, the Court also has it before it plaintiff's motion for class certification. Safety-Kleen did not argue in its Opposition that individual issues predominate over common issues. If plaintiff's view, that CSR's could be exempt on some days and not on other days, depending on when they transported hazardous materials, were valid (it is not), then it would be necessary to examine the computer records for each and every CSR, and individual issues would predominate over common issues, leading to the conclusion that a class should not be certified.

II.   **MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S COMMISSION CLAIM**

Safety-Kleen opposed plaintiff's motion to amend his complaint because, while California prohibits taking some specific expenses into account in setting compensation, it *does not* prohibit taking revenue into account. *Ralphs Grocery v. Superior Court*, 112 Cal.App.4th 1090 (2003). The Court allowed the amendment because it "alleges that defendant reduced commissions based on lack of branch *profitability*," and *profitability* "takes into account both income and expenditures." Order Granting Leave to Amend, p. 5:9-13 (emphasis added). Therefore, the Court held, "a set of facts can be proved under the amendment which would constitute a valid claim." *Ibid.*, p. 5:13-14. Safety-Kleen's present motion for summary judgment demonstrates that profitability was not taken into account in the 2004 commission plan, and plaintiff's Opposition fails to show otherwise. Therefore, the motion for summary judgment should be granted.

Section 8 of the IWC's Orders prohibits deductions for "any cash shortage, breakage or loss of equipment." The Court may judicially notice that few non-retail commercial enterprises in modern business are paid in cash. Plaintiff has not shown that Safety-Kleen's customers pay in cash. Safety-Kleen's revenue or billings calculation has nothing to do with "cash shortages," as that term is used in the IWC's Orders.

Nor does the calculation violate Labor Code § 221. The plaintiff in *Ralphs* alleged violations of section 221 and of section 8 of the IWC's Orders. 112 Cal.App. at 1095. Managers

13

1   were exempt from section 8, but they were not exempt from section 221.  Nevertheless, the court

2   found no violation under section 221.  Plaintiff refers to Safety-Kleen's plan as "arbitrary."

3   Opposition, pp. 22:4, 23:24, 24:17, 24:22.  It was designed to measure a CSR's contribution to

4   revenue.  Among other behaviors, Safety-Kleen's management wanted to encourage cooperation

5   among CSR's and between CSR's and sales associates.  Each contributed to a branch's overall

6   revenue, and CSR wanted to recognize their collective contributions.  Declaration of David

7   Ecklelbarger in Support of Motion for Summary Judgment, ¶'s 4, 10.  Plaintiff has offered no

8   evidence that this effort was arbitrary.  As in *Ralphs*, calculation of a commission that takes

9   legitimate business considerations into account does not "resemble, literally or in spirit, … the

10  recapture of wages previously paid in violation of section 221."  *Ibid*. at 1105.  "The policy

11  considerations that supported the result in Kerr's are simply not applicable to … employees

12  [whose joint sales efforts are compensated] "based on a previously disclosed … formula [that]

13  does not threaten 'special hardship' because of unanticipated or unpredictable deductions from

14  their wages.'"  *Ibid*.  As in *Ralphs*, "it would require a significant extension of the Supreme

15  Court's dicta regarding the underlying spirit of the Labor Code provisions protecting workers'

16  wages to conclude [that the plan] is unlawful."  *Ibid*. at 1106.

17      Finally, plaintiff represents that any failure on its part to produce sufficient facts in

18  opposition is attributable to Safety-Kleen's failure to produce Mr. Eckelbarger for a deposition.

19  That representation is false, as explained in the Second Declaration of Attorney Tollen, filed

20  herewith.

21      The 2004 commission plan did not take into account expenses or profits.  It was lawful

22  under California law.  Summary judgment should be granted.

23  DATED: July 11, 2007                          SEYFARTH SHAW LLP

24

25                                  By  *Robert W. Tollen*

26                                      Robert W. Tollen
                                        Janine S. Simerly
                                        Cassandra H. Carroll
27                                  Attorneys for Defendant
                                    SAFETY-KLEEN SYSTEMS, INC.

