UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


STEVEN WAMBOLDT,

        Plaintiff,                       No. C 07-0884 PJH

        v.                          **ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT; GRANTING CLASS CERTIFICATION**

SAFETY-KLEEN SYSTEMS, INC.,

        Defendant.

_____/

     Now before this court are the motion of defendant Safety-Kleen Systems, Inc. ("Safety-Kleen") for summary judgment or partial summary judgment and the motion of plaintiff Steven Wamboldt ("Wamboldt") for class certification.  Jeremy R. Fietz and Barron E. Ramos appeared for plaintiff; Robert William Tollen appeared for defendant.  Having read the papers and carefully considered the relevant legal authority, defendant's motion for summary judgment is hereby GRANTED IN PART AND DENIED IN PART for the following reasons and for the reasons stated at the hearing.  Plaintiff's motion for class certification is hereby GRANTED.

**BACKGROUND**

     This action arises from defendant's failure to pay overtime to certain employees, and was originally filed by Wamboldt on behalf of himself and others on November 17, 2006 in Los Angeles Superior Court.  Safety-Kleen removed the case to the Central District of California alleging that this action meets the requisites of the Class Action Fairness Act of

1    2005.  The case was then transferred here, where *Perez v. Safety Kleen Systems, Inc.* is

2    pending, upon plaintiff's motion.

3        Plaintiff alleges that Safety-Kleen failed to pay overtime due to their customer

4    service representative employees as required by California Labor Code § 510.  In addition

5    to failing to pay overtime to non-exempt employees, plaintiff alleges Safety-Kleen also

6    improperly reduced commissions payable to those employees.  See Am. Compl. ¶¶ 10, 12,

7    27-28.  The complaint also contains derivative claims that defendant violated: (1) California

8    Labor Code § 202 which requires an employer to pay all wages due within 72 hours of an

9    employee's separation; (2) California Unfair Competition law, Cal. Bus. & Prof. Code §§

10   17200 et seq., which prohibits unlawful withholding of wages; and (3) California Labor Code

11   Private Attorneys General Act of 2004 ("PAGA"), Labor Code §§ 2698 et seq., which

12   authorizes civil penalties.  Id. ¶¶ 13, 26, 30, 33-41.

13       Safety-Kleen now moves for summary judgment, or in the alternative, partial

14   summary judgment.  In support of its motion, Safety-Kleen contends that California's

15   overtime requirements are not applicable to Safety Kleen's customer service

16   representatives ("CSRs"), including Wamboldt.  It also contends that it used branch

17   revenue, not profitability, in calculating CSR commission compensation and that California

18   law does not prohibit that practice.  Wamboldt now moves for class certification.

**DISCUSSION**

19

20   A.    Legal Standards

21         1.    Summary Judgment

22       Summary judgment shall be granted if "the pleadings, depositions, answers to

23   interrogatories, and admissions on file, together with the affidavits, if any, show that there is

24   no genuine issue as to any material fact and that the moving party is entitled to judgment

25   as a matter of law."  FRCP 56(c).  Material facts are those which may affect the outcome of

26   the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to

27   a material fact is genuine if there is sufficient evidence for a reasonable jury to return a

28   verdict for the nonmoving party.  Id.  The court must view the facts in the light most

1  favorable to the non-moving party and give it the benefit of all reasonable inferences to be

2  drawn from those facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

3  587 (1986); United States v. City of Tacoma, 332 F.3d 574, 578 (9th Cir. 2003).  "To show

4  the existence of a 'genuine' issue, . . . [a plaintiff] must produce at least some significant

5  probative evidence tending to support the complaint."  Smolen v. Deloitte, Haskins & Sells,

6  921 F.2d 959, 963 (9th Cir. 1990) (quotations omitted).  The court must not weigh the

7  evidence or determine the truth of the matter, but only determine whether there is a

8  genuine issue for trial.  Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir. 1999).

9       A party seeking summary judgment bears the initial burden of informing the court of

10 the basis for its motion, and of identifying those portions of the pleadings and discovery

11 responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp.

12 v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof

13 at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other

14 than for the moving party.  On an issue where the nonmoving party will bear the burden of

15 proof at trial, the moving party can prevail merely by pointing out to the district court that

16 there is an absence of evidence to support the nonmoving party's case.  Id.  If the moving

17 party meets its initial burden, the opposing party must then set forth specific facts showing

18 that there is some genuine issue for trial in order to defeat the motion.  See Fed. R. Civ. P.

19 56(e); Anderson, 477 U.S. at 250.

20      2.    Class Certification

21      In order for a class action to be certified, plaintiffs must prove that they meet the

22 requirements of Federal Rule of Civil Procedure 23(a) and (b).  As a threshold to class

23 certification, plaintiffs must satisfy four prerequisites under Rule 23(a).  First, the class must

24 be so numerous that joinder of all members individually is "impracticable."  See Fed. R. Civ.

25 P. 23(a)(1).  Second, there must be questions of law or fact common to the class.  Fed. R.

26 Civ. P. 23(a)(2).  Third, the claims or defenses of the class representative must be typical

27 of the claims or defenses of the class.  Fed. R. Civ. P. 23(a)(3).  And fourth, the person

28 representing the class must be able to protect fairly and adequately the interests of all

1   members of the class.  Fed. R. Civ. P. 23(a)(4).  The parties moving for class certification

2   bear the burden of establishing that the Rule 23(a) requirements are satisfied.  Gen'l Tel.

