SEYFARTH SHAW LLP
Robert W. Tollen (SBN 038875)
Kevin J. Lesinski (SBN 110862)
Sarah K. Hamilton (SBN 238819)
560 Mission Street, Suite 3100
San Francisco, California 94105
Telephone: (415) 397-2823
Facsimile: (415) 397-8549

Attorneys for Defendant
SAFETY-KLEEN SYSTEMS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN WAMBOLDT, on behalf of himself, those similarly situated and on behalf of the general public,<br><br>        Plaintiff,<br><br>    v.<br><br>SAFETY-KLEEN SYSTEMS, INC., a Wisconsin corporation, and DOES 1 through 100, inclusive,<br><br>        Defendant. | Case No. CV 4:07 00884 PJH<br><br>**DEFENDANT SAFETY-KLEEN SYSTEMS, INC.'S NOTICE OF MOTION AND MOTION TO DECERTIFY THE CLASS;  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: July 7, 2010<br>Time: 9:00 AM<br>Judge: Hon. Phyllis J. Hamilton |

# TABLE OF CONTENTS

Page(s)

A.   INTRODUCTION ..................................................................................................2

B.   PROCEDURAL HISTORY....................................................................................3

C.   ARGUMENT .........................................................................................................4

    1.   Decertification is Procedurally Proper.......................................................4

    2.   Class Certification Requires that Common Questions Predominate .........5

    3.   The Court Cannot Use Common Proof to Determine Applicability
        of the Exemption Based on Transportation of Hazardous Materials.......8

    4.   The Court Cannot Use Common Proof to Determine Applicability
        of the Exemption Based on Transporting Material Moving in
        Interstate Commerce ................................................................................14

    5.   The Court Cannot Use Common Proof to Determine Applicability
        of the Exemption Based on the Gross Vehicle Weight Ratings
        of the Trucks Driven by Each CSR...........................................................17

    6.   The Court Cannot Use Common Proof to Determine Whether Each
        CSR Worked Overtime Hours ..................................................................20

    7.   The Court Cannot Use Common Proof to Determine Each CSR's Damages .......20

D.   CONCLUSION....................................................................................................21

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

CASES

4

*Amchem Prods., Inc.*, 521 U.S. at 624 ..................................................................................5

5

*Bishop v. Petro-Chemical Transport, LLC,*

6
    582 F.Supp. 2d 1290 (E.D. Cal. 2008 ..........................................................................17

7

*Blackwell v. Skywest Airlines, Inc.,*
    245 F.R.D. 453 (S.D. Cal. 2007) ...........................................................................5, 20

8

*Dauphin v. Chestnut Ridge Trans.,*

9
    2009 U.S. Dist. LEXIS 74483 (S.D.N.Y. 2009 ............................................................17

10

*Dukes v. Wal-Mart, Inc.,*

11
    509 F.3d 1168 (9th Cir. 2007) .....................................................................................4

12

*Gen. Tel. Co. of Sw. v. Falcon,*
    457 U.S. 147 (1982)......................................................................................................4

13

*Goldberg v. Faber Indus., Inc.,*

14
    291 F.2d 232 (7th Cir. 1961) .......................................................................................6

15

*Hanlon v. Chrysler Corp.,*

16
    150 F.3d 1011 (9th Cir. 1998) ..................................................................................4, 5

17

*In re Hydrogen Peroxide Antitrust Litig.,*
    552 F.3d 305 (3d. Cir. 2008) .......................................................................................5

18

*In Re Wells Fargo Home Mortgage Overtime Pay Litig.,*

19
    571 F.3d 953 (9th Cir. 2009) .......................................................................................7

20

*In re Wells Fargo Home Mortgage Overtime Pay Litig.,*
    No. C 06-01770 MHP, 2010 U.S. Dist. LEXIS 3132 (N.D. Cal. Jan. 13, 2010)................5, 7

21

*Jiminez v. Domino's Pizza, Inc.,*

22
    238 F.R.D. 241 (C.D. Cal. 2006) .......................................................................5, 6, 20

23

*Marlo v. U.P.S., Inc.,*

24
    251 F.R.D. 476 (C.D. Cal. 2008) .......................................................................4, 6, 7

25

*O'Connor v. Boeing N. Am., Inc.*
    197 F.R.D. 404 (C.D. Cal. 2000) ...........................................................................4, 5

26

27

*Pablo v. Servicemaster Global Holdings, Inc.,*
    No. C 08-03894 SI, 2009 U.S. Dist. LEXIS 79584 (N.D. Cal. Aug. 17, 2009) .......................7

28

*Poulos v. Caesars World, Inc.*,
    379 F.3d 654 (9th Cir. 2004) ...............................................................................5

*Sterling v. Veliscol Chem. Corp.*,
    855 F.2d 1188 (6th Cir. 1988) .............................................................................21

*Vinole v. Countrywide Home Loans, Inc.*
    571 F.3d 935 (9th Cir. 2009) ................................................................................7

*Watkins v. Ameripride Servs.*,
    375 F.3d 821 (9th Cir. 2004) ..........................................................................14, 15

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001) ..............................................................................5

**STATUTES**

Cal. Health & Safety Code § 25250 ...............................................................................12

Title 13 of the California Code ........................................................................................2

Vehicle Code § 15210 ...........................................................................................17, 18

Vehicle Code § 12804(b)(2) .........................................................................................18

Vehicle Code § 34500 ......................................................................................8, 17, 18

**OTHER AUTHORITIES**

40 C.F.R. Section 261 ...................................................................................................11

40 C.F.R. Sections 261.31, 261.32 and 261.33 ............................................................11

49 C.F.R. Sections 171.3 and 171.8 ............................................................................11

49 C.F.R. §§ 395.1 .......................................................................................................14

40 CFR 261.31 .......................................................................................................11, 12

C.C.R. § 1200 ..........................................................................................................8, 17

C.C.R. §§ 1200 *et seq.* ................................................................................................8

C.C.R. § 66261.24.a.6 ..................................................................................................12

Code of Federal Regulations, Title 49, Sections 395.1 ..................................................2

Fed. R. Civ. Pro. 23 ..........................................................................................1, 4, 5, 7

IWC Wage Order, § 3(A) ..............................................................................................20

SEYFARTH SHAW LLP
Robert W. Tollen (SBN 038875)
Kevin J. Lesinski (SBN 110862)
Sarah K. Hamilton (SBN 238819)
560 Mission Street, Suite 3100
San Francisco, California 94105
Telephone: (415) 397-2823
Facsimile: (415) 397-8549

Attorneys for Defendant
SAFETY-KLEEN SYSTEMS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN WAMBOLDT, on behalf of himself, those similarly situated and on behalf of the general public,<br><br>        Plaintiff,<br><br>v.<br><br>SAFETY-KLEEN SYSTEMS, INC., a Wisconsin corporation, and DOES 1 through 100, inclusive,<br><br>        Defendant. | Case No. CV 4:07 00884 PJH<br><br>**DEFENDANT SAFETY-KLEEN SYSTEMS, INC.'S NOTICE OF MOTION AND MOTION TO DECERTIFY THE CLASS;  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: July 7, 2010<br>Time: 9:00 AM<br>Judge: Hon. Phyllis J. Hamilton |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on July 7, 2010, at 9:00 a.m., or as soon thereafter as counsel can be heard, in Courtroom 3, 3rd Floor of the United States District Court House, located at 1301 Clay Street, Oakland, California, Defendant Safety-Kleen Systems, Inc. ("Safety-Kleen"), will and hereby does move for an order decertifying the class pursuant to Fed. R. Civ. Pro. 23(c)(1)(C).