28

Safety-Kleen's Reply Memo In Support Of Summary Judgment/Partial Summary Judgment,
Case No. CV 07 00884 PJH

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2005 WL 1527630 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

**c**
Harrington v. Despatch Industries, L.P.
D.Mass.,2005.
Only the Westlaw citation is currently available.
United States District Court,D. Massachusetts.
Kevin C. HARRINGTON
v.
DESPATCH INDUSTRIES, L.P.
**No. Civ.A. 03-12186-RGS.**

June 29, 2005.

Jeffrey M. Sankey, Law Office of Jeffrey M. Sankey, Mansfield, MA, for Kevin C. Harrington.
Robert M. Hale, Goodwin Procter, LLP, Boston, MA, for Despatch Industries, L.P.

*MEMORANDUM AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT*
STEARNS, J.
**\*1** Plaintiff Kevin Harrington brought this action against his employer, Despatch Industries, LP (Despatch), seeking payment of overtime wages under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.* and the Massachusetts Minimum Fair Wage Law (MFWL), G.L. c. 151, *et seq.* On October 29, 2004, the parties filed cross-motions for summary judgment. Harrington seeks summary judgment on the FLSA claim only, while Despatch moves for judgment on both claims, arguing that Harrington is an "exempt" employee under the "administrative" exemptions of the FLSA and the Motor Carrier Act (MCA) of 1935.

Despatch is a Minnesota limited partnership whose primary line of business is the manufacture, sale, and servicing of industrial ovens. In 1992, Harrington was hired by Despatch as its New England Field Service Engineer. On being hired, Harrington was told that in addition to his work as a service technician, he would share responsibility for the growth of the company's New England business. Despatch's employment letter explicitly stated that

Harrington was being hired as an "exempt" employee. Harrington understood this to mean that he would be paid an annual salary, rather than an hourly wage. [FN1] That understanding did not, however, discourage Harrington from making persistent requests of Despatch for overtime pay.

> FN1. That Harrington was paid an annual salary is not in dispute, although the parties disagree over the exact amount. Harrington lists his annual earnings as $62,361.83 for 2000, $65,230.36 for 2201, and $66,722.71 for 2003 (he does not provide a figure for 2002). Despatch claims that Harrington has taken his figures from the wrong box on his W-2 forms and that the accurate salary figures are $74,589.63 for 2000, $77,806.36 for 2001, and $79,309.36 for each of 2002 and 2003.

Despatch provides Harrington with a four and one-half ton Chevrolet van to travel to customer sites. The van is equipped with tools, test equipment, and spare parts. Despatch (or a vendor) regularly ships parts to Harrington at his home in Massachusetts for delivery to its customers. While most of Despatch's customers are based in Massachusetts, Harrington drove a total of 231 hours calling upon customers in other New England states during the three years preceding the filing of the lawsuit.

In addition to its own staff, Despatch contracts with Certified Service Representatives (CSRs) to perform customer service and repair work. The CSRs work as independent contractors. Harrington typically accompanies a new CSR on his or her initial customer calls. To track time spent by employees on service and repair work, Despatch uses a "direct utilization rate." The rate is calculated by dividing the number of hours the employee records for these jobs by 40 hours. For

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 2

Not Reported in F.Supp.2d, 2005 WL 1527630 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

the period June 2000 through July 2001, Despatch set a direct utilization goal of 65 percent for Harrington. In June of 2001, Harrington's job title was changed to Field Service Account Manager. For the period June 2001 through June 2002, Harrington's utilization goal was 65 percent, while his actual utilization rate was 80 percent. From June 2002 through June 2003, the goal was 65 percent, and the actual rate was 85 percent. From May 2003 through April 2004, the goal was 69 percent, while the actual rate was 64 percent.

Over time, Despatch has encouraged Harrington to become more involved in sales and to delegate as much of his service work as possible to the CSRs. At one point, Despatch told Harrington that it expected him to spend up to 60 percent of his time marketing its products and services. By all accounts, Harrington is a highly successful employee. Despatch acknowledges that he "handles customers masterfully" and has been instrumental in the growth of its New England business. The dispute is not over the quality of Harrington's work as an account manager or as a service technician. The dispute is over whether Harrington is an exempt employee under either the FLSA or the MCA (or both statutes). If he is not, Harrington claims that he is owed 1406.5 hours in overtime pay. FN2

> FN2. While the issue is not discussed in the parties' briefs, the FLSA statute of limitations is two years (three if the employer's violation was willful). 29 U.S.C. § 255(a). *See McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988). The MFWL also contains a two-year statute of limitations. G.L. c. 151 § 20A. While Harrington's overtime claim is based on the three-year statute of limitations, he makes no allegation of willfulness on Despatch's part.