3   Co. of Southwest v. Falcon, 457 U.S. 147, 156 (1982).

4          If all four prerequisites of Rule 23(a) are satisfied, the court then determines whether

5   to certify the class under one of the three subsections of Rule 23(b), pursuant to which

6   named plaintiffs must establish that 1) there is a risk of substantial prejudice from separate

7   actions; or 2) declaratory or injunctive relief benefitting the class as a whole would be

8   appropriate; or 3) common questions of law or fact common to the class predominate and

9   that a class action is superior to other methods available for adjudicating the controversy at

10  issue.  See Fed. R. Civ. P. 23(b)(3).

11         The court does not make a preliminary inquiry into the merits of plaintiffs' claims in

12  determining whether to certify a class.  See Eisen v. Carlisle & Jacquelin, 417 U.S. 156,

13  177 (1974).  It will, however, scrutinize plaintiffs' legal causes of action to determine

14  whether they are suitable for resolution on a class wide basis.  See, e.g., Moore v. Hughes

15  Helicopters, Inc. 708 F.2d 475, 480 (9th Cir. 1983).  In doing so, the court must accept the

16  substantive allegations contained in plaintiffs' complaints as true, but will consider matters

17  beyond the pleadings in order to ascertain whether the asserted claims or defenses are

18  susceptible of resolution on a class wide basis.  See McCarthy v. Kleindienst, 741 F.2d

19  1406, 1419 n.8 (D.C. Cir. 1984).

20  B.     Defendant's Motion for Summary Judgment

21         1.     Statutory Background

22                a)     Motor Carrier Overtime Exemption

23         The Industrial Welfare Commission ("IWC") was established by the California

24  Legislature in 1913.  It is a quasi-legislative body authorized by statute to issue regulations

25  or orders governing wages, hours, and working conditions.  The IWC has promulgated 15

26  wage orders, following a similar format, which each apply to separate industries or

27  occupations.  See Collins v. Overnite Transportation Co., 105 Cal. App. 4th 171, 174

28  (2003).

1    The Eight-Hour-Day Restoration and Workplace Flexibility Act of 1999, 1999 Stats.

2    Ch. 124 (AB 60) was a response to the IWC's amendment of five wage orders on April 11,

3    1997, which eliminated the state's daily overtime rule in favor of the less restrictive weekly

4    overtime rule of the federal Fair Labor Standards Act ("FLSA").  Id. at 175.  California's Act

5    "established a new statutory scheme governing hours of labor and overtime compensation

6    for all industries and occupations, which codified certain provisions of IWC wage orders,

7    amended other provisions, and added a series of new options for alternative workweeks."

8    Id. at 176.

9    California Labor Code § 510, which requires daily and weekly overtime, was enacted

10   as part of that Act.  It states, in part, that:

11           Eight hours of labor constitutes a day's work. Any work in excess of eight
             hours in one workday and any work in excess of 40 hours in any one
12           workweek and the first eight hours worked on the seventh day of work in
             any one workweek shall be compensated at the rate of no less than one
13           and one-half times the regular rate of pay for an employee.

14   Cal. Lab. Code § 510(a).  The requirements of the section do not apply to certain exempt

15   categories of employees.  Id.  The employer bears the burden of proving an employee is

16   exempt from overtime.  "Exemptions are narrowly construed against the employer and their

17   application is limited to those employees plainly and unmistakably within their terms."

18   Nordquist v. McGraw-Hill Broad. Co., 32 Cal. App. 4th 555, 562 (1995).  See also Reich v.

19   American Driver Serv., 33 F.3d 1153, 1157 (9th Cir. 1994) (noting that defendant was not

20   "plainly and unmistakably" within the terms of motor carrier exemption).

21   Labor Code § 515(b)(2) authorizes the IWC to retain exemptions contained in its

22   wage orders.  It states: "Except as otherwise provided in this section and in subdivision (g)

23   of Section 511, nothing in this section requires the commission to alter any exemption from

24   provisions regulating hours of work that was contained in any valid wage order in effect in

25   1997."  Labor Code § 515, therefore, does not affect the validity of the "motor carrier

26   exemption" contained in IWC wage orders, because that exemption is contained in a valid

27   wage order in effect in 1997.  See Collins, 105 Cal. App. 4th at 178.

28

1    This "motor carrier exemption" is contained in multiple IWC wage orders.

2  Specifically, the wage order governing the mercantile industry, IWC Order No. 7-1001

3  ("Wage Order 7"), § 3(K) states that provisions of the overtime section are not applicable to

4  *employees whose hours of service are regulated* by (1) the United States Department of

5  Transportation ("DOT") Code of Federal Regulations, title 49, sections 395.1 to 395.13,

6  Hours of Service of Drivers; or (2) Title 13 of the California Code of Regulations, section

7  1200, subchapter 6.5, section 1200 and following sections, regulating hours of drivers.

8  This same motor carrier exemption is also contained in section 3(K) of wage order No.

9  4-2001 ("Wage Order 4), Professional, Technical, Clerical, Mechanical, & Similar

10  Occupations, as well as in certain other wage orders not at issue here.  It is not contained

11  in Wage Orders 16 and 17.[1]

12    Safety-Kleen maintains that the hours of its CSRs are regulated by Title 13

13  California Code of Regulations ("CCR") §§ 1200 et. seq., because its CSRs, including

14  Wamboldt, drive vehicles that transport hazardous materials.  Safety-Kleen does not

15  maintain that the federal DOT regulations apply to plaintiff.

16    Section 1200 is the first section of chapter 6.5 of CCR Title 13, and provides that the

17  motor carrier safety provisions of that chapter apply to all vehicles listed in Vehicle Code

18  § 34500 and their operations.  See 13 CCR § 1200.  California Vehicle Code § 34500

19  provides that the department of the California Highway Patrol "shall regulate the safe

20  operations of" various vehicles including "any truck . . . transporting hazardous materials."