Safety-Kleen moves to decertify the class because the record shows that the class fails to meet the requirements of Fed. R. Civ. Pro. 23(b)(3), under which the class was previously certified.   Specifically, individual issues predominate resolution of this matter because an

1

1    individual inquiry will be needed as to each class member, in the form of both testimony and

2    documentary support for each and every class member, as to their activities each and every day.

3    Such a trial will be unmanageable and will not capture any of the benefits of the class action

4    device. Because a key factor that persuaded the Court to grant class certification in the first

5    instance (*i.e.*, predominance of common issues) is not satisfied, Safety-Kleen respectfully

6    requests that the Court enter an order decertifying the class.

7        This motion is based on this Notice, Safety-Kleen's Memorandum of Points and

8    Authorities, all pleadings and documents on file herein, and on such other and further evidence

9    as may be presented at or before the hearing on this matter.

10    **MEMORANDUM OF POINTS AND AUTHORITIES**

11    **A.**     **INTRODUCTION**

12        Plaintiff Steven Wamboldt was formerly employed as a Customer Sales Representative

13    ("CSR") for Defendant Safety-Kleen Systems, Inc. Safety-Kleen is a leading North American

14    recycling and re-refining, parts cleaning and environmental solutions company, providing

15    services to private and governmental enterprises. Plaintiff alleges that he and other CSRs were

16    misclassified as exempt from overtime under California law and, as a result, are due additional

17    compensation for overtime. Safety-Kleen contends that its California CSRs were properly

18    classified as exempt under California's exemption for employees subject to California's or the

19    federal government's motor carrier safety regulations.[1]

20        On August 21, 2007, the Court certified the case as a class action. At that time,

21    Defendant did not know what evidence it would need to present at trial. Accordingly, Defendant

22    was not in a position to oppose the certification motion, and did not oppose the motion, on the

23    grounds that individualized issues would predominate. It is now clear that individualized issues

24    will overwhelm common issues and that the class should be decertified. Two other factors,

25    discussed below, also support decertification: recent Ninth Circuit case law and this Court's

---

[1] IWC Orders, § 3: "The provisions of this section are not applicable to employees whose hours of service are regulated by: (1) The United States Department of Transportation Code of Federal Regulations, Title 49, Sections 395.1 to 395.13, Hours of Service of Drivers; or (2) Title 13 of the California Code of Regulations, subchapter 6.5, Section 1200 and following sections, regulating hours of drivers."

1    ruling on the summary judgment motion against the individual plaintiff Steven Wamboldt.

2    **B.    PROCEDURAL HISTORY**

3    On May 29, 2007, Plaintiff moved to certify.  Defendant opposed on the grounds that a

4    class action was not a superior method for adjudicating the claims.  Defendant did not oppose on

5    the grounds that common issues failed to predominate.  Simultaneously, Defendant moved

6    against the individual plaintiff, Steven Wamboldt, for summary judgment on his claim for

7    improper deductions from commissions and on his overtime claim.  The court granted summary

8    judgment against Mr. Wamboldt on his commission claim, denied summary judgment on his

9    overtime claim, and certified a class based on the overtime claim.

10   With regard to the motion for summary judgment on the overtime claim, the Court found

11   that there were disputed facts as to whether Mr. Wamboldt transported hazardous waste

12   sufficiently to be exempt from overtime under the motor carrier safety regulation exemption.  On

13   September 26, 2007, Defendant moved, with leave, for reconsideration of the order denying

14   summary judgment.  The Court's Order dated March 17, 2008, denied Defendant's motion and,

15   in doing so, articulated a day-by-day standard for applying the California motor carrier

16   exemption.  Specifically, the Court held that:

17
18   > "California has a daily overtime requirement, whereas federal law
     > provides a weekly overtime requirement.  The logical conclusion
     > to be reached vis-à-vis the California motor carrier exemption is
19   > that California more broadly awards overtime for **days** in which
     > drivers are not covered by the exemption."  (Order at p. 14, Mar.
20   > 17, 2008 (emphasis added).)

21   At trial, the Court will have to determine whether each CSR was exempt, on each

22   working day, on any one of three separate grounds: first, that the individual CSR transported

23   hazardous material (California motor carrier safety regulations); second, that the individual CSR

24   transported material that was moving in interstate commerce (federal motor carrier safety

25   regulations); and, third, that any truck driven by the individual CSR had a gross vehicle weight

26   rating of 26,001 or more pounds (California motor carrier safety regulations).  If any one of the

27   three applies on any given day, then that CSR is exempt on that day.  On that basis,

28   individualized issues will overwhelm common issues.

Defendant's Notice of Mtn. and Mtn. to  Decertify; MP&A ISO- Case No. CV 07-00884 PJH

1    In addition, since the Court's order certifying the class, the Ninth Circuit has issued

2    several rulings that more clearly address class certification in misclassification cases. Those

3    rulings too point to the inappropriateness of the class. They will be discussed below.

4    **C.    ARGUMENT**

5        **1.    Decertification is Procedurally Proper**

6        A district court order certifying a class is subject to later modification, including

7    decertification. Fed. R. Civ. P. 23(c)(1)(C); *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 160

8    (1982) ("Even after a certification order is entered, the judge remains free to modify it in the

9    light of subsequent developments in the litigation"); *see, e.g., Marlo v. U.P.S., Inc.,* 251 F.R.D.

10   476 (C.D. Cal. 2008) (decertifying class in misclassification case). In considering a motion to

11   decertify, the standard is the same as in the motion to certify, *i.e.* whether the Rule 23

12   requirements are met. *Marlo,* 251 F.R.D. at 479 (citing *O'Connor v. Boeing N. Am., Inc.* 197

13   F.R.D. 404, 410 (C.D. Cal. 2000). A district court reevaluating certification may consider its

14   previous substantive rulings in the context of the history of the case and may "consider the nature

15   and range of proof necessary to establish the [class-wide] allegations." *Id.* at 480.