## DISCUSSION

**\*2** Under the FLSA, an employer is required to compensate employees who work overtime at a rate not less than one and one-half times their regular hourly wage. (Overtime is defined as hours worked in excess of a 40-hour work week. *See* 29 U.S.C. § 207(a)(1)). If, however, the employee falls within one of the FLSA exemptions for managerial (salaried) employees, the employer is not required to pay overtime.

### 1. The Administrative Exemption

Employees working in a "bona fide executive, administrative or professional capacity," are exempted under the FLSA. 29 U.S.C. § 213(a)(1). The employer bears the burden of proving that the exemption applies to an employee who is denied overtime. *See Reich v. Newspapers of New England, Inc.,* 44 F.3d 1060, 1070 (1st Cir.1995). Department of Labor (DOL) regulations specify either a "long" or a "short" test for determining whether an employee is exempt. *See* 29 C.F.R. § 541.2. Because Harrington at all times earned more than $250 per week, his employment is governed by the short test. Under this test, an employee is exempt if his primary duty (1) "consists of the performance of office or non-manual work directly related to management policies or general business operations of the employer or the employer's customers"; and (2) "includes work requiring the exercise of *discretion and independent judgment."* 29 C.F.R. § 541.214. (Emphasis added).

DOL interpretive regulations "subdivide the first prong of the short test into two subparts: (1) the employee must be engaged in 'administrative' rather than 'production' activity; and (2) this administrative activity must be of 'substantial importance' to management or operations." *Reich v. John Alden Life Insurance Co.,* 126 F.3d 1, 8 (1st Cir.1997), citing 29 C.F.R. § 542.205(a). "The administrative operations of the business include the work performed by so-called white-collar employees engaged in 'servicing' a business as, for example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." 29 C.F.R. § 541.205(b). While "applying the administrative-production dichotomy is not as simple as drawing the line between white-collar and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 1527630 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

blue-collar workers," *John Alden Life Ins. Co.,* 126 F.3d at 9, it is evident from the undisputed utilization rates that Harrington's primary duties are those of a repairman and service technician.

DOL regulations provide that "[i]n the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent, of the employee's time." 29 C.F.R. § 541.103.[FN3] Harrington invariably spent more than half of his time on manual service and repair work. He trained as a repairman, and it was in that role that he gathered a following among his customers. " Perhaps the most frequent cause of misapplication of the term 'discretion and independent judgment' is the failure to distinguish it from the use of skill in various respects." [FN4] 29 C.F.R. § 541 .207(c).

> FN3. I recognize that the First Circuit has cautioned against slavish adherence to the regulation, as "primary" should be read as meaning "principal," rather than "over half, " and because a person is capable of managing others while physically doing something else. *See Donovan v. Burger King Corp.,* 672 F.2d 221, 226 (1st Cir.1982).

> FN4. Discretionary acts are those " characterized by [a] high degree of discretion and judgment involved in weighing alternatives and making choices with respect to ... policy and planning.... Discretionary acts are not those which involve the 'carrying out of previously established policies or plans.' " *Whitney v. Worcester,* 373 Mass. 208, 218, 366 N.E.2d 1210 (1977).

**\*3** While conceding that Harrington devotes a substantial part of his time to the performance of services and repairs for customers, Despatch argues that this is Harrington's personal choice and not a job requirement. Despatch maintains that the crux of Harrington's duties as a Field Service Account Manager is the oversight of CSRs and regional field service operations. In this capacity, Harrington (in Despatch's view) is required to exercise judgment

and discretion by assisting individual customers in weighing purchase options, in matching the appropriate CSR to customer accounts, and in acting as the liaison between the CSRs and Despatch.