21  Hazardous material is any material "posing an unreasonable risk to health, safety, or

22  property during transportation" as set forth under 49 CFR § 172.101.  See Vehicle Code §§

23  353, 2402.7; 13 CCR § 1160.3(d).  That section includes the hazardous materials table

24  which lists a number of materials as hazardous.

25

26

27    [1]  Defendant contends that Wage Order 4 or 7 (codified at California Code of

28  Regulations, title 8, sections 11040 and 11070. ) is applicable.  Plaintiffs contend that Wage Order 16 or 17 may be applicable.

1    Drivers of vehicles covered by 13 CCR § 1200 are governed by certain regulations

2  limiting driving time.  For example, "no motor carrier shall permit or require any driver used

3  by it to drive nor shall any such driver drive" more than "twelve hours following eight

4  consecutive hours off duty" or drive after having been on duty 15 hours following 8

5  consecutive hours off duty.  See 13 CCR § 1212.5(a)(2).  In addition, 13 CCR § 1212.5(b)

6  sets forth maximum on-duty time for drivers.  A driver is defined as "[a]ny person, including

7  the owner-driver, who drives any motor vehicle subject to this chapter, and any person,

8  whether driving for compensation or not, who is under the direct control of and drives for a

9  motor carrier."  13 CCR § 1201(h).  A driver-salesperson is defined as "[a]ny employee who

10  is employed solely as such by a private carrier of property by motor vehicle, who is

11  engaged both in selling goods, services, or the use of goods, and in delivering by

12  commercial motor vehicle the goods sold or provided or upon which the services are

13  performed, who does so entirely within a radius of 100 miles of the point at which he/she

14  reports for duty, who devotes not more than 50 percent of his/her hours on duty to driving

15  time."  13 CCR § 1201(i).[2]  Safety-Kleen's motion for summary judgment is based on its

16  claim that Wamboldt is a driver, not a driver-salesperson.

17    California retained a motor carrier exemption based on the similar exemption of the

18  Fair Labor Standards Act.  See Collins, 105 Cal. App. 4th at 175 (noting that the IWC

19  orders "retained this exemption based on Federal Motor Vehicle Safety Standards and

20  added a reference to a parallel set of California regulations").

21    Under federal law, any motor carrier that engages in interstate commerce is subject

22  to the Secretary of Transportation's jurisdiction, see 49 U.S.C. § 10521, and is exempt from

23  the maximum hours provisions of the FLSA.  "Upon engaging in such interstate commerce,

24  the Secretary of Transportation may prescribe the requirements for the 'qualifications and

25

---

26    [2]  There are certain provisions specific to driver-salespersons.  The provisions of
Section 1212.5(b) do not apply to any driver-salesperson whose total driving time does not
27  exceed 40 hours in any period of seven consecutive days.  13 CCR § 1212(c).  In addition, a
driver is exempt from the requirements of Section 1213 in certain situations, including when
28  the "driver, except a driver salesperson, returns to the work reporting location and is released
from work within 12 consecutive hours."  13 CCR § 1212(e).

1    maximum hours of service of employees of, and safety of operation and equipment of, [the]

2    motor carrier. . . .' 49 U.S.C. § 3102(b)(1)."  Reich v. American Driver Serv., 33 F.3d 1153,

3    1155-1156 (9th Cir. 1994).  "Any motor carrier that engages in wholly intrastate commerce,

4    however, is subject to the Secretary of Labor's jurisdiction, and consequently, to the

5    maximum hours provisions of the FLSA."  Id.  "Although many motor carriers engage in

6    both interstate and intrastate commerce, a motor carrier cannot be subject to the

7    jurisdiction of both the Secretary of Labor and the Secretary of Transportation."  Id.

8         To determine which Secretary's jurisdiction such a motor carrier's employees are

9    subject, courts look to the Supreme Court's decision in Morris v. McComb, 332 U.S. 422,

10   92 L. Ed. 44, 68 S. Ct. 131 (1947), under which even a "minor involvement in interstate

11   commerce as a regular part of an employee's duties can subject that employee to the

12   Secretary of Transportation's jurisdiction."  "Nevertheless, an employee's minor

13   involvement in interstate commerce does not necessarily subject that employee to the

14   Secretary of Transportation's jurisdiction for an unlimited period of time, and if the

15   employee's minor involvement can be characterized as de minimis, that employee may not

16   be subject to the Secretary of Transportation's jurisdiction at all."  Id.  See also 29 CFR §

17   782.2(b)(3) ("As a general rule, if the bona fide duties of the job performed by the employee

18   are in fact such that he is . . . called upon in the ordinary course of his work to perform,

19   either regularly or from time to time, safety-affecting activities . . , he comes within the

20   exemption in all workweeks when he is employed at such job. . . .  On the other hand,

21   where the continuing duties of the employee's job have no substantial direct effect on such

22   safety of operation or where such safety-affecting activities are so trivial, casual, and

23   insignificant as to be de minimis, the exemption will not apply to him in any workweek so

24   long as there is no change in his duties. . . .").

25        A "driver," as defined for the federal Motor Carrier Act jurisdiction . . . does not

26   require that the individual be engaged in such work at all times; it is recognized that even

27   full-duty drivers devote some of their working time to activities other than such driving.

28   "Drivers," as thus officially defined, include, for example, such partial-duty drivers as the

1    following, who drive in interstate or foreign commerce as part of a job in which they are

2    required also to engage in other types of driving or nondriving work:. . . so-called

3    "driver-salesmen" who devote much of their time to selling goods rather than to activities

4    affecting such safety of operation.  29 CFR § 782.3(a).