16       To certify a class under Rule 23, a plaintiff must demonstrate that all elements of Rule

17   23(a), along with one of the elements of Rule 23(b), have been met. *Hanlon v. Chrysler Corp.,*

18   150 F.3d 1011, 1022 (9th Cir. 1998). Previously, the Court found that the elements of Rule 23(a)

19   were met, along with the requirements of 23(b)(3).

20       Rule 23(b)(3) requires the court to find that "questions of law or fact common to the

21   members of the class predominate over any questions affecting only individual members." Fed.

22   R. Civ. P. 23(b)(3). As noted, Defendant did not challenge Plaintiff's original motion to certify

23   on that ground. It is now apparent that common issues do not predominate and that the class

24   should be decertified. *See Dukes v. Wal-Mart, Inc.,* 509 F.3d 1168, 1176 (9th Cir. 2007)

25   (internal citations omitted) ("If later evidence disproves Plaintiffs' contentions that common

26   issues predominate, the district court can at that stage modify or decertify the class . . . .");

27   *Marlo,* 251 F.R.D. at 488 (in decertifying class, court noted that "in spite of earlier indications

28   that class treatment was feasible, the subsequent discovery, motion practice and trial preparations

1   has revealed that the requirement of predominate common issues is not satisfied."); *O'Connor*,

2   197 F.R.D. at 418 (two years after granting class certification, Court granted defendant's motion

3   to decertify where "Court believe[d] that it ha[d] a more realistic appreciation of the effect of

4   individualized questions in this proceeding").

5       **2.**    **Class Certification Requires that Common Questions Predominate**

6          For a class to be certified, it is not enough that there are common questions. They must

7   *predominate*. Fed. R. Civ. P. 23(b)(3). The predominance inquiry tests "whether [the] proposed

8   classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon*, 150 F.3d at

9   1022. The party seeking certification must establish that "common questions present a

10   significant aspect of the case and . . . can be resolved for all members of the class in a single

11   adjudication." *Id.* The Court must also conclude that such common issues *predominate* over

12   individual questions. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 624 (1997); *Poulos v.*

13   *Caesars World, Inc.*, 379 F.3d 654, 664 (9th Cir. 2004).

14          District courts must "formulate some prediction as to how specific issues will play out in

15   order to determine whether common or individual issues will predominate in a given case." *In re*

16   *Wells Fargo Home Mortgage Overtime Pay Litig.*, No. C 06-01770 MHP, 2010 U.S. Dist.

17   LEXIS 3132, at *15 (N.D. Cal. Jan. 13, 2010) (*citing In re Hydrogen Peroxide Antitrust Litig.*, 552

18   F.3d 305, 311 (3d. Cir. 2008) (citations omitted)). Where individualized inquiries are necessary to

19   determine liability, class certification is improper. *See, e.g., Jiminez v. Domino's Pizza, Inc.*, 238

20   F.R.D. 241, 251-53 (C.D. Cal. 2006) (denying certification in misclassification case where

21   exempt status turned on individualized duties performed by store managers); *see also Blackwell*

22   *v. Skywest Airlines, Inc.*, 245 F.R.D. 453, 467-70 (S.D. Cal. 2007).

23          "The important inquiry is not whether common issues predominate with respect to

24   plaintiff's prima facie case, but rather will common issues predominate in the entire litigation."

25   *Wells Fargo*, 2010 U.S. Dist. LEXIS 3132, at *26 (*citing Zinser v. Accufix Research Inst., Inc.*,

26   253 F.3d 1180, 1186 (9th Cir. 2001) ("If the main issues in a case require the separate

27   adjudication of each class member's individual claim or ***defense***, a Rule 23(b)(3) action would

28   be inappropriate") (emphasis added)).

1    Here, to determine overtime violations, the Court will have to examine the exempt status

2    of each member of the class. For each employee, this will entail examining whether that CSR is

3    exempt under any one of the grounds for applying California or federal motor carrier safety

4    regulations. That analysis will include reviewing the particular circumstances of (1) whether

5    each CSR drove hazardous material, (2) whether the CSR transported material that was moving

6    in interstate commerce, and (3) whether the CSR drove a vehicle with a gross vehicle weight

7    rating of 26,001 pounds or greater. The exemption for employees subject to California or federal

8    motor carrier safety regulations "depends upon the activities of the individual employees."

9    *Goldberg v. Faber Indus., Inc.*, 291 F.2d 232, 235 (7th Cir. 1961). Based on the Court's ruling

10   on March 17, 2008, the inquiry as to their activities will need to be made on a day-by-day basis,

11   for each and every class member.

12       The applicability, or inapplicability, of each of the three bases for the motor carrier safety

13   regulation exemption, as to each CSR, and on each day of his or her job, will result in an

14   individualized inquiry that will totally predominate over any common question. *See, e.g.,*

15   *Jiminez*, 238 F.R.D. at 252 (where "questions and issues of proof are so individualized, the Court

16   cannot say that the common question [of misclassification] presented predominates").

17       Further, in order to determine a violation in the case of each individual CSR, the court

18   will have to consider a *fourth* element. The court will have to find that, *on any given day* when a

19   CSR was *not* exempt, the CSR worked overtime that day. Regardless of the validity of the

20   exemption, there is no overtime violation on a day when a CSR worked no overtime.

21       Finally, if it is determined that an individual CSR worked overtime on a day when that

22   CSR did *not* engage in exempt activities, the court will have to determine a fifth element, i.e., the

23   *number* of overtime hours worked, in order to award back overtime pay.

24       The task before the court is such that this case is not appropriate for class treatment. *See,*

25   *e.g., Marlo.*, 251 F.R.D. at 484 ("when individualized issues or determinations become so central

26   to a case, the class action no longer advances the efficiency and economy for which it was

27   intended").

28       The question for certification in a misclassification case is not whether a single

1   classification applies to the entire class, but whether Plaintiff can show by means of common

2   proof that the classification was wrong for the entire class. *Vinole v. Countrywide Home Loans,*

3   *Inc.* 571 F.3d 935, 948 (9th Cir. 2009) (notwithstanding that the entire putative class was

4   uniformly classified as exempt, individual inquiries were necessary to determine whether the

5   exempt classification was incorrect as to each member of the putative class); *Pablo v.*

6   *Servicemaster Global Holdings, Inc.*, No. C 08-03894 SI, 2009 U.S. Dist. LEXIS 79584, at *14

7   (N.D. Cal. Aug. 17, 2009) (common issues do not predominate in a misclassification case where

8   the case requires inquiry into the time each employee spent doing certain tasks and how each

9   employee performed his/her job).  If the classification is lawful as to some of the putative class

10  members, but unlawful as to others, the determination cannot be proven on a class-wide basis

11  using representative evidence. *Marlo*, 251 F.R.D. at 484 (class action is not appropriate where

12  there is no common proof of misclassification).