Harrington, on the other hand, maintains that his elevation in title from Field Service Engineer to Field Service Account Manager involved no change in his job responsibilities and was undertaken to place him in a higher pay bracket because he had " maxed out" of the pay scale for Field Service Engineers. Harrington notes that his utilization goal was increased from 65 percent to 69 percent *after* the change in job titles. Harrington acknowledges that as a loyal employee he promoted service agreements, introduced CSRs to customers, and did whatever he could to keep customers happy. However, in Harrington's view, these functions were ancillary to his primary role as a service technician, because the best way to build customer relationships is "to keep the equipment running." Harrington told Despatch that assuming increased administrative duties was "not doable" because of the physical demands of his job. Harrington denies having any supervisory authority over the CSRs and notes that prior to the filing of the lawsuit, Despatch did not hold him responsible for CSR performance. In conducting Harrington's 2001 annual review, Despatch checked off the rating category for "Work Supervision/Management" as "Not Applicable," and left the box blank during Harrington's June 2002 review.

An exemption is determined by an employee's actual duties, and not by his title or the employer's formal description of his job. 29 C.F.R. § 541.201(b); *see also Ale v. Tennessee Valley Authority,* 269 F.3d 680, 688-689 (6th Cir.2001). That is the case here. However imposing Harrington's title, the record does not support the argument that Harrington has the authority to make discretionary decisions, large or small, or that he has any actual supervisory powers over the CSRs (other than scheduling their initial visits to customer sites). The FLSA administrative exemption therefore does not apply.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 1527630 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

### 2. The Motor Carrier Act Exemption

The MCA was enacted in 1935 "to promote efficiency, economy, and safety in the rapidly burgeoning motor transportation industry." *Friedrich v. U.S. Computer Services,* 974 F.2d 409, 412 (3rd Cir.1992). The MCA "vested in the Interstate Commerce Commission power to establish reasonable requirements with respect to qualifications and maximum hours of service of employees and safety of operation and equipment of common and contract carriers by motor vehicle." *Levinson v. Spector Motor Service,* 330 U.S. 649, 658, 67 S.Ct. 931, 91 L.Ed. 1158 (1947). The FLSA wage and hour standards were enacted three years after the MCA with an exception for employees over "whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of [the MCA]." 29 U.S.C. § 213(b)(1).

**\*4** In making an exception, Congress's purpose was to avoid a jurisdictional conflict between the Secretary of Labor and the Secretary of Transportation by giving precedence to the MCA as a public safety statute. *See Levinson,* 330 U.S. at 662 ("It remains for us to give full effect to the [MCA's] safety program to which Congress has attached primary importance, even to the corresponding exclusion by Congress of certain employees from the benefits of the compulsory overtime pay provisions of the Fair Labor Standards Act."). Thus, if the MCA exemption applies to Harrington's employment, the fact that he is not an exempted employee for FLSA purposes is of no relevance.

The Secretary of Transportation need not actually exert power over an employee for jurisdiction to attach. "It is the existence of the power as opposed to its exercise which Congress has said is determinative...." *Morris v. McComb,* 332 U.S. 422, 434, 68 S.Ct. 131, 92 L.Ed. 44 (1947). Under the MCA, the Secretary of Transportation is authorized to prescribe "qualifications and maximum hours of service of employees of and standards of equipment of, a motor private carrier, when needed to promote safety of operation." 49 U.S.C. § 31502(b)(2). A " motor private carrier" [FN5] is defined as

FN5. One would think that Congress meant "private motor carrier," but the term is one of art rather than description.

[a] person, other than a motor carrier, transporting property by motor vehicle when:
(A) the transportation [involves interstate commerce];
(B) the person is the owner, lessee, or bailee of the property being transported; and
(C) the property is being transported for sale, lease, rent, or bailment, or to further a commercial enterprise.

49 U.S.C. § 10102(16). To fall under the regulatory jurisdiction of the Secretary of Transportation, an employee must be:(1) employed by carriers whose transportation of passengers or property by motor vehicle is subject to his jurisdiction under section 204 of the Motor Carrier Act ...; and
(2) engage[d] in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the MCA.

29 C.F.R. § 782.2(a). "Highway transportation by motor vehicle from one State to another, in the course of which the vehicles cross the State line, clearly constitutes interstate commerce under both [the FLSA and the MCA]. Employees of a carrier so engaged, whose duties directly affect the safety of operation of such vehicles, are within the exemption...." 29 C.F.R. § 782.7(b)(1).