5                    b)       Commission Reductions

6           It is "unlawful for any employer to collect or receive from an employee any part of

7    wages theretofore paid by said employer to said employee."  Cal Lab Code § 221.

8           California Code of Regulations, title 8 § 11070, subdivision 8, applicable to the

9    mercantile industry, provides that employers cannot "make any deduction from the wage or

10   require any reimbursement from an employee for any cash shortage, breakage, or loss of

11   equipment, unless it can be show that the shortage, breakage, or loss is caused by a

12   dishonest or willful act, or by the gross negligence of the employee."  This provision is also

13   included in 8 CCR § 11040.  In other words, this provision is found in both IWC Orders 4

14   and 7, but not IWC Orders 16 or 17.  See 8 CCR §§ 11160-11170.   Wages include

15   bonuses.  See also Ralphs Grocery Co. v. Superior Court, 112 Cal. App. 4th 1090, 1104

16   (2003).

17           2.       Overtime Claim

18          Preliminarily, the court must first determine which wage order applies here to

19   determine if the claimed exemption is even applicable.  Plaintiff argues that Wage Order 7

20   does not apply to Safety-Kleen's business.  To determine which order is applicable, one

21   must look at the main purpose of the business being examined.  Both parties cite to the

22   DLSE's January 2003 publication:  Which Wage Order?  Classifications, available at

23   www.dir.ca.gov/dlse/ WhichIWCOrderClassifications.PDF.  If the business is not covered

24   by any industrial order, then occupational orders must be turned to.  However, distinct

25   operations in any given business can be governed by separate wage orders if management

26   is separately organized and they are operated for different business purposes.  Id.

27          Safety-Kleen describes itself as a leading provider of cleaning and environmental

28   services.  Its mission statement is "to be the leader in providing responsible oil re-refining,

                                                    9

1   cleaning and environmental solutions."  Servicing and cleaning is a main focus of its

2   business.  See www.safety-kleen.com.  Safety-Kleen describes itself as a provider of parts

3   washers, environmental services, and industrial waste management.  See MSJ at 3:10.

4           Turning to the potentially applicable wage orders, Wage Order 4 governs

5   "Professional, Technical, Clerical, Mechanical and Similar Occupations" and includes

6   professional, semiprofessional, managerial, supervisory, laboratory, research, technical,

7   clerical, office work, and mechanical occupations, which include, but are not limited to

8   "inspectors; installers; . . . machine operators; mechanics; . . . sales persons and sales

9   agents; . . . and other related occupations listed as professional, semiprofessional,

10  technical, clerical, mechanical, and kindred occupations."  This order is an occupational

11  order, which covers mechanics and sales persons only when they are not governed by an

12  industry order.  DLSE's guide lists "hazardous material cleanup and handling" as a

13  business/occupation, noting that Wage Order 4 applies if no contractor's license is

14  required, and that Wage Order 16 applies if work is done "on construction site (contractor's

15  license required)."

16          Wage Order 7 governs the "Mercantile Industry" which means "any industry,

17  business, or establishment operated for the purpose of purchasing, selling or distributing

18  goods or commodities at wholesale or retail; or for the purpose of renting goods or

19  commodities."  This wage order may apply to Safety-Kleen, although Safety-Kleen's own

20  website states that its business is cleaning and refining waste and seems more service-

21  oriented than sales oriented.

22          Wage Order 16 governs occupations in the construction, drilling, logging, and mining

23  industries, where "construction occupations" means "all job classifications associated with

24  construction, including, but not limited to, work involving alteration, demolition, building,

25  excavation, renovation, remodeling, maintenance, improvement, and repair work by the

26  California Business and Professions Code, Division 3, Chapter 9, §§ 7025 et seq., and any

27  other similar, or related occupations or trades."  Order 16 includes hazardous material

28  cleanup only when the worker is participating in "on-site construction activities."  There are

1   no facts showing that this order is applicable, as Safety-Kleen's CSRs were not in the

2   business of on-site construction activities (and certainly had nothing to do with drilling,

3   logging, or mining).

4   　　　Finally, while Wage Order 17 covers miscellaneous employees and notes that "any

5   industry or occupation not previously covered by, and all employees not specifically

6   exempted in, the Commission's Wage Orders in effect in 1997, or otherwise exempted by

7   law, are covered by this order," the Division of Labor Standards Enforcement has not

8   identified any occupations that meet the definition of "miscellaneous employees" in

9   Industrial Welfare Commission Order 17-2001.

10   　　　Therefore, plaintiffs have not provided evidence showing that any Wage Orders

11   other than Wage Order 4 or 7 apply.  Wage Order 4 seems applicable (although as

12   defendant notes, it is not necessary for purposes of this motion to decide between Orders 4

13   and 7).  Plaintiff has offered no evidence that Wage Order 16 applies, as there is no

14   evidence of on-site construction activities or the requirement of a contractor's license.  Nor

15   has it offered evidence that Wage Order 17 applies, as that Wage Order does not identify

16   any occupations that meet its definition.  Wage Order 4 is broad and covers salespersons,

17   mechanics, and hazardous materials cleanup and handling if not done on a construction

18   site.  The court therefore finds that either Wage Order 4 or 7 applies here.  Both Wage

19   Orders contain the motor carrier exemption at issue here.

20   　　　As to whether or not the motor carrier exemption applies to Wamboldt, the court

21   finds that there are disputed material facts regarding this issue.  Regarding whether

22   Wamboldt was a "driver" under California motor carrier provisions, a driver is defined as

23   "[a]ny person, including the owner-driver, who drives any motor vehicle subject to this

24   chapter, and any person, whether driving for compensation or not, who is under the direct

25   control of and drives for a motor carrier."  13 CCR § 1201(h).  Driving includes "all time

26   spent at the driving controls of a motor vehicle in operation."  13 CCR § 1201(g).  Given this

27   broad definition of "driver," Wamboldt was a driver if he operated a vehicle covered by the

28   statute.