13          In another recent Ninth Circuit case, *In Re Wells Fargo Home Mortgage Overtime Pay*

14  *Litig.*, 571 F.3d 953 (9th Cir. 2009), the appellate court rejected the district court's finding that

15  the predominance standard was satisfied based on a company policy of uniformly treating

16  employees in outside sales positions as exempt.  The Ninth Circuit held that predominance under

17  Rule 23(b)(3) is absent where it is necessary to undertake a "fact-intensive inquiry into each

18  potential plaintiff's employment situation." *Id.* at 959 (defendant's "uniform exemption policy

19  says little about the main concern in the predominance inquiry: the balance between individual

20  and common issues").  On remand, the district court rejected class certification, noting that the

21  recent Ninth Circuit authority "appears to foreclose any viable path for certifying this

22  [misclassification] action as a class action." *Wells Fargo*, 2010 U.S. Dist. LEXIS 3132, at *17.

23          Where a trial will "unavoidably require the court to conduct 'several hundred mini-

24  trials,'" class certification is not proper. *Wells Fargo,* 2010 U.S. Dist. LEXIS 3132, at *15;

25  *Marlo*, 251 F.R.D. at 486 (decertifying class where "[t]here [was] a significant risk that the trial

26  would become an unmanageable set of mini-trials on the particular individuals presented as

27  witnesses").

28

### 3.   The Court Cannot Use Common Proof to Determine Applicability of the Exemption Based on Transportation of Hazardous Materials

Section 3(K)(2) of the IWC's Wage Order provides that its overtime provisions are not applicable to an employee whose hours of service are regulated by the motor carrier safety regulations of the Department of the California Highway Patrol ("CHP"), 13 C.C.R. §§ 1200 *et seq.* The Department's motor carrier safety regulations apply to drivers of commercial motor vehicles engaged in transporting hazardous materials. *See* 13 C.C.R. § 1200 (providing that the motor carrier safety regulations apply to vehicles listed in Vehicle Code § 34500, which section includes "trucks transporting hazardous materials").

Safety-Kleen contends that each of its CSRs drove vehicles on a daily basis carrying hazardous materials throughout the period covered by this lawsuit, *i.e.*, from December 25, 2003, to present.[2] CSRs transport parts washer solutions and many other industrial waste products. This Court has previously held--on the record then before the Court--that an issue of fact exists as to whether Mr. Wamboldt transported any of these items. (Order at p. 13, Aug. 21, 2007; Order at p. 11, Mar. 17, 2008.) Mr. Wamboldt has denied that he transported any hazardous material on many days that he worked as a CSR for Safety-Kleen. Safety-Kleen disputes Mr. Wamboldt's contention and intends to prove at trial that Mr. Wamboldt and each of his fellow CSRs transported hazardous materials on the vast majority of days that they worked for Safety-Kleen. As described below, and in the attached Declaration of Billy R. Ross ("Ross Decl."), that will require an individualized analysis of records showing the type and quantity of materials and waste that were transported on each day by each CSR.

In order to present its defense at trial, Safety-Kleen would need to introduce into evidence the Daily Trip Reports, Bills of Lading, Uniform Hazardous Waste Manifests and related documents which identify the type and quantity of hazardous material and hazardous waste transported each day by each CSR. (Declaration of Kevin J. Lesinski ("Lesinski Decl."),

---

[2] In the related *Perez* case, the Court granted Safety-Kleen's motion for summary adjudication as to claims arising on or before December 24, 2003, due to Safety-Kleen's discharge in bankruptcy. Plaintiffs' counsel, the same in both cases, have agreed that the same cut-off will apply here and that it will not be necessary for Safety-Kleen to repeat its motion in this case. Otherwise, the cut-off would be 13 months earlier, i.e., November 17, 2002.

1   ¶ 2.)   These documents are required to be kept by Safety-Kleen as a permitted carrier of

2   hazardous waste under regulations of the United States Department of Transportation ("DOT"),

3   the United States Environmental Protection Agency ("EPA") and the State of California

4   Department of Toxic Substances Control ("Cal/EPA"). (Ross Decl., ¶¶ 3, 4, 25.)

5         On a typical day, each CSR starts his or her day by picking up parts washing fluid and

6   other chemical substances and materials at the particular Safety-Kleen branch out of which the

7   CSR works, takes those chemicals and materials to Safety-Kleen's customers and picks up waste

8   materials (much of which is hazardous waste) from the customers' places of business and, at the

9   end of the day, returns that waste material to his or her branch or to an adjacent hazardous waste

10   storage facility operated by Safety-Kleen.  (Ross Decl., ¶ 5.)  In Mr. Wamboldt's case, he started

11   his work days by picking up parts washing fluid and other chemicals, compounds and materials

12   at the Safety-Kleen branch then located in El Monte, California, near Los Angeles.  (*Id.*, ¶ 6.)

13   All chemicals and compounds (including all hazardous materials), and the quantities thereof,

14   which were on Mr. Wamboldt's truck when he left the El Monte branch each day were listed on

15   a Bill of Lading which Safety-Kleen keeps to this day.  (*Id.*, ¶ 7.) All CSRs are required to have a

16   completed Bill of Lading listing such chemicals and compounds before they leave the branch at

17   the beginning of their day.  (*Id.*)  Mr. Wamboldt then made his rounds for the day, stopping at

18   customers' places of business, dropping off parts washing fluids and other chemical substances

19   and materials, and picking up whatever waste material each customer had for him to pick up that

20   particular day.  (*Id.*, ¶ 8.)

21         In compliance with governmental hazardous waste regulations, Mr. Wamboldt, like all

22   Safety-Kleen CSRs, was required to list the exact hazardous material or hazardous waste

23   (according to DOT, EPA and Cal/EPA hazardous material and hazardous waste codes) and the

24   quantity of each, that he picked up each day at each customer's place of business on a Uniform

25   Hazardous Waste Manifest or similar document.  (Ross Decl., ¶ 9.)  Then, at the end of his day,

26   Mr. Wamboldt dropped that waste off at Safety-Kleen's El Monte branch or the adjacent

27   permitted hazardous waste storage facility operated by Safety-Kleen. (*Id.*, ¶ 10.)  Similar waste

28   storage or transfer  facilities are maintained at or adjacent to each of Safety-Kleen's branches.

1    (*Id.*) As mentioned above, Daily Trip Reports, Bills of Lading, Uniform Hazardous Waste

2    Manifests and other related documents identifying the type and quantity of hazardous material

3    and hazardous waste transported each day by each CSR, including Mr. Wamboldt, were required

4    to be kept, and have been kept, by Safety-Kleen. (*Id.*, ¶¶ 3, 4, 25, 26.)