Despatch qualifies as a motor private carrier because Harrington operates a vehicle in interstate commerce, is the bailee of property (tools and spare parts) owned by Despatch that are transported in commerce for the purpose of furthering a commercial enterprise (servicing Despatch's industrial ovens). *See* 49 U.S.C. § 10102(16). Thus, if some portion of Harrington's job duties impact the safety of interstate motor transportation, the MCA exemption applies and Harrington is ineligible for overtime. *See Crooker v. Sexton Motors, Inc.,* 469 F.2d 206, 209 (1st Cir.1972), citing *Pyramid Motor Freight Corp. v. Ispass,* 330 U.S. 695, 708, 67 S.Ct. 954, 91 L.Ed. 1184 (1947) (

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 5

Not Reported in F.Supp.2d, 2005 WL 1527630 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

"It is obvious that one who drives a vehicle in interstate commerce directly affects the safety of such operations as long as he is driving.").

**\*5** Harrington contends that Despatch is not a motor private carrier under the MCA because the tools and spare parts carried in his van are not the type of property contemplated by the statute. In addition, he argues that the transportation of tools and spare parts was not the "primary purpose" of his travel, but ancillary to the more vital purpose of transporting Harrington himself to the customer site. Harrington urges the adoption of the reasoning of *Reich v. New Mt. Pleasant Bakery,* 1993 WL 372270 *5 (N.D.N.Y. Sept.13, 1993), a district court case holding that the MCA exemption does not apply when transportation is not the primary business of the employer. However, the overwhelming majority of cases disagree. In *Friedrich v. U.S. Computer Services,* 974 F.2d 409 (3d Cir.1992), the seminal case on the subject, the Third Circuit found that a thirty-five pound tool box and related parts and equipment constituted " property" within the meaning of the MCA, and that field engineers who carried such tools and parts in interstate commerce were exempt employees. *Id.* at 419. *See also Harshman v. Well Service, Inc.,* 248 F.Supp. 953, 958 (W.D.Pa.1964) (tools and equipment carried on trucks are "property" for MCA exemption purposes); *Sinclair v. Beacon Gasoline Co.,* 447 F.Supp. 5, 11 (W.D.La.1976) (same). *See also Peraro v. Chemlawn Services Corp.,* 692 F.Supp. 109, 114 (D.Conn.1988) (trucks equipped to provide interstate carpet cleaning services are MCA-exempted).

Harrington's argument that the transportation of tools and spare parts is not the "primary purpose" of his interstate travel is a reference to the "primary business test" set out in 49 U.S.C. § 13505 (formerly § 10524(a)), which precludes ICC jurisdiction over the transportation of property by a person engaged in a non-transportation business when such transportation is within the scope of and furthers that person's primary business. The same argument was made and rejected in *Friedrich.* The court held that section 10524(a) was inapplicable because its purpose is simply to relieve motor private carriers of burdensome ICC licensing,

permit, and certificate requirements. *Friedrich,* 974 F.2d at 413. The *Friedrich* holding has since been adopted by the Courts of Appeals for the Ninth and Second Circuits. *See Klitzke v. Steiner Corp.,* 110 F.3d 1465, 1469 (9th Cir.1997) ("[Despite § 10524(a), there are] no limitations on the Secretary's power to prescribe safety requirements for employees of motor private carriers."); *Bilyou v. Dutchess Beer Distributors, Inc.,* 300 F.3d 217, 226 (2d Cir.2002) ("That part [§ 13505] contains provisions authorizing the DOT to enact registration and security (insurance and bonding) requirements for motor carriers, freight forwarders, and brokers.... Section 13505 has no bearing on the Secretary's power, as described in 29 U.S.C. § 213(b)(1)."). *See also McGuiggan v. CPC Int'l, Inc.,* 84 F.Supp.2d 470, 482 (S.D.N.Y.2000); *Carpenter v. Pennington Seed,* 2002 WL 465176 at *4 (E.D.La. Mar.26, 2002). I see no reason to part with the majority.

**\*6** Harrington argues that even if Despatch is a motor private carrier, the MCA exemption is inapplicable to his case because his connection with interstate commerce is *de minimis.*[FN6] Although Harrington cites extra-circuit authority that is supportive of his argument, the First Circuit has squarely rejected the idea of a *de minimis* exception to the MCA. *See Crooker,* 469 F.2d at 210 ("[While the *de minimis* exception may apply to those whose activities do not directly affect safety], the activities of one who *drives in interstate commerce, however frequently or infrequently,* are not trivial. Such activities directly affect the safety of motor vehicle operations."). (Emphasis added). "It is the *character* of the activities rather than the *proportion* of either the employee's time or his activities that determines the actual need for the Commission's power to establish reasonable requirements with respect to qualifications, maximum hours of service, safety of operation and equipment." *Levinson,* 330 U.S. at 674-675. (Emphases added).