1    Here, Safety-Kleen only moves for summary judgment on the basis that Wamboldt

2  was a driver of a truck transporting hazardous materials.  The facts in a light most favorable

3  to plaintiff are that Wamboldt typically drove 25% of his workday.  Wamboldt Decl. ¶ 3.  He

4  typically spent the last two hours of each day at the branch doing paperwork.  Id. ¶ 13.  He

5  was not hired as a driver, but was hired as a customer service representative, and his

6  duties included sales, service, compliance inspections, driving to perform service calls,

7  packaging waste, etc.  Id. ¶ 2.

8    Safety-Kleen's motion, however, depends upon how often and to what extent

9  Wamboldt drove a truck transporting hazardous materials, which include materials

10  designated as hazardous under 49 CFR § 172.101.  See 13 CCR § 1160.3(d).  Wamboldt

11  claims that he did not transport hazardous materials on a regular basis.  He claims that he

12  never carried either AquaWorks SPRAY or DIP concentrates.  Wamboldt Decl. ¶ 9.  He

13  carried the diluted versions on only one occasion, and was told they were not hazardous.

14  Id.  The diluted solutions are listed as not being regulated by the DOT on Safety Kleen's

15  own website.  Wamboldt also claims that he rarely carried hazardous paint thinner and 105

16  parts washer solvent.  Id. ¶ 11.  He frequently carried only the aqueous non-hazardous

17  solution.  Id. ¶ 12.  As for waste he picked up from customers, he claims that the return

18  drum of non-hazardous aqueous solvent was not hazardous; nor is the dirt, oil, and grease

19  removed by the parts washing solution.  Id.

20    Safety-Kleen itself admits it uses several parts washer cleaning solvents that are not

21  hazardous.  Two exceptions are, however, AquaWorks SPRAY concentrate and

22  AquaWorks DIP concentrate.  They are both listed as hazardous materials at 49 CFR §

23  172.101.  Defendant claims that every CSR carries at least one drum and two gallons of

24  each of these solutions, respectively.  See Ross Decl.  As for shipments from the

25  customers back to the branch, Safety Kleen maintains that Wamboldt transported

26  hazardous materials from the customers back to the branch approximately 85.7% of his

27  workdays, based upon the company records.  See Ross Decl., Exs. C-E.

28

1    While Safety-Kleen claims that Wamboldt conceded to transporting hazardous

2  materials during his deposition, the court can find no such admission.  Counsel asked

3  Wamboldt to assume that the DOT regulations included the solvents he handled on a

4  regular basis, and asked whether he had any reason to dispute that.  In response,

5  Wamboldt noted he had not read every line of the DOT regulations, but he "could assume

6  that."  See Wamboldt Depo Tr. at 168.  This is not a clear admission that he transported

7  hazardous materials on a regular basis – rather, Wamboldt stated he was willing to assume

8  such for purposes of the deposition.

9    Given Wamboldt's declaration, the court finds that there are disputed facts as to

10  whether Wamboldt regularly transported hazardous waste, and summary judgment is

11  inappropriate on this claim.

12    Furthermore, as plaintiff points out, Safety-Kleen's own records seem to indicate that

13  they treated Wamboldt as a non-exempt employee.  Not only did Safety-Kleen put the

14  number of hours and the hourly rate on Wamboldt's paystub, but they paid him a flat

15  overtime lump sum of $100 for working on a Saturday.  See Williams Depo. at 217-221,

16  247.  It is unclear as to whether these facts are material.  Plaintiff has not adequately

17  explained how defendant's treatment of him figures into whether or not he legally falls

18  within an overtime exemption.  Do these facts create a defense to defendant's claim of a

19  statutory exemption?  Do these facts give rise to a non-statutory claim that defendant and

20  plaintiff had an agreement that he would be paid certain hourly or overtime rates?  If so, is

21  amendment of the complaint necessary to raise such claims?  Even though the court has

22  found that other disputed facts prevent it from granting summary judgment, the court raises

23  these issues now, as presumably, they will need to be addressed at some point in this

24  litigation.

25    Similarly, regarding the legal standard the factfinder will ultimately apply to

26  determine whether Wamboldt is covered by the exemption, and if so, whether he is entitled

27  to overtime for hours or days during which he was not driving under the exemption, the

28  parties have not provided the court with sufficient information to determine whether

1  California's motor carrier exemption should be interpreted and construed in the exact same

2  manner as the federal exemption, as Safety-Kleen urges.  Are there material differences

3  between California's motor carrier laws and the federal motor carrier laws that influence the

4  breadth or application of the motor carrier exemption?  Does the difference in the breadth

5  of the federal and California exemptions make a difference here?[3]  Does California follow

6  federal exemptions when construing its other overtime exemptions?