5           Mr. Wamboldt contends that many of the materials he carried on his Safety-Kleen truck

6    were not hazardous materials. (Pl's Opp'n to Mot. Summ. J. at pp. 10-12.)  Safety-Kleen agrees

7    that certain products and materials he and the other CSRs carried were not hazardous materials,

8    but it also contends that, on the vast majority of days, Mr. Wamboldt and each CSR did in fact

9    transport hazardous materials and hazardous waste.  (Ross Decl., ¶ 11.)  The specific hazardous

10   materials and hazardous waste transported by the CSRs vary from CSR to CSR and from day to

11   day.  (*Id.*)  At the trial of this action, Safety-Kleen would present evidence describing in detail

12   the type and quantity of each hazardous material that was transported each day by each CSR.

13   (Lesinski Decl., ¶ 3.)

14         The presentation of that proof at trial would be very time-consuming and would consist

15   of an individualized analysis of what materials and waste each CSR carried on his or her truck

16   each day that they worked.  (Lesinski Decl., ¶¶ 2, 4.)  As noted above, determining whether or

17   not a CSR was transporting hazardous materials or hazardous waste on a particular day requires

18   an examination of a multitude of documents, including, e.g., Safety-Kleen's database records,

19   supporting Uniform Hazardous Waste Manifest forms, consolidated Uniform Hazardous Waste

20   Manifest forms, Bills of Lading, customer invoices and receipts and related documents, all of

21   which are still maintained by Safety-Kleen.  (Ross Decl., ¶ 12.)  To the extent that Mr.

22   Wamboldt and/or each of the other CSRs dispute that they were transporting hazardous material

23   or hazardous waste on any particular day, Safety-Kleen would need to produce such documents

24   and present proof on an individualized basis of the hazardous material and hazardous waste

25   transported each day by each CSR.  (Lesinski Decl., ¶¶ 2, 4.)

26         In order to provide an example of the process required to determine whether or not a

27   particular CSR was transporting hazardous material or hazardous waste on a particular day,

28   Safety-Kleen refers the Court to paragraphs 26 through 33 of the attached Declaration of Billy R.

1  Ross, and Exhibits A through F attached thereto. Mr. Ross provides therein a description of how

2  he determined that just one CSR--the named plaintiff, Steven Wamboldt--was transporting

3  hazardous material and hazardous waste on just one day that Mr. Ross picked randomly, i.e.,

4  March 25. 2004. The process involves a detailed review and cross-referencing of numerous

5  documents pertaining to the type of services and the type and quantity of product and waste

6  delivered to and picked up from each customer that day.

7       As Mr. Ross explains in his Declaration, under EPA, DOT, Cal/EPA and CHP

8  regulations, there are various ways in which a material can be determined to be a hazardous

9  material or a hazardous waste. (Ross Decl., ¶ 13.) The permissible methods of handling,

10 transporting, storing, treating and disposing of such material or waste, and the methods of

11 documenting the same, vary according to the type of material or waste in question and the way in

12 which it was determined to be hazardous. (*Id.*) Before Safety-Kleen will pick up any hazardous

13 waste from a customer, it requires the customer first to identify the particular type of hazardous

14 waste according to codes established under EPA, DOT, Cal/EPA or CHP regulations. (*Id.*, ¶ 14.)

15 Safety-Kleen can and does assist the customer in that process, but it is the customer's

16 responsibility to make an accurate determination and characterization of hazardous waste it

17 wishes Safety-Kleen to remove from its premises. (*Id.*)

18      For example, some waste materials are so hazardous that the EPA classifies them as

19 hazardous even if the concentration of the hazardous material in the waste is as little as one part

20 per million. (Ross Decl., ¶ 15.) These materials are called "listed" hazardous wastes because

21 they are listed by the EPA in 40 C.F.R. Sections 261.31, 261.32 and 261.33 as being hazardous

22 wastes. (*Id.*) They include waste tetrachloroethylene dry cleaning solvent, which by definition

23 carries the mandatory EPA listing for hazardous waste code F002 as required under 40 CFR

24 261.31. (*Id.*) Pursuant to DOT regulations (49 C.F.R. Sections 171.3 and 171.8), any material

25 "listed" by the EPA as a hazardous waste under 40 C.F.R. Section 261 is deemed to be a

26 hazardous material. (*Id.*, ¶ 16.) "Listed" hazardous waste is subject to the most stringent

27 regulations for the transportation, treatment and disposal of waste, as well as the documentation

28 thereof. (*Id.*)

1    If a material is not a "listed" hazardous waste, it can still be determined to be a hazardous

2    waste depending upon its characteristics. (Ross Decl., ¶ 17.) Under both EPA and Cal/EPA

3    regulations, waste can be classified as hazardous if it has the following characteristics: (1)

4    ignitable or flammable; (2) corrosive; (3) reactive (such as explosive); or (4) toxic. (*Id.*) In order

5    to determine whether or not a particular batch of waste is hazardous based upon such

6    characteristics, the customer must either: (a) subject that particular batch of waste to laboratory

7    testing to see if it fails any of the established criteria for hazardous waste; (b) rely upon periodic

8    testing of similar waste in accordance with testing programs approved by the EPA or Cal/EPA;

9    or (c) rely upon what the EPA and Cal/EPA call "generator knowledge;" i.e., if the generator of

10   the waste (i.e., the customer) knows that it has added hazardous material to the waste, it can

11   defer the time and expense of laboratory testing and go directly to a determination and labeling

12   of the material as "hazardous waste" and then assign the appropriate EPA and Cal/EPA waste

13   codes to that shipment of waste. (*Id.*, ¶ 18.)

14   In addition, certain wastes are deemed to be hazardous by the EPA or Cal/EPA but

15   reduced levels of management and documentation are required. (Ross Decl., ¶ 19.) For

16   example, spent automotive lead acid batteries and lamps and light bulbs containing mercury fall

17   into this category. (*Id.*) Both are considered to be hazardous wastes and present special dangers

18   to human health and the environment. (*Id.*) However, the EPA and Cal/EPA make certain

19   special allowances on the management of such hazardous waste, such as allowing them to be

20   transported under a Bill of Lading rather than a Hazardous Waste Manifest. (*Id.*)

21   In California, there is also a category of wastes classified as hazardous by Cal/EPA, but

22   not generally classified as hazardous by the EPA. (Ross Decl. at 20.) Two examples are used or

23   spent oil and used or spent Aqueous Parts Washer Solution waste. (*Id.*) Used oil is deemed a

24   hazardous waste under California law (Cal. Health & Safety Code § 25250). (*Id.*) Aqueous

25   Parts Washer waste is considered a hazardous waste under California law because it is toxic to

26   fish (see: Title 22 C.C.R. § 66261.24.a.6). (*Id.*) Both of these hazardous waste designations are