> FN6. Harrington worked a total of 7,667 hours over the relevant three year period. Only 231 hours, or three percent of his time, was spent actually operating a vehicle in interstate commerce.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6

Not Reported in F.Supp.2d, 2005 WL 1527630 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

Finally, Harrington argues that if the MCA exemption is in play, *Crooker'* s week-by-week analysis should be applied. In *Crooker,* the plaintiff was an employee of a New Hampshire car dealership. His primary job was to clean and polish new cars. On occasion, he would be asked to deliver or pick up a car in Massachusetts. The First Circuit held that the "continuing duties" of Crooker's job did not include driving in interstate commerce, and that he was therefore entitled to overtime for the weeks in which no such driving occurred. *See Crooker,* 469 F.2d at 211. In so ruling, the First Circuit relied on a DOL regulation: [FN7] "If in particular workweeks other duties are assigned to [the employee] which result, in those workweeks, in his performance of activities directly affecting the safety of operation of motor vehicles in interstate commerce on the public highways, the exemption will be applicable to him in those workweeks, but not in the workweeks when he continues to perform the duties of the non-safety affecting job." *Crooker,* 469 F.2d at 210, citing 29 C.F.R. § 782.2(b)(3).

FN7. While the regulation is not binding on the Secretary of Transportation, it is often cited by courts in a *Crooker* context.

Harrington's employment is distinguishable. One of the "continuing duties" of Harrington's job is to drive the van to perform maintenance work for Despatch's customers anywhere in New England. Interstate travel, unlike the case in *Crooker,* is an integral part of Harrington's job, the frequency of which will increase as Despatch's customer base in New England grows. Thus, the week-by-week *Crooker* analysis is inapplicable. *See Gerard v. Northern Transportation, LLC,* 146 F.Supp.2d 63, 67 (D.Me.2001), citing 29 C.F.R. § 782.2(b)(3), which provides:
if the bona fide duties of the job performed by the employee are in fact such that he is ... called upon in the ordinary course of his work to perform, either regularly or from time to time, safety-affecting activities ..., he comes within the exemption in *all* workweeks when he is employed at such job.
*7 This general rule assumes that the activities involved in the continuing duties of the job in all such workweeks will include activities which have

been determined to affect directly the safety of operation of motor vehicles on the public highways in transportation in interstate commerce. Where this is the case, the rule applies regardless of the proportion of the employee's time or of his activities which is actually devoted to such safety-affecting work in the particular workweek, and the exemption will be applicable even in a workweek when the employee happens to perform no work directly affecting "safety of operation."

29 C.F.R. § 782.2(b)(3). Because in the ordinary course of his work, Harrington is called upon to drive in interstate commerce, 29 C.F.R. § 782.2(b)(3) applies and Harrington is an MCA-exempt employee. *See Guyton v. Schwann Food Co.,* 2004 WL 533942 *6 (D.Minn.2004) (sales managers who drive delivery trucks in interstate commerce "from time to time," although not every week, fall within the MCA exemption because their activities directly affect motor vehicle safety); *Carpenter v. Pennington Seed, Inc.,* 2002 WL 465176 *4 (E.D.La.2002) (same).[FN8]

FN8. The relevant exemptions under the MFWL are identical to those under the FLSA, 29 U.S.C. § 207(a)(1), and the same analysis applies. *See Valerio v. Putnam Assocs., Inc.,* 173 F.3d 35, 40 (1st Cir.1999). However, because the federal MCA preempts any contrary result under the MFWL, the statute is no more availing to Harrington than is the federal FLSA.

*ORDER*

For the foregoing reasons, Despatch's motion for summary judgment is *ALLOWED.* Because Harrington is an MCA-exempt employee, his motion for summary judgment is *MOOT.* The Clerk will enter judgment for Despatch.
SO ORDERED.

D.Mass.,2005.
Harrington v. Despatch Industries, L.P.
Not Reported in F.Supp.2d, 2005 WL 1527630 (D.Mass.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 7

Not Reported in F.Supp.2d, 2005 WL 1527630 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**


END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.