7       While there is significant caselaw regarding the federal motor carrier exemption, the

8  application of California's exemption is not entirely clear, as illustrated by the brief yet

9  vague interpretation in California's DLSE manual, which states that "any driver who does

10  not drive or operate a truck for any period of time during an entire workday is entitled to

11  overtime premium compensation for all overtime hours worked performing duties other than

12  driving during that day."  The manual quotes <u>Crooker v. Sexton Motors, Inc</u>., 469 F.2d 206

13  (1st Cir. 1972), which in turn states that in work weeks in which the employee performed no

14  interstate driving subject to the federal motor carrier exemption (overtime under federal law

15  is governed week-to-week as opposed to day-to-day under California regulations), he is

16  entitled to overtime and is not exempt for those weeks.  <u>See</u> 469 F.2d at 210.  <u>Crooker</u>,

17  however, quotes DOL regulations, which themselves state that if a person is "called upon in

18  the ordinary course of his work to perform, either regularly or from time to time,

19  safety-affecting activities" then "he comes within the exemption in all workweeks when he is

20  employed at such job."  This rule applies "regardless of the proportion of the employee's

21  time or of his activities which is actually devoted to such safety-affecting work in the

22  particular workweek" and applies even if he performs no work directly affecting safety of

23

---

24       [3]  For example, under Federal Law, the FLSA's overtime provisions "shall not apply with
respect to . . . any employee with respect to whom the Secretary of Transportation has *power*

25  *to establish qualifications and maximum hours of service* pursuant to the provisions of section
204 of the Motor Carrier Act."  29 U.S.C. § 213 (emphasis added).  Under California law,

26  however, California's overtime provision is "not applicable to *employees whose hours of*
*service are regulated* by (1) the United States Department of Transportation Code of Federal

27  Regulations, title 49, sections 395.1 to 395.13, Hours of Service of Drivers; or (2) Title 13 of
the California Code of Regulations, section 1200, subchapter 6.5, section 1200 and following

28  sections, regulating hours of drivers."

1   operation.  On the other hand, "where the continuing duties of the employee's job have no

2   substantial direct effect on such safety of operation or where such safety-affecting activities

3   are so trivial, casual, and insignificant as to be *de minimis*, the exemption will not apply to

4   him in any workweek so long as there is no change in his duties."  If in particular

5   workweeks other duties are assigned which affect "safety of operation of motor vehicles in

6   interstate commerce on the public highways, the exemption will be applicable to him those

7   workweeks, but not in the workweeks when he continues to perform the duties of the

8   non-safety-affecting job."  29 CFR § 782.2(b)(3).

9        In light of the caselaw, it does seem that driving 25% of the time a vehicle regulated

10  by the motor carrier regulations would have a substantial effect on motor safety and would

11  trigger the motor carrier exemption.  See, e.g., Morris v. McComb, 332 U.S. 422 (1947)

12  (where drivers were full-time drivers of motor vehicles, finding that motor carrier exemption

13  applied to drivers who only drove in interstate commerce approximately 4% of the time).

14  Wamboldt's argument that drivers must drive more than 50% of the time does not appear to

15  be supported by the statute.[4]  In fact, the DLSE manual changed Section 50.9.2.1 to omit

16  the statement that a driver must drive more than 50% of the time.  See Ramos Decl., Ex. D

17  (DLSE Manual).  However, as discussed above, there are some unanswered questions as

18  to whether California's exemption should follow the DOL regulations regarding the federal

19  exemption.  Because there is a dispute of fact as to whether and to what extent Wamboldt

20  drove hazardous materials, however, the court need not resolve these questions now.  As

21  the factual disputes are not likely to be resolved by further motion practice, the court

22  expects the parties to assist the court in determining how the legal question of whether the

23  exemption applies will be answered following a jury's determination of the factual issues.

24

25

26  _____

27      [4]  Wamboldt's argument that drivers must drive more than 50% of the time because
    driver-salespersons drive 50% or less of the time does not make sense, as "driver-
28  salespersons" appear to be a subcategory of drivers under the statute – the two are not
    mutually exclusive.

3.      Commissions Claim

There are two provisions upon which plaintiff bases his claim that Safety-Kleen illegally reduced Wamboldt's commissions when it took into account branch performance. First, Labor Code Section 221 provides that "[i]t shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee."  Second, both Wage Orders 4 and 7 provide that "[n]o employer shall make any deduction from the wage or require any reimbursement from an employee for any cash shortage, breakage, or loss of equipment, unless it can be shown that the shortage, breakage, or loss is caused by a dishonest or willful act, or by the gross negligence of the employee."  Ralphs Grocery, 112 Cal. App. 4th at 1098.

Labor Code § 221 does not prohibit deductions from wages for cash or merchandise shortages.  Incentive bonuses based on profitability do not constitute a recapture of wages prohibited by § 221.  Moreover, where exempt employees receive an incentive bonus "based on a previously disclosed profitability formula", this does not threaten "special hardship" because of unanticipated or unpredictable deductions from their wages.  Ralphs Grocery, 112 Cal. App. 4th at 1105.  The Labor Code prohibits an employer only from collecting or receiving wages that have already been earned by performance of agreed-upon requirements.  See Steinhebel v. Los Angeles Times Communications, LLC, 126 Cal. App. 4th 696, 707 (2005).

Here, the undisputed facts show that the CSRs commissions for 2004 were predicated on a number of factors, including revenue received for product sales, placements, and overall branch performance as measured against performance goals. Until these various factors were calculated, there was no commission that was "paid to the employee."  Therefore, this method of calculating commissions did not collect back wages already paid to Wamboldt.  While plaintiff argues that the deduction for branch budget performance was not made until plaintiff's individual commission was already calculated, the evidence shows that the branch performance factor was just a part of the entire formula used to calculate the commission due.  There is no evidence in the record that shows that

1   Safety-Kleen and Wamboldt had some different agreement as to how Wamboldt's

2   commissions would be structured or that they had any other "agreed upon requirements"

3   that Wamboldt would be awarded certain commissions based on his sales alone.  Nor did

4   Wamboldt's counsel represent that he needed additional discovery to obtain this type of

5   information.

6          As for the separate wage order prohibition on deductions for cash shortages, in

7   Ralphs Grocery, the employer presented "persuasive arguments, supported by substantial

8   academic literature, that profit-based compensation plans benefit both employers and

9   employees" and demonstrated that "as a matter of economics, calculation of an incentive

10  bonus based on profitability by taking into account not only revenues but also store

11  expenses in accordance with standard accounting principles differs markedly from reducing

12  (or recapturing) wages through prohibited deductions."  112 Cal. App. 4th at 1101.