27   somewhat unique to the State of California. (*Id.*) However, once Cal/EPA deems a waste to be

28   hazardous, the CHP likewise deems it to be a hazardous material. (*Id.*)

1      Within this regulatory framework, the determination of whether or not a particular CSR

2   transported hazardous material or hazardous waste on a particular day will require an

3   examination of many Safety-Kleen records, including Bills of Lading, Hazardous Waste

4   Manifest forms, consolidated manifests, and the results of testing.  (Ross Decl., ¶ 21.)  To make

5   that determination as to each day that each CSR has worked during the relevant period will

6   require the separate examination of hundreds of thousands of documents and literally millions of

7   pieces of information.  (*Id.*)  And it is highly unlikely that any two days will be the same.  (*Id.*)

8   Rather, a separate analysis of each day of work by each CSR will need to be made.  (*Id.*)

9      As noted above, each CSR has a different route and services different customers.  (Ross

10  Decl., ¶ 22.)  Those routes, and the particular customers serviced on the routes, are constantly

11  changing.  (*Id.*)  At the beginning of each week, each CSR's route for the coming week is

12  established based upon orders and instructions received from Safety-Kleen's customers.  (*Id.*)

13  Then, those routes are usually changed or shuffled to maximize the CSR's productivity.  (*Id.*)

14  For example, if a CSR is told that he needs to service several customers in a particular week in a

15  particular geographical area or in a particular industry, he will attempt to set up the service calls

16  to those customers for the same day.  (*Id.*)  The mix of customers serviced by each CSR thus

17  changes on a daily basis.  (*Id.*)  While CSRs usually service from three to twelve customers a

18  day, sometimes they only service one very large customer, such as an oil refinery or MUNI, or

19  they might service or as many as fifteen customers whose individual needs are smaller.  (*Id.*)

20      The process by which Safety-Kleen will prove that Mr. Wamboldt and his fellow

21  CSRs transported hazardous material on the vast majority of days on which they worked for

22  Safety-Kleen will involve the introduction into evidence of each of the records described above

23  for each of the days worked by each CSR, plus testimony by Safety-Kleen witnesses describing

24  the nature and quantity of materials transported by the CSR on each day and the particular basis

25  upon which Safety-Kleen contends that the materials are hazardous, as well as cross-examination

26  of Mr. Wamboldt and his fellow CSRs who may claim that the materials they transported were

27  not hazardous.  (Lesinski Decl., ¶¶ 2, 3.)  This process would involve presenting to the trier of

28  fact numerous Safety-Kleen records covering, on average, several hundred days of work for each

CSR.   The presentation of the evidence for just one day of one CSR's transportation of hazardous material would likely take several hours.   (*Id.*, ¶ 4.)   Assuming there would be cross-examination of Safety-Kleen's witnesses by plaintiffs' counsel, followed by direct and cross-examination of Mr. Wamboldt and each of the 304 CSRs on the subject of whether or not they were transporting hazardous material on each of the days they worked for Safety-Kleen, if this were to proceed to trial as a class action, the trial would likely last at least six months and would consist largely of individualized issues of whether each CSR was exempt from the overtime rules on any particular day.   (*Id.*)   (See part 5 below, estimating that there are approximately 146,185 separate work days that would be the subject of examination at trial.)

Mr. Wamboldt contended that he did not transport the same materials each and every day and that the materials he transported were not, at least for some days, hazardous. (Pl's Opp'n to Mot. Summ. J. at pp. 10-12.)   Class counsel will have to make the same contention for each member of the class.   Otherwise, there would be no basis for disputing exempt status.   Resolving this issue for each of the 304 class members, on a daily basis, will entail an examination into each CSR's daily activities.   The fact that a given CSR, on a given day, did or did not transport hazardous material will not be dispositive as to any other CSR. (Lesinski Decl., ¶ 5.)   The trier of fact will be required to make a separate finding as to each CSR and as to each day of that CSR's tenure.   (*Id.*)   Individual issues will predominate and will overwhelm the trial.   (*Id.*)

**4.     The Court Cannot Use Common Proof to Determine Applicability of the Exemption Based on Transporting Material Moving in Interstate Commerce**

Section 3(K)(1) of the IWC's Wage Order provides that its overtime provisions are not applicable to an employee whose hours of service are regulated by the DOT's motor carrier safety regulations, found at 49 C.F.R. §§ 395.1 to 395.13.   DOT's motor carrier safety regulations are applicable to drivers transporting materials that are moving in interstate commerce, without regard to whether the particular driver crosses a state line.   *Watkins v. Ameripride Servs.*, 375 F.3d 821, 826 (9th Cir. 2004).   Defendant contends that each of its CSRs

transported materials that were in interstate movements.  Specifically, Defendant contends that, throughout the period of the lawsuit, from December 25, 2003 to present, each CSR picked up waste product from Safety-Kleen customers in California, which waste product was pre-routed and shipped to locations outside the state of California.

The Court declined to grant summary judgment against Mr. Wamboldt based on this defense.  The Court ruled that he had raised a dispute of material fact.  (Order at p. 19, Mar. 17, 2008.)  Citing to *Watkins*, 375 F.3d at 825, the Court noted that it must –

> [e]xamine the character of the shipments [the driver is] charged with delivering, and the intent of the shippers as to the ultimate destination of the goods…. Such a determination can only be made "after considering the entire panoply of 'facts and circumstances surrounding the transportation.'" (*Id.* at p. 17.)

The Court ruled that, as to Wamboldt alone, there was "simply too much ambiguity and lack of clarity to determine that undisputed facts disclose the portion of Wamboldt's duties that can be characterized as interstate in nature."  (Order at p. 20, Mar. 17, 2008.)  At trial, the trier of fact will be required to resolve that issue as to Mr. Wamboldt and as to each of the other 303 members of the class.

Each CSR has a different route and services different customers.  (Ross Decl., ¶ 22.) Each CSR starts his or her day by picking up parts washing fluid and other chemical substances and materials at the particular Safety-Kleen branch out of which the CSR works, takes those chemicals and materials to Safety-Kleen's customers, and picks up waste materials (much of which is hazardous) from the customers' places of business and, at the end of the day, returns that waste material to his or her branch or to an adjacent hazardous waste storage facility operated by Safety-Kleen.  (*Id.*, ¶ 5.)  As noted in part 4, above, Mr. Wamboldt, like every other CSR, was required to list the exact hazardous material or hazardous waste (according to DOT, EPA and Cal/EPA hazardous material and hazardous waste codes), and the quantity of each, that he picked up each day at each customer's place of business on a Uniform Hazardous Waste Manifest or similar document which Safety-Kleen is required to keep and has kept to this day. (*Id.*, ¶ 9.)  Also as noted in part 4, above, in Mr. Wamboldt's case, at the end of his work day, he dropped off the waste he had picked up that day at Safety-Kleen's El Monte branch or the

15

1    adjacent State of California permitted hazardous waste storage facility operated by Safety-Kleen.