13  Nonetheless, that court found that economic reality had to yield to regulations, "to the

14  extent the Legislature or, as applied to nonexempt employees, the Commission in its

15  authorized wage orders has prohibited the use of certain expenses in determining wages

16  due an employee."  Here, Safety-Kleen reduced Wamboldt's commissions when his branch

17  did not meet certain revenue goals in order to encourage cooperation among and between

18  CSRs and sales associates.  This also resulted in increased commissions on occasion.

19  However, plaintiff has not presented any evidence that his salary was reduced based on

20  any *expenses* or by cash or inventory shortages, which are prohibited deductions, as the

21  revenue figure did not take expenses into account.

22         The court in Ralphs Grocery specifically held that "[t]o the extent the bonus

23  calculation includes expense items the Legislature or the Industrial Welfare Commission

24  has declared may not be charged to an employee (deductions for any part of the cost of

25  workers' compensation claims or cash shortages for nonexempt employees), such a bonus

26  plan is unlawful.  However, other expense items, even those beyond the individual

27  manager's direct control, may lawfully be considered in profit-based bonus programs, which

28  can serve as an effective economic incentive to managerial level employees to maximize

1   company profit by increasing revenue and minimizing expenses." Id. at 1094.  There is no

2   evidence that Safety-Kleen deducted for any expenses or inventory or cash shortages

3   when calculating Wamboldt's commission.  In light of the above, summary judgment is

4   proper on plaintiff's claim that Safety-Kleen improperly reduced Wamboldt's commissions.

5   C.       Plaintiff's Motion for Class Certification

6            As for whether class certification is proper under Rule 23(a), Safety-Kleen only

7   contests the adequacy of representation.  Briefly, as to the other factors, numerosity is

8   satisfied, as the class is comprised of approximately 200 members, and courts have found

9   that the numerosity factor is satisfied if the class comprises 40 or more members and will

10  find that it has not been satisfied when the class comprises 21 or fewer.  See Consolidated

11  Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995); Ansari v. New York

12  Univ., 179 F.R.D. 112, 114 (S.D.N.Y. 1998).  The typicality requirement is also satisfied, as

13  all claims arise from the same practice of not paying CSRs overtime.  As for commonality, a

14  common nucleus of operative facts is enough to satisfy the commonality requirement of

15  Rule 23(a)(2).  Rosario v. Livaditis, 963 F.2d 1013, 1017-18 (7th Cir. 1992), cert. denied,

16  506 U.S. 1051 (1993).  This factor can be met by raising a single common issue that is

17  central to the case.  See Staton v. Boeing, 327 F.3d 938, 954-56 (9th Cir. 2003).  Here, all

18  CSRs share the same alleged harm of not being paid overtime.  Whether they are exempt

19  or non-exempt is a shared legal issue.  Even if certain facts differ somewhat for each

20  plaintiff, all plaintiffs are CSRs and generally perform the same duties.  In addition, Safety-

21  Kleen's policy is the same with regard to all proposed class plaintiffs.  Commonality,

22  therefore, is also established.

23           Finally, as to adequacy of representation, Safety-Kleen maintains that Wamboldt

24  cannot adequately represent the class with regards to injunctive relief, because he lacks

25  standing to seek such relief, and as a former employee, his only interest is in damages.  It

26  may, therefore, not be in the best interest of current employees to trade some monetary

27  relief for prospective relief, even though it may be in Wamboldt's interest to do so.

28

As a former employee, Wamboldt has standing to pursue injunctive relief on behalf of current and former employees.  California UCL provides that "[a]ny person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. . . .  Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of Section 17204 and complies with Section 382 of the Code of Civil Procedure . . . .  Cal Bus & Prof Code § 17203.  Actions for relief under Cal. Bus. & Prof. Code § 17200 may be prosecuted "by any person who has suffered injury in fact and has lost money or property as a result of such unfair competition."  Cal Bus & Prof Code § 17204.

In addition, "if the court has reason to conclude that a plaintiff has neglected or will neglect the claims for injunctive relief in his pursuit of his damage claims, it may find him an inadequate representative."  Stewart v. Winter, 669 F.2d 328, 335 (5th Cir. 1982); see also Wofford v. Safeway Stores, 78 F.R.D. 460, 490 (N.D. Cal. 1978) (noting that former employees may represent present employees); Wetzel v. Liberty Mut. Ins. Co., 508 F.2d 239, 247 (3d Cir. 1975) (noting that the former employees were "free from any possible coercive influence of [the company's] management, [the plaintiffs] are better situated than either job applicants or present employees to present an intelligent and strongly adverse case against [the company's] alleged discriminatory practices.").  There is no basis to make such a finding here.  Wamboldt has worked for Safety-Kleen twice, and previously took three years off in between his two periods of employment.  See Wamboldt Decl. ¶ 7.  It is certainly possible, even if unlikely, that he could return to Safety-Kleen.  He voluntarily asserted a claim for injunctive relief, and there is no indication that he will not vigorously pursue that claim, as he and his attorneys have done to date.  The requirements of Rule 23(a) are therefore satisfied.