2    (*Id.*, ¶ 10.)

3         Each of the hazardous waste storage or transfer facilities to which the CSRs drop off

4    waste at the end of each work day are merely transfer stations, not final destinations for the

5    waste. (Ross Decl., ¶ 23.) None of them has been permitted for being the final resting place or

6    treatment facility for such waste. (*Id.*) The final destinations are hazardous waste treatment

7    facilities or disposal facilities, most of which are located outside the State of California. (*Id.*)

8    Depending upon the type of waste, the level and concentration of hazardous material contained

9    therein, and numerous other factors, the waste is pre-routed to the appropriate waste treatment or

10   disposal facility. (*Id.*) The final destination for each type of waste is predetermined by Safety-

11   Kleen pursuant to regulations promulgated by the EPA, DOT and Cal/EPA. (*Id.*) At the time it

12   is picked up from Safety-Kleen's customer, the batch of waste generally is tagged with the waste

13   treatment or disposal facility to which it has been pre-routed. (*Id.*) The transfer stations

14   consolidate drums and other containers of waste for shipment to the different waste treatment or

15   disposal facilities. (*Id.*) However, except for parts washing waste (which is not, in any event,

16   shipped out of California), the contents of the drums and other containers are not mixed together.

17   (*Id.*) From the transfer stations, other truckers transport the consolidated shipments to their

18   ultimate destinations. (*Id.*)

19        Much of the waste is pre-routed and delivered to Safety-Kleen's recycling facility in

20   Denton, Texas or to its hazardous waste fuel blending facility in Smithfield, Kentucky. (Ross

21   Decl., ¶ 24.) Some waste (e.g., parts washing waste) is transported to facilities located in

22   California, such as the Demenno/Kerdoon hazardous waste treatment facility in Compton,

23   California. (*Id.*)

24        Pursuant to EPA, DOT and Cal/EPA regulations, Safety-Kleen is required to keep, and

25   has kept, records of the transportation of such waste to such recycling, treatment or disposal

26   facilities. (Ross Decl., ¶ 25.) As with the transport of hazardous material on each work day by

27   each CSR, the proof at trial, as to whether each CSR was exempt on any given day based upon

28   his or her transport of materials in interstate commerce, will consist of the introduction into

Defendant's Notice of Mtn. and Mtn. to  Decertify; MP&A ISO- Case No. CV 07-00884 PJH

1    evidence of voluminous daily records filled out each day by each CSR, along with the testimony

2    of Safety-Kleen witnesses concerning the type and quantity of chemical and material waste

3    picked up by each CSR each day and the ultimate destination of such materials as indicated on

4    Uniform Hazardous Material Manifests and other records kept by Safety-Kleen. (Lesinski Decl.,

5    ¶ 2.)   To the extent that plaintiff disputes that such material was transported in interstate

6    commerce by any CSR on any given day, the direct and cross-examination of each CSR will be

7    required. (*Id.*, ¶ 3.)

8          The fact that a given CSR, on a given day, did or did not transport material that was in an

9    interstate movement will not be dispositive as to any other CSR. (Lesinski Decl., ¶ 5).  The trier

10   of fact will be required to make a separate finding as to each CSR and as to each day of that

11   CSR's tenure. (*Id.*)

12         As other Courts have previously held under similar circumstances, class certification is

13   not proper. *See, e.g., Bishop v. Petro-Chemical Transport, LLC*, 582 F.Supp. 2d 1290 (E.D. Cal.

14   2008) (denying class certification where defendant demonstrated that individualized inquiry

15   would have to be made on the application of interstate commerce provisions of the Federal

16   Motor Carrier Exemption); *see also Dauphin v. Chestnut Ridge Trans.*, 2009 U.S. Dist. LEXIS

17   74483 (S.D.N.Y. 2009) (denying class certification where application of the common carrier

18   exemption would require the court to examine each driver's interstate travel).

19        **5.**    **The Court Cannot Use Common Proof to Determine Applicability of the**
20               **Exemption Based on the Gross Vehicle Weight Ratings of the Trucks Driven by Each CSR**

21         Section 3(K)(2) of the IWC's Wage Order provides that its overtime requirements are not

22   applicable to an employee whose hours of service are regulated by the motor carrier safety

23   regulations of the CHP.   13 C.C.R. §§ 1200 *et seq.*   The Department's motor carrier safety

24   regulations apply to any driver of a commercial motor vehicle with a gross vehicle weight rating

25   ("GVWR") of 26,001 or more pounds. *See* 13 C.C.R. § 1200 (regulations apply to vehicles

26   listed in Vehicle Code § 34500; subsection (k) covers a commercial motor vehicle with a GVWR

27   of 26,001 or more pounds).   A "commercial vehicle" is any vehicle that requires, *inter alia,* a

28   class B license. Cal. Veh. Code § 15210(b)(1).   A class B license is required to operate a single

1    vehicle with a gross vehicle weight rating of more than 26,001 pounds.    Cal. Veh. Code §

2    12804(b)(2).  A "gross vehicle weight rating" is "the weight specified by the manufacturer as the

3    loaded weight of a single vehicle." Cal. Veh. Code § 350(a).

4        Over the course of the period covered by this lawsuit, December 25, 2003, to present,

5    Safety-Kleen has provided various trucks for its CSRs.  (Ross Decl. at ¶ 34.)  Some have gross

6    vehicle weight ratings of 26,001 or more pounds, and some have lower ratings.    (*Id.*)    For

7    example, Mr. Wamboldt testified that at times he drove a Ford truck with a gross vehicle weight

8    rating of 33,000 pounds.    (Declaration of Attorney Robert W. Tollen ("Tollen Decl."), ¶2, Exh.

9    A (Wamboldt Dep. pp. 10:14–10:17).)    At other times, he testified, he drove an International

10   truck with a gross vehicle weight rating of 25,999 pounds. (*Id.*, ¶ 2, Exh. A (Wamboldt Dep. pp.

11   10:18–10:20)).  He also drove other vehicles at indeterminate times and of indeterminate gross

12   vehicle weight ratings.  (*Id.*, ¶ 2, Exh. A (Wamboldt Dep. pp. 7:14–10:20).)