Turning to Rule 23(b), plaintiff moves to certify the class under Rules 23(b)(1) and 23(b)(3).  Under Rule 23(b)(1), a class action is proper where separate lawsuits by each class member would create a risk of imposing incompatible standards of conduct on the party opposing the class through inconsistent adjudications.  FRCP 23(b)(1)(A).  The risk

1   must be that defendant would be unable to act in response to both judgments, which may

2   be the case where class members are likely to seek injunctive or declaratory relief.  <u>See</u>

3   <u>Klender v. United States</u>, 218 F.R.D. 161, 167 (E.D. Mich. 2003).  The rule includes "cases

4   where the party is obliged by law to treat the members of the class alike (a utility acting

5   toward customers; a government imposing a tax), or where the party must treat all alike as

6   a matter of practical necessity (a riparian owner using water as against downriver owners)."

7   <u>Amchem Prods. v. Windsor</u>, 521 U.S. 591, 614 (1997).

8         While Wamboldt seeks injunctive relief, it is not clear that this creates the risk of

9   inconsistent judgments.  Here, it seems that  "[i]f each class member were to proceed

10  separately, an injunction might (or might not) issue ordering Defendant to reclassify that

11  particular class member as non-exempt based on an individualized analysis of duties

12  performed" and the injunction may not affect the rights of the other employees.  <u>See</u>

13  <u>Sepulveda v. Wal-Mart Stores, Inc.</u>, 237 F.R.D. 229, 245 (C.D. Cal. 2006) (finding class

14  certification inappropriate under Rule 23(b)(1)).  Although Wamboldt seeks an injunction

15  ordering Safety-Kleen to pay overtime to all CSRs, the court has doubts as to whether a

16  global injunction would issue affecting all CSRs.[5]  However, because the court finds that

17  the requirements of Rule 23(b)(3) are satisfied, class certification is proper.

18        Under Rule 23(b)(3), common issues must predominate and the class action must

19  be the superior device.  In determining whether common issues predominate, the court first

20  identifies the substantive issues raised by the cause of action and the applicable defenses.

21  It then inquires into the proof relevant for each issue.  Predominance is determined not by

22  counting the number of common issues but by weighing their significance.  <u>See</u> Schwarzer,

23  Tashima & Wagstaffe, <u>Federal Civil Procedure Before Trial</u>  (2006) § 10:412.  In

24  determining whether the class action is superior, the court considers class members'

25  individual interests in controlling the prosecution in separate actions.

26

27         _____

28         [5]  Plaintiff has not met his burden to prove that a class action is proper under Rule
    23(b)(1)(B), as there is no evidence that the claims would exceed the amount of funds
    available.

1    Safety-Kleen's main argument in opposition to certification under 23(b)(3) relates to

2    superiority and is: (1) that plaintiffs have large claims for damages that economically may

3    be pursued individually; and (2) class members have alternative remedies that are superior

4    to a class action, like alternative administrative forums, in which they can pursue speedy

5    and informal relief.

6    The court finds, however, that the individual claims for damages are not so large that

7    they may be pursued individually in an economic manner.  Here, plaintiff's maximum

8    potential overtime entitlement is approximately $48,000, and class members with shorter

9    periods of employment would have smaller claims that would be expensive to litigate

10   individually.  The cases relied upon by Safety-Kleen are inapposite.  See Zinser v. Accufix

11   Research Inst., Inc., 253 F.3d 1180, 1191 (9th Cir. 2001) (finding certification not

12   appropriate where class action complaint specifically stated that plaintiffs each claimed in

13   excess of $50,000, not including punitive damages); Benner v. Becton Dickinson & Co.,

14   214 F.R.D. 157, 173 (S.D.N.Y. 2003) (finding certification not warranted where claimants

15   each had damage claims in excess of $75,000).

16   Regarding procedural alternatives, "courts have not hesitated to certify class actions

17   for wage and hour claims simply because California law provides for administrative relief.

18   In fact, under the California Labor Code, 'an employee may seek administrative relief by

19   filing a wage claim with the commission or, in the alternative, may seek judicial relief by

20   filing an ordinary civil action for breach of contract and/or the wages prescribed by statute.'"

21   Wang v. Chinese Daily News, Inc., 231 F.R.D. 602, 614 (C.D. Cal. 2005).  Therefore, the

22   mere availability of a DLSE administrative hearing  – especially in light of the fact that

23   Safety-Kleen previously appealed the Labor Commissioner ruling to the Superior Court –

24   does not mandate denial of certification.

25   While the availability of a DLSE administrative hearing might be entitled to more

26   weight if the manageability of the lawsuit were questionable, this class action appears

27   manageable at this juncture.  See Jiminez v. Domino's Pizza, Inc., 238 F.R.D. 241, 254

28   (C.D. Cal. 2006).  There are many common legal and factual issues here with regards to

1   the applicability of any overtime exemptions, namely the motor carrier exemption.  CSRs all

2   share the same job description and drive within a certain range of hours per day.  Safety-

3   Kleen contends that the motor carrier exemption applies to all CSRs and has not paid

4   overtime to any of them.  Even though there may very well be a factual inquiry with regards

5   to each plaintiff regarding the number of hours spent driving hazardous materials per day,

6   as plaintiff notes, these are relatively straightforward calculations, and defendant has this

7   data readily available.  Even if overtime will need to be computed on a daily basis for each

8   plaintiff, performing this calculation has not been shown to be an unmanageable task.

9   Individual issues will not predominate, and class certification is therefore proper.

10                                        **CONCLUSION**

11          Accordingly, the motion for summary judgment is GRANTED IN PART AND DENIED

12   IN PART.  Summary judgment is GRANTED as to the portions of plaintiff's two causes of

13   action based on defendant's failure to pay full commissions, but all remaining claims in

14   those two causes of action remain.  The motion for class certification is GRANTED.

15          **IT IS SO ORDERED.**

16   Dated:  August 21, 2007

17

18                                                        _____
                                                          PHYLLIS J. HAMILTON
19                                                        United States District Judge

20

21

22

23

24

25

26

27

28