13       A CSR will be exempt on those days when the CSR drove a vehicle with a gross vehicle

14   weight rating of 26,001 or more pounds, and the CSR will not be exempt (based on gross vehicle

15   weight ratings) on those days when the CSR drove a vehicle with a lower rating.  Safety-Kleen

16   contends that the overwhelming bulk of class members drove vehicles with gross vehicle weight

17   ratings of 26,001 or more pounds and did so on many, most, or all days of their careers with

18   Safety-Kleen, depending on the individual CSR.  On that basis, Safety-Kleen contends that the

19   overwhelming bulk of class members were exempt from overtime on many, most, or all days of

20   their careers with Safety-Kleen, depending on the individual CSR.

21       Safety-Kleen will need to present evidence at trial identifying the vehicle driven each day

22   by each CSR and the gross vehicle weight rating of that vehicle.  There are 304 CSRs in the

23   class.  Safety-Kleen will need to show the gross vehicle weight rating of the vehicle driven by

24   each one of them each working day.

25       The only way Safety-Kleen knows to identify the vehicle driven by a particular CSR is to

26   examine the Dispatch and Trip Report completed by that CSR each day.  (*See* Ross Decl, ¶ 35;

27   and Exh. G attached thereto (sample Dispatch Trip Report).)  The number of the truck is entered

28

1  in the box in the upper left-hand corner. (*Id.*) Based on that number, Safety-Kleen can identify

2  the particular vehicle driven by that CSR that day. (*Id.*) Safety-Kleen will then need to go back

3  through its fleet orders to determine the gross vehicle weight ratings designated by the vehicle

4  manufacturer of those trucks. (*Id.*)

5        There is no way to avoid examining each CSR's daily Dispatch and Trip Report. It is

6  true that trucks are usually assigned to CSRs and that they usually drive the same truck each day.

7  There is no way, however, to guarantee that a CSR will have driven the assigned truck each day.

8  As Mr. Wamboldt testified, for example, on a given day a truck could be in the shop.[5]

9        As well, Safety-Kleen continuously replaced older trucks with new trucks. (Ross Decl.

10  ¶ 36.) It is not possible to look to purchases of new vehicles and their distribution within the

11  system to determine what vehicle was driven by any particular CSR or group of CSRs. (*Id.*)

12  Safety-Kleen does not have records of when a CSR started driving a new truck. (*Id.*) The only

13  way to determine when a CSR was assigned a new truck is to look at the vehicle numbers

14  recorded each day in the upper left-hand corner of that CSR's daily Dispatch and Trip Reports.

15  (*Id.*) If the number is constant for some period and then changes and the new number remains

16  constant for some new period, it is an indication that a new vehicle was assigned to that CSR.

17  (*Id.*)

18        There are 304 members of the class, but they were not all employed at the same time. On

19  average, Safety-Kleen employed 86.5 CSR's in California at any one time. (Declaration of

20  Charles M. Williams ("Williams Decl."), ¶ 2.) Based on 5 working days per year, 52 weeks per

21  year, and roughly 6½ years (December 25, 2003, to trial date), there will be approximately

22  146,185 Daily Dispatch and Trip Reports to examine.

23        The fact that a given CSR, on a given day, did or did not drive a truck whose gross

24  vehicle weight rating was 26,001 pounds or more will not be dispositive as to any other CSR.

25  The trier of fact will be required to make a separate finding as to each CSR and as to each day of

26  that CSR's tenure.

27        Even if each CSR always drove the same vehicle over the course of his or her

28  _____
[5] (Tollen Decl., ¶ 2, Exh. A (Wamboldt, Dep. p. 8:21-9:1).)

employment, the question of whether each particular CSR drove a vehicle with a gross vehicle weight rating of 26,001 or more pounds is an individual question. (Tollen Decl., ¶ 4.) Resolving this issue for each of the 304 class members will cause individual issues to predominate over common issues and to overwhelm the trial. (*Id.*, ¶ 4.) In fact, however, CSRs did not necessarily drive the same vehicles over the course of their employments. Resolving the issue of what vehicle each CSR drove each day of the CSR's employment will geometrically compound the individualized nature of the issues. (*Id.*, ¶ 5.)

### 6. The Court Cannot Use Common Proof to Determine Whether Each CSR Worked Overtime Hours

Whether an employee is properly classified as exempt rises or falls on a daily basis. Even if a CSR is non-exempt on a particular day, however, there is no violation of the overtime law unless the CSR worked in excess of eight hours that day (or in excess of 40 hours that week). "Employment beyond eight (8) hours in any workday ... is permissible provided the employee is compensated for such overtime at not less than [appropriate premium overtime rates]." IWC Wage Order, § 3(A). This is an issue of liability, not an issue of damages. Where individualized inquiries are necessary to determine liability, class certification is improper. *See, e.g., Jimenez*, 238 F.R.D. at 251-53; *Blackwell v. Skywest Airlines, Inc.*, 245 F.R.D. 453, 467-70 (S.D. Cal. 2007). At trial, plaintiff will be required to establish, for each day on which a CSR did not engage in exempt activities, that the CSR worked *beyond* 8 hours that day. The fact that a given CSR, on a given day, did or did not work beyond eight hours on a particular day will not be dispositive as to any other CSR. The trier of fact will be required to make a separate finding as to each CSR and as to each day of that CSR's tenure on which the CSR was not exempt. Those individualized determinations will predominate over common issues.

### 7. The Court Cannot Use Common Proof to Determine Each CSR's damages

Proof of an overtime violation merely requires proof that a particular CSR worked in excess of 8 hours on a day, or in excess of 40 hours in a week, at a time when the CSR was not engaged in exempt activity. Proof of the amount of backpay, on the other hand, requires proof of the *actual number* of overtime hours the CSR worked. Such individualized determinations will

1  predominate over any common issue.  In *Sterling v. Veliscol Chem. Corp.*, 855 F.2d 1188, 1200

2  (6th Cir. 1988), the Court held:  "*[G]eneralized proofs will not suffice to prove individual*

3  *damages… . [I]ndividual particularized damages still must be proved on an individualized*

4  *basis.*" (emphasis added).  If this case were to remain certified, the trier of fact would need to

5  make *multiple individualized determinations* with regard to the amount of each class member's

6  individual damages.  The trier of fact would need to determine, for each day in which each CSR

7  was found to be non-exempt, the length of each such workday.   These individualized

8  determinations would predominate.

9  **D.      CONCLUSION**

10         For the reasons outlined above, Defendant respectfully requests that the Court enter an

11  order decertifying the class.

12

13  DATED: April 20, 2010                         SEYFARTH SHAW LLP

14                                                By _____

15                                                     Robert W. Collen
                                                     Kevin J. Lesinski
16                                                     Sarah K. Hamilton
                                                  Attorneys for Defendant
17                                                SAFETY-KLEEN SYSTEMS, INC.

18  12098181v.3

19

20

21

22

23

24

25

26

27

28

Defendant's Notice of Mtn. and Mtn. to  Decertify; MP&A ISO- Case No. CV 07-00884 PJH